**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MIGDAL INSURANCE COMPANY LTD., MIGDAL MAKEFET PENSION AND PROVIDENT FUNDS LTD., YOZMA PENSION FUND OF SELF EMPLOYED LTD., PROVIDENT FUND OF THE EMPLOYEES OF THE HEBREW UNIVERSITY OF JERUSALEM LTD., ALTSHULER SHAHAM MUTUAL FUNDS MANAGEMENT LTD., ALTSHULER SHAHAM PROVIDENT FUNDS AND PENSION LTD., and HALMAN ALDUBI PROVIDENT AND PENSION FUNDS LTD., | No. |
| | **COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| TEVA PHARMACEUTICAL INDUSTRIES LTD., TEVA PHARMACEUTICALS USA, INC., EREZ VIGODMAN, EYAL DESHEH, ALLAN OBERMAN, SIGURDUR OLAFSSON, DEBORAH GRIFFIN, YAACOV ALTMAN, YITZHAK PETERBURG, DIPANKAR BHATTACHARJEE, MICHAEL MCCLELLAN, KÅRE SCHULTZ, and MAUREEN CAVANAUGH, | April 30, 2019 |
| Defendants | |

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION .................................................................... 2

II.     JURISDICTION AND VENUE .................................................................. 8

III.    PARTIES .................................................................................................... 9

        A.      Plaintiffs ........................................................................................ 9

        B.      Defendants ................................................................................... 10

IV.     SUBSTANTIVE SECURITIES FRAUD ALLEGATIONS ................... 14

        A.      Pre-Relevant Period Allegations ................................................ 14

                1.      ADS Price Suffers; Transaction Motivation Announced ......................... 14

        B.      Teva Adopted Undisclosed Price-Hike Strategy ....................... 15

        C.      Teva Began to Implement The Price-Hike Strategy ................... 18

        D.      2014 - Relevant Period Begins; Fraudulent Attribution of Profits; ADS Price Jumps; Law Enforcement Scrutiny ........................................................................ 18

        E.      Third and Fourth Quarter 2014 – Direct Questions; Explicit Denials Of Price Hikes ................................................................................................ 23

        F.      The First Half of 2015 – Teva ADS Price Soars to Become "Currency" For "Transformational" Actavis Acquisition ......................................................... 27

        G.      The Second Half of 2015 – Motivation Shifts; Paying for Actavis ..................... 30

        H.      First Half of 2016 – Price-Hike Strategy Screeches to A Halt; Pricing Pressure Denied; Subpoenas Concealed; $20 Billion Debt Offering and Close of Actavis Deal ............................................................................................ 34

        I.      Third Quarter of 2016 – Disclosure of Declining Performance and Subpoenas; Generics Day ........................................................................ 41

        J.      Fourth Quarter 2016 – Teva Reported as Target of Investigations; Poor Results; DOJ and State AG Charges; Executives Fired .............................. 43

        K.      First Quarter 2017 – Continued Decline of Generics Revenue .......................... 46

        L.      August 3-7, 2017 – Teva Announces Massive $6.1 Billion Charge for U.S. Generics Business ........................................................................................ 48

        M.      November 2, 2017 ........................................................................ 50

        N.      February 8, 2018 ........................................................................... 51

        O.      December 9, 2018 – End of the Relevant Period ....................... 52

V.      FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................... 52

        A.      Defendants' False and Misleading Statements Concerning Teva's Operation in a Competitive Market ................................................................ 53

B.    Defendants' False and Misleading Statements Concerning Financial Reporting and Generic Drug Pricing ..................................................................... 58

C.    Defendants' False and Misleading Statements Concealing Teva's Receipt of The DOJ and State AGs' Subpoenas ........................................................... 105

D.    Defendants Violated Their Statutory Duty to Disclose Pricing Trends ............. 107

VI.    ADDITIONAL ALLEGATIONS OF SCIENTER .......................................................... 110

A.    Former Employee Allegations ........................................................................... 110

B.    The Defendants Were Motivated to Use Teva's ADS as "Currency" for a "Transformational" Acquisition .......................................................................... 112

C.    Conscious Misbehavior or Recklessness .......................................................... 114

1.    Implementation of The Price-Hike Strategy .......................................... 114

2.    Only Senior Executives Could Make Price Increases ............................ 115

3.    Continuous Access to Documents and Information Tracking Profits from Price Increases ............................................................................... 117

4.    The Defendants Spoke Repeatedly About the Pricing of Generic Drugs ........................................................................................ 118

5.    Defendants' and Analysts' Focus on Generics ...................................... 120

6.    The Magnitude, Importance and Duration of the Fraud ........................ 121

7.    Contemporaneous Red Flags Indicated That the Defendants' Statements Were False or Misleading ..................................................... 121

8.    Officer Terminations Support Scienter .................................................. 123

9.    Other Facts Supporting Scienter ........................................................... 123

D.    Corporate Scienter ............................................................................................ 124

VII.    TEVA ENGAGED IN COLLUSION, RENDERING THE STATEMENTS FALSE AND MISLEADING AND FURTHER SUPPORTING A STRONG INFERENCE OF SCIENTER ................................................................................................................ 125

VIII.    TEVA COLLUDED WITH OTHER MANUFACTURERS TO FIX PRICES ............ 126

A.    Evidence of Collusion Further Supports a Strong Inference of Scienter ........... 132

B.    The Undisclosed Fact of Teva's Collusion Constitutes an Independent Basis for Falsity .......................................................................................................... 134

IX.    LOSS CAUSATION ...................................................................................................... 134

A.    August 4-5, 2016 ............................................................................................... 135

B.    November 3, 2016, December 13-16, 2016 ........................................................ 136

C.    November 15, 2016 ............................................................................................ 138

D.    December 5-6, 2016 ........................................................................................... 139

|  |  |  |  |
|---|---|---|---|
| E. | January 6, 2017 | ........................................................ | 140 |
| F. | February 6-7, 2017 | .................................................... | 141 |
| G. | August 3-7, 2017 | ..................................................... | 142 |
| H. | November 2, 2017 | .................................................... | 144 |
| I. | February 8, 2018 | ..................................................... | 145 |
| J. | December 9-10, 2018 | ............................................... | 146 |

X.     PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET DOCTRINE .. 147

XI.    CLAIMS FOR RELIEF .................................................................. 148

COUNT I  For Violation of Section 10(b) of the 34 Act and Rule 10b-5 ..................... 148

COUNT II  For Violation of Section 20(a) of the 34 Act ............................................... 149

COUNT III  For Violation of the Israel Securities Law, 1968 ...................................... 149

COUNT IV  For Violation Of Sections 1-402(c) and 1-501(c) of the PSA .................. 153

COUNT V  For Violation of Sections 1-401 and 1-501(a)(ii) of the PSA ................... 154

COUNT VI For Fraud ................................................................................................. 156

COUNT VII For Negligent Misrepresentation .............................................................. 157

XII.   INFLATED PROFIT ANALYSIS ............................................................ 158

XIII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ..................................................................... 159

XIV.  JURY DEMAND ............................................................................... 160

XV.   PRAYER FOR RELIEF ...................................................................... 161

## GLOSSARY OF TERMS

| Term | Definition |
| --- | --- |
| Defendants | Defendants Teva Pharmaceutical Industries Ltd.; Teva Pharmaceuticals Usa, Inc.; Erez Vigodman; Eyal Desheh; Allan Oberman; Sigurdur Olafsson; Deborah Griffin; Yaacov Altman; Yitzhak Peterburg; Dipankar Bhattacharjee; Michael Mcclellan; Kåre Schultz; and Maureen Cavanaugh. References to the Defendants include only those individuals then employed by Teva at the referenced time. |
| Actavis | Allergan Generics, acquired by Teva on or around August 2, 2016 |
| ADS | Teva's American Depository Shares |
| ADS Final Prospectus | The final prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 at 5:19 p.m. ET |
| ADS Offering | The public offering of ADS completed on or about December 3, 2015 and January 6, 2016 |
| ADS/Preferred Offering Materials | The ADS/Preferred Registration Statement, along with the base and preliminary prospectuses and related prospectus supplements constituting part of the ADS/Preferred Registration Statement including the ADS Final Prospectus and Preferred Final Prospectus, and the documents incorporated by reference therein |
| ADS/Preferred Offerings | The ADS Offering and the Preferred Offering |
| ADS/Preferred Registration Statement | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015. |
| ADS/Preferred and Notes Registration Statements | The shelf registration statement on Form F-3 Teva filed with the SEC on November 30, 2015 (for the ADS/Preferred Offering), and the Post-Effective Amendment No. 1 to its shelf registration statement on the Form F-3 Teva filed with the SEC on July 13, 2016 (for the Notes Offering). |
| Anchorage | Anchorage Police & Fire Retirement System |
| ANDA | Abbreviated New Drug Application, an application submitted by a generic drug manufacturer to the U.S. Food and Drug Administration seeking approval for a drug the FDA has already approved |
| API | Active Pharmaceutical Ingredient use to make pharmaceutical products |
| Board | Teva's Board of Directors |
| Cavanaugh | Maureen Cavanaugh, Teva USA's Senior VP and Chief Operating Officer, North America Generics during the Relevant Period. |
| CAO | Chief Accounting Officer |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |

| The Class Action | The federal securities class action against Teva and certain of its current and former officers, styled:  *Ontario Teachers' Pension Plan Board, et al v. Teva Pharmaceutical Industries Ltd. et al*, No. 3:17-cv-00558 (D. Conn.) |
| --- | --- |
| COO | Chief Operating Officer |
| Relevant Period | February 6, 2014 through December 10, 2018, inclusive |
| COGS | Cost of Goods Sold |
| Desheh | Defendant Eyal Desheh, Teva's CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, when he served as Teva's Interim President and CEO |
| DOJ | U.S. Department of Justice |
| FE | Former Employees of Teva who are referenced herein and identified as FE- |
| Galownia | Kevin Galownia, Teva's VP of Pricing Operations since January 2018, and formerly Teva's Senior Director, Marketing from January 2010 to March 2014, and its Senior Director, Marketing Operations from September 2014 to December 2017 |
| GAO | U.S. Government Accountability Office |
| GAO Report | GAO audit report titled, "Generic Drugs Under Medicare" and publically released on September 12, 2016 |
| Generics Day | The September 9, 2016 investor day conference Teva hosted to discuss its generics business |
| Generics MDL | *In re Generic Pharmaceutical Pricing Antitrust Litigation*, Case No. 2:16-md-02724 (E.D. Pa.) |
| Glazer | Jeffrey Glazer, former CEO of Heritage Pharmaceuticals |
| Griffin | Defendant Deborah Griffin, Teva's SVP and CAO (Principal Accounting Officer) who also served as the Authorized U.S. Representative of Teva during the Relevant Period. She was also VP and CFO of Teva USA during the Relevant Period. |
| Heritage | Heritage Pharmaceuticals Inc. |
| Inflated Profits | The amount of profit Teva generated solely as a result of its price increases |
| LBE | The Latest Best Estimate, a document produced quarterly with the involvement of Oberman (and later Olafsson), Griffin, and Cavanaugh, one that tracked whether financial forecasts were being met, and which was delivered to Teva's Israeli executives, including Vigodman and Desheh |
| Levin | Jeremy M. Levin, Teva's CEO from May 9, 2012 to October 30, 2014 |
| Malek | Jason Malek, Former President of Heritage |
| MD&A | The Management Discussion & Analysis section of SEC Form 20-F |

| | |
|---|---|
| NADAC | National Average Drug Acquisition Cost, the non-manufacturer specific average market-wide price paid by pharmacies for a specific drug, collected via a monthly survey of pharmacists, and provided to the public by the U.S. Department of Health and Human Services' Centers for Medicare & Medicaid Services |
| NDC Code | National Drug Code, a unique three-segment product identifier for drugs required by the Food, Drug, and Cosmetic Act (21 U.S.C. § 360)). |
| Notes | Collectively certain U.S.-dollar-denominated senior notes issued by Teva in a public offering on or about July 21, 2016, namely: (a) 1.400% Senior Notes due July 20, 2018 ("2018 Notes"); (b) 1.700% Senior Notes due July 19, 2019 ("2019 Notes"); (c) 2.200% Senior Notes due July 21, 2021 ("2021 Notes"); (d) 2.800% Senior Notes due July 21, 2023 ("2023 Notes"); (e) 3.150% Senior Notes due Oct. 1, 2026 ("2026 Notes"); and (f) 4.100% Senior Notes due Oct. 1, 2046 ("2046 Notes") |
| Notes Final Prospectus | The prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on July 19, 2016 |
| Notes Offering | The public offering of the Notes completed on or about July 21, 2016 |
| Notes Offering Materials | The Notes Registration Statement, along with the base and preliminary prospectus and related prospectus supplements constituting part of Notes Registration Statement, including the Notes Final Prospectus, and the documents incorporated by inference therein |
| Notes Registration Statement | The Post-Effective Amendment No. 1 to the shelf registration statement on Form F-3 Teva filed with the SEC on July 13, 2016 |
| NYSE | New York Stock Exchange |
| Oberman | Defendant Allan Oberman, President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014 |
| Offerings | The ADS/Preferred Offerings and the Notes Offering |
| Offering Materials | The ADS/Preferred Offering Materials and the Notes Offering Materials |
| Officer Defendants | Defendants Erez Vigodman, Eyal Desheh, Allan Oberman, Sigurdur Olafsson, Deborah Griffin, and Maureen Cavanaugh. References to the Officer Defendants include only those individuals then employed by Teva at the referenced time. |
| Olafsson | Defendant Sigurdur ("Siggi") Olafsson, President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016 |
| Oracle ERP System | The internal enterprise resource planning software system on which Teva digitally stores drug-by-drug pricing, sales, and revenue data |
| Ordinary Shares | Teva's  ordinary shares of ILS 0.10 par value per share; September 30, 2018 and December 31, 2017: authorized 2,495 million shares; |
| Patel | Nisha Patel, Teva's former Director of Strategic Customer Marketing from April 2013 to August 2014 and its Director of National Accounts from September 2014 to December 2016 |

| Preferred Final Prospectus | The final prospectus supplement filed pursuant to Rule 424(b)(5) with the SEC on December 3, 2015 at 5:26 p.m. ET |
|---|---|
| Preferred Offering | The public offering of Preferred Shares completed on or about December 3, 2015 and January 6, 2016 |
| Preferred Shares | 7.00% mandatory convertible preferred shares issued to the public on or about December 3, 2015 and January 6, 2016 |
| Price-Hike Strategy | Teva's new and undisclosed corporate strategy, adopted in 2013, to systematically and broadly implement price increases across its generic drug portfolio |
| Pricing Group | A group of Teva employees, led by Galownia in the United States, whose day-to-day responsibilities included analysis of the pricing for Teva's generic drugs |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| R&D | Research and Development |
| RFP | Request for Proposal, a blind-bidding process intended to solicit a "best and final" offer where each firm that submits a response without knowing what competing firms are bidding |
| S&M | Sales and Marketing |
| SEC | Securities and Exchange Commission |
| Sherman Act | Sherman Antitrust Act |
| State AGs | The Attorneys General of 47 States, the District of Columbia, and Puerto Rico who filed a Consolidated Amended Complaint against Teva and others on June 18, 2018, in the Generics MDL |
| Teva or the Company | Defendant Teva Pharmaceutical Industries Ltd |
| Teva USA | Defendant Teva Pharmaceuticals USA, Inc. |
| TASE | The Tel Aviv Stock Exchange |
| Teva Securities | ADS, Preferred Shares, Notes, and Ordinary Shares, collectively |
| Vigodman | Defendant Erez Vigodman, Teva's President and CEO from February 11, 2014 to February 6, 2017 and one of its directors of the Board from June 22, 2009 to February 6, 2017 |
| WAC | Wholesale Acquisition Cost, the list price of a generic manufacturer's drug to a wholesaler or a direct purchaser without discounts |
| YOY | Year-Over-Year |

Plaintiffs Migdal Insurance Company Ltd. ("Migdal Insurance"), Migdal Makefet Pension and Provident Funds Ltd. ("Migdal Makefet"), Yozma Pension Fund of Self Employed Ltd. ("Yozma" and, with Migdal Makefet and Migdal Insurance, "Migdal"), Provident Fund of the Employees of the Hebrew University of Jerusalem Ltd. ("Hebrew University"), Altshuler Shaham Mutual Funds Management Ltd. ("Altshuler Mutual"), Altshuler Shaham Provident Funds and Pension Ltd. ("Altshuler Provident", and together with Altshuler Mutual "Altshuler Shaham"), and Halman Aldubi Provident and Pension Funds Ltd. ("Halman Aldubi", and together with Migdal, Hebrew University, and Altshuler Shaham "Plaintiffs"), allege in this securities action claims under Sections 10(b) and 20(a) of the Exchange Act of 1934 (the "34 Act"), the Israel Securities Law, 1968,  the Pennsylvania Securities Act of 1972 (the "PSA"), and fraud and negligent misrepresentation under the law of Pennsylvania, against Teva and certain of its current and former employees and officers.[1]

Plaintiffs allege the following based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon investigation of counsel, including, among other things: (i) review and analysis of public filings made by Teva with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by Defendants; (iii) review and analysis of news articles and conference call transcripts; (iv) review and analysis of other court filings related to Teva, including the amended complaint for violation of the federal securities laws in *Ontario Teachers' Pension Plan Board, et al v. Teva Pharmaceutical Industries Ltd. et al*, No. 3:17-cv-00558 (D. Conn.) (the "Class Action"),  and pleadings in *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, MDL No. 2724, Civil Action No. 2:16-md-02724 (E.D. Pa.); (v) review and analysis of other publicly

---

[1]     Capitalized terms not otherwise defined herein have the meaning ascribed in the Glossary of Terms attached hereto.

available information concerning Teva; and (vi) analysis of pricing in the generic drug markets in which Teva operated. The investigation of facts pertaining to this case is ongoing. Plaintiffs believe that additional evidence will support the allegations herein after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.      This action arises from misrepresentations and omissions that Defendants made to Plaintiffs concerning, *inter alia*, Teva's generic drug business—*viz.*, its drug pricing strategy, goodwill valuation, and legal compliance—during the Relevant Period (February 6, 2014 to December 10, 2018, both dates inclusive).  These misrepresentations and omissions caused the market, including Plaintiffs, to purchase Teva's securities at artificially inflated prices.  By December 10, 2018, the market came to learn that Teva had participated in one of the largest illegal cartels ever in the history of the United States, destroying billions of dollars in investor wealth.

2.      Since its formation as a local drug wholesaler in Jerusalem in 1901, Teva has grown to become the world's largest generic drug manufacturer. Teva currently produces 120 billion generic tablets and capsules per year in 87 pharmaceutical and API facilities around the world. As the Company readily acknowledges on its website "[t]he scale and breadth of [its] generics portfolio has an unprecedented impact on global healthcare."

3.      Generic drugs by definition only enter the market after a patent monopoly has expired, which removes significant pricing power from manufacturers and, over time, results in declining prices. Nevertheless, Teva was able to increase the prices of certain generic drugs by as much as 100% or more during the Relevant Period.

4.      In early 2013, Teva implemented a pricing strategy for its generic drug portfolio whereby in concert with its competitors it methodically raised prices throughout its generic drug portfolio (the "Price-Hike Strategy"). Throughout the Relevant Period, Teva's senior officers

personally oversaw at least 76 price increases for its generic drugs, which they monitored along with the daily, weekly, and quarterly profits generated along with each price increase. Over the Relevant Period, the financial impact of the strategy was staggering, totaling over $2.3 billion in profits attributable solely to the price increases (the "Inflated Profit").

5.     While Defendants loudly touted Teva's robust revenue growth, they went to great lengths to conceal the true driver of Teva's growth—the illegal Price-Hike Strategy. For example, on February 11, 2016, the Company reported that its generic drug business generated a $500 million increase in profits over the year prior. On the earnings call held that same day with investors, Teva's President and CEO Olafsson explicitly rejected the notion that Teva's astonishing earnings growth was attributable to its pricing strategy: "So how did we do this? *Not by pricing but by portfolio mix, new products, and efficiency measures. . . . [W]e and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media*."[2] In truth, Teva's Price-Hike Strategy was responsible for $155 million, or 31%, of the Company's year-over-year growth, and, overall, generated approximately $848 million in Inflated Profits for 2015.

6.     During the Relevant Period, the Price-Hike Strategy contributed as much as $236 million in Inflated Profits per quarter between the third quarter of 2013 and second quarter of 2017.

7.     Defendants' implementation of the Price-Hike Strategy and their failure to disclose the primary contributor to Teva's renewed success concealed a significant risk from the market. Namely, Defendants' omitted that Teva's generic drug pricing strategy was inherently risky and unsustainable for a variety of reasons, including that two-thirds of the increases were done in tandem with other drug manufacturers. Wholesale purchasers of generic drugs routinely set pricing through competitive RFP bidding. Consequently, every time Teva raised its prices it created an

---

[2]     Emphasis added throughout unless otherwise noted.

unmitigated risk that another competitor (one who was not a participant in its cartel) could underbid Teva, thus that Teva would lose its entire market share. Even more concerning, Teva's reliance upon illegal price gouging or collusion created a risk of public outcry and civil and criminal liability. Accordingly, Plaintiffs and other investors were led to value their Teva securities based upon the Inflated Profits which were unsustainable and likely to disappear—which they did.

8.      Defendants' motive was to inflate Teva's share price in order to effect a large acquisition that Teva otherwise could not afford. As Teva's CFO Desheh predicted in January 2014, within 12 to 24 months, Teva's "stock price will go up and we'll be able to use our share as a currency . . . to fund transactions" that could transform Teva into an even larger, more dominant force in generics. Newly-hired CEO Vigodman reportedly also wished to undertake a significant acquisition as he took the helm in February 2014, at the start of the Relevant Period.

9.      Just as Desheh predicted, within 18 months, Teva's ADS price shot up along with the increasing profits. Indeed, Teva's share price hit an all-time high of $72 on July 27, 2015, the day Teva announced it was acquiring Actavis for $40 billion. Of course, Teva did not have the cash; the price tag equaled roughly 20 years of Teva's recent average profits. As Defendants intended all along, they would use Teva's securities as "currency" and raise $27 billion from investors.

10.     At the same time as Teva was greatly expanding its generic business through its acquisition of Actavis, the generic drug industry had fallen under increased scrutiny from the public, triggering Congressional hearings, calls for drug pricing legislation, and prosecutorial investigations. Even as investors began to grow wary of the confluence of the above factors, Teva and its executives assured them there would not be a material impact on the Company. For

example, CFO Desheh commented that "there's a lot of *noise around pricing* issues. Some of it's coming from politicians. . . . *Our exposure to all these things is very minimal*."

11.    As 2016 began, other pharmaceutical companies reported disappointing earnings, which they attributed to increased pressure to reduce prices. This pricing pressure was a byproduct of heightened government scrutiny and public outcry. When asked whether Teva faced the same risks, Olafsson falsely claimed that Teva was not exposed: "Teva has not seen any fundamental change or worsening in the pricing environment." Vigodman claimed "[w]hat we see is a 4% to 5% erosion [in pricing] . . . That's not something which is different from what we said during 2015." In reality, the denied pricing pressure was eating into Teva's Inflated Profits; in the first quarter of 2016, Inflated Profits were 45% *lower* than they had been a year earlier.

12.    On June 21, 2016, Teva received a subpoena from the Antitrust Division of the DOJ seeking documents and other information relating to the marketing and pricing of certain of Teva's generic products and communications with competitors. Then on July 12, 2016, the Connecticut Attorney General, on behalf of the State AGs, also served Teva with a subpoena concerning its pricing for generic drugs. The receipt of subpoenas created significant obstacles to Teva's ability to raise prices under the strategy; Teva did not make any price hikes after that point. Though Teva had previously set a date in the fall of 2016 for a $20 billion debt offering, on July 13, 2016—the day after service of the Connecticut Attorney subpoena—Defendants announced that the debt offering was being immediately accelerated, filing the Notes Registration Statement the same day. Despite dozens of pages disclosing other investigations and legal matters, the filings were silent as to the DOJ's and State AGs' subpoena. Teva raised cash in the debt offering, and closed the deal on August 2, 2016. The next day, with Inflated Profits further declining since 2015, Teva reported disappointing earnings and disclosed receipt of the subpoenas. Though the truth was

beginning to surface, Defendants continued to deny that price increases ever occurred. On September 8, 2016, Olafsson stated that "people that say that . . . there's a big generic price inflation, are simply wrong."

13.     Reality, however, overtook the Defendants. In November 2016, *Bloomberg* reported that Teva was a target of the DOJ and State AGs' investigations and looming charges. The end of the Price-Hike Strategy brought further declines in profits. Olafsson, an architect of the strategy and the driving force of the Actavis transaction, was fired on December 5, 2016. A week later, the State AGs sued Teva for violations of the Sherman Act. In short order, CEO Vigodman was terminated in February 2017, and CFO Desheh was also out by May 2017. On August 3, 2017, the very first investor call after their terminations, Teva announced that it was required to take a $6.1 billion write-down of its entire generics business because its fundamental value had been "permanently impaired."

14.     Without the Price-Hike Strategy driving Inflated Profits, Teva's ability to service its over $30 billion in debt also raised fears; the credit-rating agencies immediately downgraded the Company's debt to just above "junk." And after 30 years of maintaining or increasing its dividend, the new Board and management of Teva were forced to cut the dividend by 75%. In reality, without the Price-Hike Strategy, Teva was a fundamentally weaker company than investors were led to believe. The share price plummeted in reaction to this news.

15.     Defendants carried out this securities fraud through four interrelated categories of misstatements and omissions, alleged particularly below. First, Defendants explicitly attributed Teva's financial performance to legitimate and benign business strategies, including cost cutting and product selection. Having attributed the source of Teva's revenues, Defendants were required to disclose the reality that Teva's performance was driven by the undisclosed Price-Hike Strategy.

Second, under Item 5 of Form 20-F, Defendants were obligated to disclose that the Price-Hike Strategy was impacting Teva's profits, first as they dramatically increased, and later as they subsequently evaporated. Third, Defendants repeatedly stated that Teva was excelling in a highly competitive environment. That was far from the truth, as Teva was only able to sustain the Inflated Profits because of a lack of competition. Whether illegal or not, this was a precarious reality, which could be—and ultimately was—undercut. Finally, in connection with the Note Offering, Defendants were required to disclose the receipt of the State AGs' and DOJ subpoenas. They did not.

16.     Additionally, Defendants colluded with other manufacturers to fix prices for a subset of at least 16 drugs, which exhibited both parallel price increases with Teva's competitors and other indicia of collusion. These allegations are corroborated by the facts identified through the State AGs' allegations that Teva engaged in a vast industry-wide price-fixing conspiracy. Additionally, the allegations herein, on information and belief, identify the Teva employee who the State AGs allege was central in the price-fixing; this employee, however, was not in a position to agree to or approve any pricing changes. Instead, Defendants Griffin, Chief Accounting Officer of Teva and CFO of Teva USA, and Cavanaugh, COO of Teva USA, made those decisions, approving all the price increases alleged herein.

17.     The full extent of Teva's years-long lies and misconduct was revealed on December 9, 2018, when Joseph Nielsen, an assistant attorney general and antitrust investigator in Connecticut who has been leading the State AGs' investigation, announced that the scope of this investigation was far larger than initially reported.  Specifically, Mr. Nielsen revealed that the investigation had expended to at least 16 companies and 300 drugs, and had exposed "the largest cartel in the history of the United States."

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5; Sections 1-402(c) and 1-501(c) of the PSA, 70 Pa. Stat. §§1-402(c) & 1-501(c); and the Israel Securities Law, 1968.

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the 34 Act (15 U.S.C. § 78aa).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the subject matter of the claims brought under the Israel Securities Law, 1968, Sections 1-402(c) and 1-501(c) of the PSA, 70 Pa. Stat. §§1-402(c) & 1-501(c), pursuant to 28 U.S.C. §1367(c); and the law of Pennsylvania

20.     Venue is proper in this District pursuant to Section 27 of the 34 Act (15 U.S.C. § 78aa).  In addition, venue is proper pursuant to 28 U.S.C. § 1391. Moreover, the Class Action is pending in this District, and courts throughout the United States have found that this District is the most appropriate forum for related actions. *See Galmi v. Teva Pharm. Indus. Ltd.*, No. 16-cv-08259 ECF No.  74 (April 3, 2017 C.D. Cal.); *Phoenix Ins. Co. Ltd. v. Teva Pharm. Indus. Ltd.*, No. 18-cv-3305, ECF No. 38  (Feb.  22,  2019 E.D.  Pa.); *Grodko v. Teva Pharm. Indus. Ltd., et al.*, No. 17-cv-3743, ECF No. 37 (E.D. Pa. April 10, 2018); *Baker v. Teva Pharm. Indus. Ltd., et al.*, No. 17-cv-3902, ECF No. 17 (E.D. Pa. Apr. 10, 2018); *Clal Insurance Company Ltd. et al., v. Teva Pharmaceutical Industries Ltd. et al*., No. 2:19-cv-00530 ECF No. 26 (E.D. Pa. April 4, 2019); *Mivtachim The Workers Social Insurance Fund Ltd. et al., v. Teva Pharmaceutical Industries Ltd. et al.*, No. 2:19-cv-00674 ECF No.  23 (E.D. Pa. April 4, 2019).

21.     In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telecommunications, and the facilities of the New York Stock Exchange ("NYSE").

## III.   PARTIES

### A.   Plaintiffs

22.     Hebrew University, is the pension fund for employees of the Hebrew University of Jerusalem, Israel's second oldest university, established in 1918. Hebrew University purchased and/or sold Teva securities on the NYSE and TASE during the Relevant Period and was damaged upon the revelation of the alleged corrective disclosures.

23.     Migdal is one of the largest life insurance and pension managers in Israel, managing nearly $60 billion in assets. Each of the Migdal entities – Migdal Insurance, Migdal Makefet, and Yozma – purchased and/or sold Teva securities on the NYSE and TASE during the Relevant Period and was damaged upon the revelation of the alleged corrective disclosures.

24.     The Altshuler Shaham entities – Altshuler Mutual and Altshuler Provident – are affiliates of the Altshuler Shaham Investment House. The Altshuler Shaham Investment House, formed in 1990, is a leading Israeli investment house that provides investment management services to its clients, which include mutual funds, pension funds, and provident funds. Altshuler Shaham purchased and/or sold Teva securities on the NYSE and TASE during the Relevant Period and was damaged upon the revelation of the alleged corrective disclosures.

25.     Halman Aldubi is an affiliate of the Halman Aldubi Investment House. The Halman Aldubi Investment House, founded in 1995, is one of the leading investment houses in Israel, managing a total of $15 billion in assets. Halman Aldubi purchased and/or sold Teva securities on the NYSE and TASE during the Relevant Period and was damaged upon the revelation of the alleged corrective disclosures.

## B.      Defendants

26.      Defendant Teva Pharmaceutical Industries Ltd., the world's largest generic drug manufacturer, is incorporated in Israel with its executive offices at 5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel. Teva ADS trade on the NYSE under the symbol "TEVA." Teva Preferred Shares and Notes are traded in the U.S. Teva's ordinary shares trade on the TASE under the symbol "TEVA."

27.      Teva has two reporting segments to its business, specialty medicines and generic medicines. During the Relevant Period, Teva's generics segment contributed approximately one half of the Company's revenues. Teva's U.S. generics business is the most important part of its generics segment, comprising approximately 50% of overall generics revenues.

28.      Defendant Teva Pharmaceuticals USA, Inc. is defendant Teva's wholly-owned subsidiary and has its principal offices at 1090 Horsham Road, North Wales, Pennsylvania, 19454. As detailed in the sworn declaration of Austin D. Kim ("Kim"), Teva USA's Vice President and Deputy General Counsel, Corporate/M&A, submitted by Teva in support of its motion to transfer two related securities fraud actions to this District, Teva's "principal United States subsidiary is Teva USA." *Galmi*, ECF No. 37-2 ¶3 (the "Kim Declaration").  Moreover, Teva's "sales, marketing, and finance executives with responsibility for U.S. generics pricing are based in Pennsylvania." *Id*., ¶4.  In addition, Teva's investor relations department and individuals responsible for drafting and preparing Teva's public filings with the SEC are based at Teva USA's Pennsylvanian offices. *Id*.  Throughout the Relevant Period, Teva listed Teva USA as its agent of service on its numerous Registration Statements filed with the SEC. Also, Teva, in its press releases, directed investors to "Teva Investor Relations at 1090 Horsham Road, North Wales PA, 19454 or by phone at (215) 591-8912" in order to receive copies of its Annual Reports and complete audited financial statements.  Lastly, "[d]ocuments relating to the subject matter of this

lawsuit—*e.g.*, materials related to Teva USA, drug pricing, and U.S. competitors—are located in Pennsylvania, or, if not there, in Israel." Kim Declaration, ¶7.

29.    Defendant Erez Vigodman served as Teva's President and CEO from February 11, 2014 to February 6, 2017 and as a Teva Director from June 22, 2009 to February 6, 2017. Vigodman signed and certified certain of Teva's alleged false and misleading reports on Forms 20-F and Forms 6-K filed with the SEC during the Relevant Period, as well as the ADS/Preferred and Notes Registration Statements. Vigodman also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein. During his tenure at Teva, Vigodman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

30.    Defendant Eyal Desheh served as Teva's Chief Financial Officer CFO from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, during which time he served as Teva's Interim CEO and Interim President. Desheh signed and certified certain of Teva's false and misleading reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as well as the ADS/Preferred and Notes Registration Statements filed with the SEC. Desheh also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.

31.    Defendant Yaacov Altman ("Altman") served as Teva's Acting CFO from October 31, 2013 to February 11, 2014. Altman signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein. Altman made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

32.     Defendant Allan Oberman served as President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014. Oberman made false and misleading statements as alleged herein. During his tenure at Teva, Oberman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

33.     Defendant Sigurdur Olafsson served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016. Olafsson made false and misleading statements on numerous conference calls with investors and analysts, as alleged herein. During his tenure at Teva, Olafsson possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

34.     Defendant Yitzhak Peterburg ("Peterburg") served as Teva's Interim President and CEO from February 6, 2017 to October 31, 2017. Prior to that date, he was Chairman of Teva's Board from January 1, 2015. He also served as a Teva director from June 2009 to July 2010 and after a brief departure he rejoined Teva's Board from 2012 until February 6, 2017. Peterburg signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein. Peterburg made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

35.     Defendant Deborah Griffin ("Griffin") serves as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), and served as the Authorized U.S. Representative of Teva during the Relevant Period. She was also VP and CFO of Teva USA during the Relevant Period. Griffin worked at Teva USA's North Wales offices. Griffin signed the ADS/Preferred and Notes Registration Statements and was an Authorized U.S. Representative for Teva. While at Teva,

Griffin possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.

36.     Defendant Dipankar Bhattacharjee ("Bhattacharjee") served as the President and CEO of Teva's Global Generic Medicines Group from December 5, 2016 to December 31, 2017. He previously served as President and CEO of Teva's Generics Europe from 2013 and 2016 and as CEO of Teva UK Ltd. and later as Senior Vice President ("SVP") of Teva's Western Europe from 2009 to 2013. Bhattacharjee made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

37.     Defendant Maureen Cavanaugh ("Cavanaugh") during the Relevant Period served as Teva USA's SVP and Chief Operating Officer, North America Generics. Cavanaugh worked at Teva USA's North Wales offices. During her tenure at Teva, Cavanaugh possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting.

38.     Defendant Kåre Schultz ("Schultz") has served as Teva's President and CEO since November 1, 2017. Schultz signed and certified certain of Teva's reports on Forms 20-F, 6-K, 8-K, and 10-K filed with the SEC during the Relevant Period, as set forth herein. Schultz made false and misleading statements as alleged herein. Since his appointment as Teva President and CEO, Schultz possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

39.     Defendant Michael McClellan ("McClellan") has served as EVP and CFO of Teva since November 2017. Prior to becoming CFO, he was Teva's SVP and Interim CFO from July

2017 to November 2017, and SVP and CFO of the Global Specialty Medicines division July 2015 to July 2017. McClellan signed and certified certain of Teva's reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period, as set forth herein. McClellan made false and misleading statements and omitted to disclose the truth during the course of numerous conferences with investors and analysts, alleged specifically herein.

40.     Defendants Vigodman, Desheh, Oberman, Olafsson, Griffin, Altman, Peterburg, Bhattacharjee, McClellan, Schultz, and Cavanaugh are referred to herein collectively as the "Officer Defendants." Teva and the Officer Defendants are referred to herein collectively as the "Defendants."

## IV.     SUBSTANTIVE SECURITIES FRAUD ALLEGATIONS

41.     The allegations detailed below are based on Plaintiffs' counsel's investigation, which included, *inter alia*, a review of Defendants' public statements, news articles, and analyst reports; analysis of pricing in the generic drug markets in which Teva operated; and review of court filings related to Teva, including the amended complaint for violation of the federal securities laws in the Class Action and the Generics MDL.

42.     In particular, Plaintiffs rely on the numerous interviews of former Teva employees cited in the Class Action amended complaint, which are identified herein by job description and responsibility, and duration of employment. Such individuals are referred to herein as the "Former Employees" or "FEs". Allegations attributed to a particular Former Employee are designated as such by reference to their "FE-__" designation or job description.

### A.     Pre-Relevant Period Allegations

#### 1.     ADS Price Suffers; Transaction Motivation Announced

43.     Before the Relevant Period, Teva's generics segment was struggling and Teva's share price had dropped from the $60s in 2010 into the $30s by 2013. Then-CEO Levin

acknowledged that the U.S. generics business had been "slowing fundamentally" for years and had announced a strategy to focus on Teva's other business segment, branded drugs. Abruptly, Levin was fired on October 30, 2013, after just 18 months as CEO, and was immediately replaced by CFO Defendant Desheh. As he stepped into the role of interim CEO, Desheh was enthusiastic about Teva's prospects, as was Chairman Peter Frost, who told analysts that his friends were buying "hundreds of millions of dollars" of Teva shares.

44.     By the beginning of 2014, Desheh's optimism became more strident as he announced Teva's motivation to make a major acquisition, predicting that within 12 to 24 months Teva's "stock price will go up and we'll be able to use our share as a currency . . . to fund transactions." As Defendant Vigodman took the helm as new CEO in February 2014, analysts reported that he also supported engaging in a significant acquisition.

### B.     Teva Adopted Undisclosed Price-Hike Strategy

45.     Defendants actively concealed, however, that by early 2013 Teva had adopted a non-public strategy to systematically increase prices across dozens of drugs in its generics drug portfolio (the "Price-Hike Strategy"). Teva's decisions to increase prices came from the top down. Using an established review and approval procedure, price increases required the Chief Accounting Officer of Teva and Teva USA CFO, Griffin, and Teva USA COO, Cavanaugh to undertake and document a careful cost-benefit analysis to determine whether to make a price increase; they would personally approve the increases. (FE-1, FE-2.) Griffin and Cavanaugh would then decide when the increases would become effective, often implementing them in batches. (FE-1, FE-2.)

46.     Members of the Pricing Group, who would have to provide detailed reviews and documentation of price reductions, were simply "told" via emails or in meetings to implement a price increase with little or no justification. (FE-3.) While the directions often came from the head

of Teva USA's Pricing Group, Kevin Galownia, he did not have the authority to make price-increase decisions himself; those decisions came from above. (FE-3, FE-1, FE-2, FE-4.) Once implemented, Teva notified its customers via a letter, and would circulate a copy to employees whose work would be impacted by the increase (*e.g*., customer service employees who would need to field consumer complaints following the hikes). (FE-2, FE-4.) The expected profits from the price increases were then incorporated into the Company-wide Oracle database (FE-2, FE-1, FE-3), to which Oberman, Olafsson (who joined Teva in July 2014), Cavanaugh, and Griffin each had access. (FE-1, FE-3.) Oracle generated daily or weekly "Scorecards" that Oberman (and later Olafsson), Griffin, and Cavanaugh would receive that reported generic drug revenues, which included the Inflated Profit, and tracked whether Teva was on schedule to meet forecasts. (FE-1, FE-2, FE-3.)

47.     The Scorecards tracked profits against financial budgets and a long-term "Work Plan" which was prepared annually and contained forecasts for the coming three to five years. As to the generics segment, Oberman (and later Olafsson), Cavanaugh, and Griffin were responsible for assembling the Work Plan, and Oberman and Olafsson were responsible for presenting it to Teva's executive committee in Israel, which included Vigodman and Desheh. (FE-2, FE-1.) During each quarter, a document called a Latest Best Estimate ("LBE") was prepared, with the involvement of Oberman (and later Olafsson), Cavanaugh, and Griffin, detailing whether forecasts were met, or whether there was a "hole" between the forecasted profits and reality. (FE-1, FE-2.) The LBE reports were sent to Teva's executive committee in Israel (FE-1, FE-2).

48.     Throughout the Relevant Period, Defendants told investors that Teva's increased profits came from ordinary business strategies, like cost cutting and new product launches. At every opportunity, in Teva's financial disclosures filed with the SEC and on conference calls, the

Defendants denied that Teva was engaged in price increases, let alone that those increases were driving profits.

49. They concealed this because the Price-Hike Strategy was inherently risky, unsustainable, and could subject Teva to government and law enforcement scrutiny, if not prosecution. Specifically, the strategy was unsustainable and risky because the U.S. generic drug market was designed to be extremely competitive; generic drugs are effectively a commodity, fully interchangeable and identical in every respect, except for price. Wholesale customers solicit pricing though a "blind" RFP bidding process. Thus, even if Teva increased its prices, the resulting profits could be short lived if other manufacturers undercut Teva's price in order to secure more market share. Moreover, generic drugs are an essential part of the lives of millions of Americans. Dramatic increases in prices foreseeably would, and in fact did, garner public criticism and Congressional action that further undercut the sustainability of the strategy. Additionally, many of Teva's price increases occurred in tandem with those of competitors. Whether illegal or not, such pricing behavior is indicative of a lack of competition, if not collusion, and could, and again did, become the subject of intense civil and criminal law enforcement investigations. Had Teva disclosed that its core business strategy was to aggressively increase prices of generic drugs, investors would have valued the Company very differently from one with a strategy driven by fundamental growth and cost cutting, as the Defendants falsely proclaimed.

50. Teva's Price-Hike Strategy was particularly well-suited for concealment. The generics industry is highly opaque; neither Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes or amounts of revenues per drug, let alone the profits from any particular drug. As explained below, to determine that the Price-Hike Strategy was actually the driver of Teva's success, the Class Action plaintiffs and their

experts undertook an econometric analysis of thousands of data points from various non-public, subscription-based data services, including multiple regression analyses, to identify and quantify Teva's very large price increases that greatly exceeded general pricing trends and inflation. The analysis then isolated the amount of profit Teva generated solely as a result of the increases. This analysis yielded the Inflated Profits measure alleged herein.

**C.     Teva Began to Implement The Price-Hike Strategy**

51.     On July 3, 2013 and August 9, 2013, the Defendants began to implement the Price-Hike Strategy by raising the prices of 18 drugs. Fifteen of the increases were implemented together with Teva's competitors who also implemented price increases on the same drugs. The increases were as high as 812% of the original price. *See* Appendix A.

52.     In just the last two quarters of 2013, these price increases generated as much as $250 million in Inflated Profits. The profit from the increases fell directly to Teva's bottom line because they required no additional R&D or S&M expenses. These 2013 price-hiked drugs would contribute as much as $875 million in Inflated Profits to Teva's bottom line by the end of the Relevant Period.

53.     From the Scorecards, LBE reports, and Work Plan, executives closely tracked the impact of the Inflated Profits. This reporting structure ensured that "everyone would have known" if there were significant price increases that generated large profits. (FE-2.)

**D.     2014 - Relevant Period Begins; Fraudulent Attribution of Profits; ADS Price Jumps; Law Enforcement Scrutiny**

54.     Entering 2014, price increases by generic drug companies had caused public concern. For example, on January 8, 2014, the National Community Pharmacists Association, based on a proprietary survey of its members, wrote to Congress stating that "[o]ver the last six months . . . many of our members across the U.S. [] have seen huge upswings in generic drug

prices," and requested an investigation. As the fact of large price increases on certain drugs trickled out to the public, the Defendants made increasingly misleading statements to cover their tracks and falsely disassociate themselves from price increases by attributing profit to other sources.

55.     The Relevant Period begins on February 6, 2014, the date Teva announced its fourth quarter 2013 and full year 2013 financial results in a press release. Those results improved as compared to performance prior to the Price-Hike Strategy. The financial disclosures, however, made no mention of the fact that this newfound success was driven by Inflated Profits.

56.     Specifically, Teva's financial disclosures touted a 14% increase in U.S. generics revenue for the fourth quarter, attributing it to "higher sales" volume, reduced expenses, and "exclusive launches" of new generic drugs. While the attributed reasons for improvement may have had some minor influence on the profits, all of the YOY improvement was driven by the Inflated Profit from price increases. The omission of this fact when listing the causes for the YOY profit growth was misleading. This pattern would repeat throughout the Relevant Period.

57.     During the February 6, 2014 earnings call, Desheh announced that Teva would increase its quarterly dividend by 5%, that the "U.S. generic business is highly profitable," and that "[w]e had a pretty good even *excellent second half* [of 2013] in the United States [generic] business." Oberman, CEO of U.S. generics followed and explained that "at the gross profit levels that [Desheh] was talking about, [the U.S. generics business] is a *very valuable business to Teva*, and we see it continuing to be on a go-forward basis." This presented a stark contrast from Levin's assessment just months earlier that the generics business was "slowing fundamentally."

58.     The improved financial results were well received by investors and analysts. On February 6, 2014, a BMO Capital Markets analyst wrote that generic sales "came in above ... our expectations and consensus"; "we think 4Q results are a high-quality beat with revenue and EPS

coupled with an improvement in margins year over year. . . . Teva shares should be bolstered by today's positive earnings announcement."

59.     The encouraging news triggered the beginning of a long and steep increase in Teva's ADS price that would last throughout 2014 and 2015.[3] By early March 2014, the ADS had risen from the $30s to trade at $48. The increased price of the ADS was critical to achieving the Defendants' stated motivation to use the ADS as "currency" to make a major acquisition. Desheh, on a March 4 investor conference call, explained that with "the stock price under $40 . . . we can't use [Teva Securities as] currency," but that, with "change[s] over the past few months," Teva was extracting "itself [from] . . . a corner that was difficult to come out of," bringing Teva closer to a large acquisition.

60.     What investors and analysts did not, and could not, know was that Desheh, Oberman, and the Company's SEC filings had concealed the Price-Hike Strategy, and that, in the fourth quarter of 2013, the 18 price increases made pursuant to the strategy generated *the entirety* of Teva's YOY gain in U.S. generics revenue.

---

[3]        Figure 1:



61.     First Quarter 2014 Results; Analysts Take Note: By the beginning of April 2014, Teva's ADS price had increased to $54.06, or 19%, since the Relevant Period began. As a National Alliance Securities analyst concluded, Teva's ADS had "the Best YTD" 2014 performance relative to its peers, a stark contrast to how Teva had "dramatically underperformed in 2013."

62.     The series of positive financial disclosures, fueled by undisclosed Inflated Profit from the concealed Price-Hike Strategy, continued. On May 1, 2014, Teva reported surprisingly positive results driven by its generics segment, which reported a YOY increase of $117 million from Q1 2013 profits. The Defendants falsely explained that lower expenses, a changed composition of revenues, and "new product launches" were the cause of the increase in profits. In reality, the Price-Hike Strategy had generated $120 million that quarter.

63.     The 2014 Work Plan, which was being reviewed by the executive committee in August 2013, would have included the expected profits from the July and August 2013 price increases. Cavanaugh, Griffin, and Oberman were each provided on a daily or weekly basis with Scorecards that tracked whether Teva's actual results met or exceeded the Work Plan forecasts. Vigodman and Desheh similarly were provided documents reflecting the impact of the Inflated Profits as they compared actual revenues versus the Work Plan through the LBE reports disseminated throughout the quarter.

64.     Analysts reacted positively to Teva's surprising and rapid turnaround. Cowen and Company analysts wrote, "The bottom line is that this story is reversing (for the positive) much faster than previously anticipated, and the belief that 'growth' could reemerge is very real." J.P. Morgan predicted an "upside to near/longer term EPS" because of Teva "taking several steps to regain its generic leadership including . . . focusing more heavily on portfolio selection and

management." Jefferies analysts noted that Vigodman "Impresses in His Wall Street Debut" due to his determination to reestablish "Teva's dominance in its core generic business."

65.     Second Quarter 2014 Results, Further Price Increases, and Law Enforcement Scrutiny: In April 2014, Teva increased the prices of another 12 generic drugs pursuant to the Price-Hike Strategy; eight of the increases were carried out together with Teva's competitors. Following the established process for implementing price increases, Cavanaugh and Griffin would have approved these price increases, and would have tracked the Inflated Profits generated through the Scorecards. By the end of the second quarter, these new price hikes alone would generate as much as $50 million in Inflated Profit; and as much as $395 million by the end of the Relevant Period.

66.     On July 1, 2014, Olafsson was hired from Actavis as President and CEO of Teva's Global Generic Medicines Group.

67.     By the summer of 2014, public attention to generic pricing had increased. On July 8, 2014, *The New York Times* published an article titled, "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," highlighting that the price of digoxin, a decades-old drug that Teva did not produce, had nearly doubled since late 2013. Within days, and as a result of this article, the Connecticut Attorney General ("AG") began a non-public investigation into the companies that manufactured digoxin. The Connecticut AG issued subpoenas to Teva's competitors Impax (on July 14, 2014), and Lannett (on July 15, 2014); each company disclosed its subpoena in an SEC filing the very next day.

68.     In this context, on July 31, 2014, Teva announced its Q2 2014 financial results, once again boasting an excellent outcome from its generics division. Profitability of the generic segment increased by $156 million from 2013, again attributed to legitimate business strategies.

During the earnings call, Desheh stressed that Teva's "improvement in sales this quarter was driven by the growth of our global generic business, primarily in the U.S."

69.     Analysts echoed Defendants' explanations. Jefferies analysts observed: "we continue to see signs of recovery for Teva's US generic business, which posted a strong 10% Y/Y gain," "Solid Q2." Piper Jaffray increased its price target for Teva from $48 to $55 because of "meaningful growth drivers for . . . [the] generics businesses," and the "[s]teady performance for U.S. generics."

70.     In truth, the Price-Hike Strategy had generated as much as $160 million in Inflated Profit, accounting for *all* of the YOY increase in profit reported for Teva's global generics division.

E.     **Third and Fourth Quarter 2014 – Direct Questions; Explicit Denials Of Price Hikes**

71.     Teva continued to report increasingly positive results driven by its U.S. generics business, even as scrutiny of certain price increases in the industry continued. The State AGs served Par Pharmaceuticals with a subpoena on August 6, 2014, which Par disclosed on August 11, 2014. Then, on October 2, 2014, Congress sent letters to Teva and 16 of its peers. One such letter, addressed personally to Vigodman, sought information on "the underlying causes of recent increases in the price of [Teva's] drugs." Vigodman never responded. Any truthful answer would have required him to reveal the Price-Hike Strategy.

72.     Griffin and Cavanaugh implemented another 20 price increases on July 1 and August 28, 2014, pursuant to the Price-Hike Strategy (Appendix A), 12 of which Teva made together with other manufacturers. The increases would have been recorded in the Oracle database, and reflected in the daily Scorecards and LBE reports. These 12 price increases would generate as much as $50 million in Inflated Profit.

23

73.     Significantly, the expected Inflated Profits from the July and August 2014 price hikes, along with all the earlier increases, would have made their way into the Oracle database and been reflected in the report to the Officer Defendants. The price hikes implemented through August 2014 generated as much as $193 million in Inflated Profits in the third quarter of 2014.

74.     <u>Third Quarter 2014 Results:</u> On October 30, 2014, Teva released positive third quarter results, driven by an increase in generic segments profits of $160 million, or 40%, as compared to the third quarter of 2013. As was routine by this point, the Defendants fraudulently attributed this increase to a reduction in expenses.

75.     With Congressional hearings looming, on the October 30, Q3 2014 earnings call, a UBS analyst asked Vigodman: "could you talk about Generics a little bit in the U.S.? . . . ***whether there were price increases in some of your base business and whether that impacted***" profit. Vigodman fraudulently explained that the market was functioning normally and that prices were decreasing:

> When there's an opportunity, ***when there is a shortage in the market***, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business.

76.     Increases in prices due to shortages is a normal market dynamic. Thus, Vigodman's statement misled investors as to the fact that Teva had, by this time, implemented the strategy by effectuating price increases on 46 drugs since July 2013 (some more than once), while not one of these 46 drugs were subject to shortages or other reported market anomalies. In total, the systematic Price-Hike Strategy had yielded as much as $193 million in Inflated Profits in the third quarter of 2014. The profits from all of these price increases would have been reflected in the Work Plan and LBEs that Vigodman and Desheh received.

77.     Unaware of the true facts, analysts reacted positively to Teva's financial results, and Teva's ADS price continued to climb. A Cowen and Company analyst noted, Teva's "Operations Are Improving, Cash Flows Are Accelerating." Piper Jaffray wrote, "***Importantly, operating profit . . . for the generics segment during the quarter was up 40% versus the same period a year ago.***" Morgan Stanley increased its price target for Teva from $57 to $61, stating, "We are encouraged by progress that Teva is making on global generics under Siggi Olafsson."

78.     December 11, 2014 Guidance Call By November 2014, the DOJ initiated its own investigation into generic drug pricing and impaneled a grand jury in Philadelphia, Pennsylvania. The grand jury began issuing subpoenas to generic drug makers, the first on November 3, 2014 to Lannett and Impax relating to a drug Teva did not make. The companies disclosed these subpoenas days later in SEC filings, on November 6 and 7, respectively.

79.     On November 20, 2014, the Senate Subcommittee on Primary Health and Aging held a hearing to explore "if there was a rational economic reason as to why patients saw [] huge price increases [in generic drugs] or whether it was simply a question of greed of companies who were able to raise prices to whatever level they wanted." Teva was invited, but refused to testify.

80.     It was against this backdrop that, on December 11, 2014, the Company held a guidance call with analysts. On the call, a Morgan Stanley analyst honed in on the issue of risky price increases, asking: for "generic manufacturers, ***I'm assuming that wholesalers have been seeing extraordinary price increases in recent years*** and has been buying inventory ahead of tremendous price increases. . . . Are you able to control it?"

81.     In response, Olafsson flatly denied that prices had increased at all: "So first ***let me correct***. ***I have to disagree that they have experienced tremendous price increase***." Olafsson

dismissed the matter further: "There has been a lot of press about price increases on individual molecules and this has been *a hot political issue selecting a few products*."

82.     These statements were flatly belied by the facts, to which Olafsson had direct access. Teva by then had implemented 50 price increases on 46 drugs, each from 50% to as much as 1,500%; each increase was part of a concealed internal strategy and implemented pursuant to Teva's established internal practices.

83.     <u>Year-End 2014 Results:</u> On February 5, 2015, Teva filed its fourth quarter and full year 2014 financial results with the SEC, once again announcing positive results driven by the generics segment. Fourth quarter 2014 profit for the generic segment increased $47 million, or 9%, as compared to Q4 2013. For the full year 2014, profit from the generic segment increased $480 million from 2013.

84.     Though the Defendants attributed success to cost savings and other benign factors, in Q4 2014 alone, Teva made as much as $219 million in Inflated Profits, or *four times* the fourth quarter increase in profits the Defendants boasted; Teva made Inflated Profits of nearly $700 million for the full year 2014, or 144% of the reported YOY increase in generic profit for the whole Company. All of these results would have been reflected internally in the Work Plan, the Scorecards, and the LBE reports distributed to the Defendants.

85.     The following table reflects Teva's overall Inflated Profits for 2014:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $120 | $160 | $193 | $219 | $693 |

86.     Without mention of the Price-Hike Strategy, Desheh bragged about the profits from Teva's generic division. On the February 5, 2015 earnings call, he claimed "the most notable contribution" to Teva's growth and profits "was generated by our Generic business, improving

profitability by more than 500 basis points," contributing "nearly $500 million" and comprising 31% of the Company's total profit. Unaware that the profits came from the Price-Hike Strategy, analysts focused on this success. Piper Jaffray wrote that "profitability of the generics business [is] continuing to improve." Barclays focused on the trajectory of generics' success: "profitability for generics improved to 21.9% from 16.8% in 2013. . . . The company anticipates another 400 basis point improvement in 2015 . . . a key priority."

87.     Notably, and consistent with the Officer Defendants having misled investors by attributing Teva's improved profits to sources other than the Price-Hike Strategy, throughout 2014 the Officer Defendants had also claimed that some portion of Teva's increasing profitability in generics was attributable to a purported $2 billion "cost-cutting" program that had first been adopted in late 2012. However, only a fraction of that cost-cutting program actually fell to Teva's bottom line as profit. As Defendants eventually disclosed on a December 2014 investor call, by then Teva had generated only $150 million in cumulative profit from the program since its inception. After that call, the Defendants stopped emphasizing cost cutting and mentioned it only rarely again.

**F.     The First Half of 2015 – Teva ADS Price Soars to Become "Currency" For "Transformational" Actavis Acquisition**

88.     Teva implemented another 14 price increases in January 2015 (Appendix A), nine of which were increased together with other manufacturers. Each of these was again subject to the same rigorous internal review and approval process that included the Officer Defendants. The Inflated Profits were captured in the daily and weekly Scorecards and intra-quarter LBE reports that Griffin, Cavanaugh, and Olafsson circulated to Vigodman and Desheh to track whether forecasts were being met. By the end of the first quarter of 2015, the 14 price increases undertaken

in that quarter would generate as much as $48 million in Inflated Profit; the Price-Hike Strategy overall would generate as much as $228 million in the quarter.

89.     The Inflated Profits boosted the ADS price to nearly $60, and the Defendants' motivation to use the ADS as "currency" for a "transformational" transaction was coalescing into reality. As J.P. Morgan noted on February 5, 2015: "We believe that Teva is looking at assets of all sizes, and will not rule out transformational M&A if the opportunity presents itself." On March 10, Susquehanna took note that "TEVA is increasingly focusing attention on its financial capacity and appetite for M&A." By April 16, Barclays reported on Teva's "willingness" to perform a "'transformational' acquisition in the generics space." That day, Leerink wrote that Teva had an "urgency to diversify via M&A."

90.     Though not disclosed at the time, by late 2014 the Defendants had actually approached Allergan, although Allergan was not ready to make a deal then. Vigodman would later admit, on July 27, 2015, that Actavis "was basically the highest priority" for an acquisition. Indeed, Olafsson told employees assembled at an August 2014 meeting soon after arriving at Teva (from Actavis), that he had never joined a company that did not eventually acquire his previous employer. (FE-1.)

91.     <u>First Quarter 2015 Results:</u> On April 30, 2015, Defendants again announced excellent results stemming from Teva's generic segment, pointing to a profit increase of $296 million, or 59%, compared to the first quarter of 2014. The Defendants again misleadingly attributed this increase in profits to a reduction in expenses, as well as a new product launch and higher profitability in Europe. The Defendants concealed that as much as $228 million in Inflated Profits accounted for 77% of the reported generic profit increase.

92.     On the earnings call, Olafsson announced a "1,000 basis points improvement over a two years period" in "operating profit in the generic segment." He attributed this to "a significant improvement in our cost of goods . . . portfolio offering . . . [including] when we have more of the launches . . . [and] the cost infrastructure."

93.     In the absence of the truthful and complete reasons for Teva's improved profit, analysts credited the Defendants' false statements. J.P. Morgan noted, "Teva continues to make progress on generics profitability . . . we remain encouraged by the recovery in Teva's generic business." Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales." Buoyed by the fraud, Teva's ADS closed at $60.42 that day, an increase of 33% since the start of Relevant Period.

94.     As the weeks passed, the Defendants continued to laud the vast success in Teva's generic segment in a series of statements:

- On May 13, 2015, at a Bank of America Conference, Desheh declared that Teva's improved generic business was "***nothing short of a revolution***," explaining that "[i]n 2013 our gross margin of generic business was 41.3%. And it's 46% in Q1 2015. Our operating margin was 16.7%. It is 27%, this is full 10 percentage points," *i.e.*, a $1 billion improvement.

- During a June 10, 2015 Goldman Sachs Global Healthcare Conference, Vigodman explained: "we started 2014 with a clear message, clear focus, getting the house in order first, solidifying the foundation of Teva. ***You see the profound change in the generic business. These are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014***." He fraudulently attributed all of this success to "cost reduction" and "[f]ull transformation of our operational network."

95.     $40 Billion Acquisition of Actavis Announced: As Olafsson had foretold on July 27, 2015, with Teva's ADS price reaching an all-time high of $72, Teva would announce the

29

transformational acquisition it had been seeking: it had entered into a definitive agreement to acquire Allergan's worldwide generics business, Actavis, for $40.5 billion in cash and equity.

96.     In announcing the deal, Vigodman explained that the rapid and surprising turnaround in Teva's generics segment since the start of the Relevant Period was the "precondition" for making the deal. Of course, he concealed that the true "precondition" underlying that turnaround was Teva's implementation of the Price-Hike Strategy.

### G.     The Second Half of 2015 – Motivation Shifts; Paying for Actavis

97.     Following the announcement of the Actavis deal, the Defendants needed to raise over $30 billion in cash to pay for it. Teva did not have the money, and the price tag would amount to roughly *20 years* of Teva's recent annual earnings. To pay for the deal, Teva would give Allergan $7 billion in ADS, and raise cash from investors through a $7 billion secondary public offering of ADS and an initial public offering of Preferred Shares in early December 2015, and $15 billion from an offering of bonds set for 2017.

98.     On July 30, 2015, following the announcement of the Actavis deal, Teva issued more glowing Q2 2015 results driven by generics; specifically, an increase in generics profit of $193 million, or 36%, compared to Q2 2014, attributed primarily, and misleadingly, to reduced expenses and new product launches. That day, Desheh boasted about "the impressive improvement in the profitability of our Generic business ... up from around 20%, 21% a year ago to between 39.5% to 30% in the first half of 2015," and specifically the "strong focus on U.S. Generics business." The Defendants concealed that the Price-Hike Strategy contributed as much as $236 million in Inflated Profits in the second quarter alone. Without the Price-Hike Strategy, generic profit would have declined.

99.     Third Quarter 2015 Results: In July 2015, Teva implemented another seven price increases, four of which were executed together with other manufacturers' price increases,

following Cavanaugh's and Griffin's review and approval and as would be reflected in the Scorecards, LBEs, and Work Plan circulated to the Defendants. By the end of the quarter, these seven price increases, together with earlier hikes, would generate as much as $218 million in Inflated Profits. Furthermore, given the timing of the increases, the expected profits would be incorporated into the 2016 Work Plan that Olafsson, Cavanaugh, and Griffin would be finalizing for presentation to Vigodman and Desheh later in the summer, following the routine schedule.

100.   Following these increases, on October 29, 2015, the Defendants issued Teva's third quarter 2015 results, reporting an increase of $20 million in generics profits compared to the third quarter of 2014, again misleadingly attributing this increase mainly to lower expenses. In reality, the Price-Hike Strategy contributed as much as $218 million, ***ten times*** the reported improvement in profit.

101.   On the earnings call, Vigodman was exuberant about the "huge opportunities in the United States" for generics. Likewise, Olafsson emphasized that "the Generic business in third quarter continued to drive growth," and that "[w]e really have been improving the profitability over time," pointing to increased margins of "16.8% in 2013, 22.1% in 2014, and year-to-date number is about 28.9%."

102.   Analysts, unaware of the truth, continue to adopt the Defendants' misleading narrative. Piper Jaffray wrote, "Margins for the generics business continue to improve. . . . Though top-line growth for the generics segment has been anemic, margins have continued to expand." Jefferies' analysts highlighted that, "Generic Drug Margins Continue to Improve," noting that "on the live Q3 presentation, management highlighted the significant improvement in profitability from its core generics business."

103.    <u>Increased Public Scrutiny on Pricing:</u> By the fall of 2015, however, Congressional initiatives, law enforcement actions, and public anger toward perceived abuses in drug pricing had taken hold. Legislation was introduced in Congress that would penalize generic manufacturers for increasing prices at a rate higher than inflation. The State AGs and DOJ were continuing their investigations. Furthermore, Allergan had received a DOJ subpoena concerning generic pricing on June 25, 2015, which it disclosed in an SEC filing on August 6, 2015.

104.    Given this landscape, during the Q3 2015 earnings call held on October 29, 2015, analysts posed direct questions to the Defendants aimed at getting a clear answer as to whether Teva was exposed to regulatory scrutiny. The Defendants met these specific questions with equally specific denials.

105.    On the call, after a series of questions on the sustainability of Teva's generics success, Vigodman reaffirmed the false premise that Teva had generated its profits solely from sustainable, ordinary business practices, and not price:

> We're very . . . responsible in everything that portends to prices on the Generics side.... And I would even put it another way, ***all the improvement you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message***.

Then, when a Barclays analyst asked for management's thoughts on the proposed legislation's "potential limit to generic drug price increases," Olafsson denied that Teva was exposed:

> In terms of the proposed legislation on pricing control on generics, ... we have told you that overall on our whole portfolio, we have a decline in price. ***The talk about the inflation in generics when you have a big portfolio is really not there.***

The only price increases he acknowledged were those "due to some ***abnormalities*** in the market," like supply shortages.

32

106.    Misled, analysts took explicit note. That day, UBS repeated the Defendants' fraudulent denials: "[Management] highlighted that the [generic business] improvement was **not driven by price**, but by volume, mix, and efficiency." The truth was that the fraudulent denials concealed the Price-Hike Strategy, and that Teva had by that point made 71 price increases, none of which were caused by market abnormalities like shortages. Moreover, a huge portion, if not all, of the margin improvement Vigodman touted was driven by as much as $1.6 billion in Inflated Profit reported since the start of the Relevant Period, including, over $690 million in 2014, and over $680 million in the first three quarter of 2015. All of this information was reflected in the Scorecards, LBEs, Work Plan and other reports regularly sent to Olafsson and Vigodman.

107.    Importantly, by this time, the Defendants' misstatements, which were necessary to maintain the ADS price in order to raise the cash for the Actavis deal, were concealing an ever increasing risk. Public, regulatory, and law enforcement scrutiny of the industry had begun to undermine Teva's ability to execute and sustain the Price-Hike Strategy. Teva was finding it increasingly difficult to increase prices. In 2014, Teva made 32 increases. In 2015, Teva made a total of only 21 hikes; 14 in January, and seven in July, the final round of significant price increases implemented in a systematic fashion prior to the close of the Relevant Period. By the end of 2015, Inflated Profits had diminished quarter over quarter for the first time since Q1 2014.

108.    With this context, and with the offering of $7 billion in ADS and Preferred Shares weeks away, Teva attended a November 19, 2015, Jefferies conference. The moderator pressed Desheh about "everyone's favorite topic the last 2 months . . . **pricing, is it an issue**? . . . **where do you go on pricing**?" Desheh acknowledged the swirl of concern over pricing and legislative actions, but claimed that "**Teva was not associated with any of that**," and specifically, with respect

to legislative initiatives to cap price increases, Teva's exposure "is as a small as anybody can have." The opposite was true.

109.     Teva's False and Misleading Registration Documents for Its Secondary ADS  and Preferred Share Offerings: On November 30, 2015, Teva filed a Registration Statement with the SEC, regarding Teva's Secondary ADS and Preferred Share Offerings, and on December 3 filed two prospectus supplements and issued the Secondary ADS and Preferred Shares. The Offering Documents included numerous false misleading statements attributing Teva's profits to sources other than the Price-Hike Strategy. The ADS/Preferred Offerings raised approximately $7.2 billion.

**H.     First Half of 2016 – Price-Hike Strategy Screeches to A Halt; Pricing Pressure Denied; Subpoenas Concealed; $20 Billion Debt Offering and Close of Actavis Deal**

110.     As 2015 came to a close, the effects of industry-wide pressure on generics pricing spurred by the investigations and scrutiny on pricing practices came to the fore as a number of industry participants reported a new trend of downward pricing pressure. On, January 11, 2016, McKesson, one of Teva's major wholesaler customers, announced that it "now expect[ed] that operating profit from generic pharmaceutical pricing trends will be significantly weaker" through the second half of its fiscal year, ending on March 31, 2016.

111.     The same day, J.P. Morgan held a healthcare conference. With McKesson's announcement in mind, J.P. Morgan asked Olafsson to comment "on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?" Olafsson responded by fraudulently claiming that Teva was not involved in "big price increases":

>      There's ***a lot of headlines of examples of big price increases*** in
>      generics. But when you are a company of the size of Teva and you

34

> have the portfolio that we have today – as I said, 270 products for
> the whole of the portfolio – ***there is a decline***.

He later fraudulently explained that, because Teva had not taken "big price increases," its

generics portfolio was not exposed to price deflation:

> The generic pricing – we need to keep in mind ***there's a lot of talk
> about inflations in generic pricing***. But what we see is there's –
> overall on our total portfolio of 270 products, ***there is a slight
> decrease in pricing***. . . . on 95% of our portfolio, we experience
> price decline. And then on 5%, we might be ***flat or a slight increase***
> . . .

112.    These false statements belied the truth. Teva had raised prices on 60 drugs, or 22%

of the portfolio Olafsson cited, generating by that point as much as $1.7 billion. This would have

been reflected on the daily Scorecards and intra-quarter LBE reports the Officer Defendants

received. More to the point, the drug prices that were driving Teva's profits were massively

inflated, making Teva particularly vulnerable to the pricing pressure that other industry players

reported.

113.    <u>Fourth Quarter and Full Year 2015 Results:</u> On February 11, 2016, Teva issued its

fourth quarter and full year 2015 financial results. The full year disclosures reported Teva's profit

in generics in 2015 were up $500 million YOY, concealing over $848 million in Inflated Profit for

the year.

114.    On the earnings call that day, Olafsson again touted a "$1 billion improvement in

operating profit over 24 months period," pointing to generics profits going from "$1.68 billion

operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of

revenue. He explained rhetorically: "So how did we do this? ***Not by pricing*** but by portfolio mix,

new products, and efficiency measures."

115.    Olafsson denied even the mere existence of price inflation, let alone having engaged in 71 price hikes: "on pricing . . . . [W]e and the generic industry overall ***don't see price inflation of generics*** as it sometimes is portrayed in the media."

116.    In truth, the concealed Price-Hike Strategy had generated as much as $1.5 billion in Inflated Profits over the 24 months period Olafsson cited.

117.    But additional price hikes had become more difficult, if not impossible to implement. Accordingly, Teva reported that fourth quarter 2015 profit in generics increased only 1% compared to the fourth quarter of 2014. Analysts, thus, grew more concerned as more firms reported pricing pressure in the fourth quarter. Guggenheim asked: "some of your competitors have talked about pricing pressure in the generics business during the quarter. Curious if you saw that, and if so what might be driving that." Olafsson fraudulently responded:

> let me start on the pricing. ***As I mentioned in the beginning, we didn't see anything change in fourth quarter***. We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year.

118.    Misled, Guggenheim expressed relief in its report, stating: "[u]nlike its generic competitors, ***TEVA did not experience any increase in pricing pressure this quarter***, which highlights the ***strength of the company's platform***, in our view." Jefferies' analysts also believed Olafsson's false distinction between Teva and other companies reporting pricing pressure: "Mgt noted that smaller generics players may have realized outsized gains from price increases on individual drugs – and are thus now exposed to faster price erosion – and stressed that its portfolio breadth and optimized supply chain/cost structure allow the co to maintain solid profitability."

119.    Based on these false statements, the Defendants had concealed from investors the true reason for the flattening of the YOY profit growth from generics: Teva's Price-Hike Strategy

36

had begun to falter. The 60 drugs on which Teva had increased price were facing renewed pricing pressure. As such, the quarterly change in Inflated Profit had begun to decrease, rather than increase by as much as $70 million since the second quarter of 2015, or by 30%. This trend would continue throughout the Relevant Period.

120.    The following table reflects Teva's overall Inflated Profit for 2015:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Inflated Profit | $228 | $236 | $218 | $166 | $848 |

121.    <u>Pricing Concerns Increase, Defendants Go on the Offense:</u> As investors became increasingly concerned about the pricing environment, the Defendants continued to affirmatively deny any vulnerability to pricing pressure. At a March 8, 2016 conference, a Cowen analyst asked Olafsson to "discuss what you're seeing" on "generic pricing." Olafsson said that "[Teva] ***never*** saw" price increases and that "inflation ***never*** really happened in the generics business." He added, "overall the pricing hasn't changed that much," and was "***stable***," and there had been no "big changes in the pricing environment" since 2015. In reality, Teva's Inflated Profit had fallen 24% in the fourth quarter 2015, from $218 million to $166 million, compared to the prior quarter.

122.    <u>First Quarter 2016 Results:</u> As the public and law enforcement scrutiny intensified, the Price-Hike Strategy faltered and Inflated Profits declined from pricing pressure. Teva was unable to make significant additional price hikes, implementing only five during the entire course of 2016, all on April 6 of that year, and all on drugs that Teva had hiked before and in markets where Teva possessed a monopoly. See Appendix A.

123.    Because of declining profits, the Defendants were under significant stress to finance the Actavis acquisition. They needed to raise the $20 billion in additional cash required to close

the Actavis deal through a bond offering. On May 9, 2016, on the Q1 2016 earnings call, the Defendants set a new date for the $20 billion offering, September 2017.

124.     That day, Teva also announced its first quarter 2016 financial results, reporting profit from generics $215 million **less than** in the first quarter of 2015. Defendants misleadingly attributed the decline to higher expenses, lower sales, lower European profit, and fewer product launches. As pricing pressure sapped the impact of the Price-Hike Strategy in Q1 2016, Teva generated $104 million **less** in Inflated Profits compared to the first quarter of 2015, accounting for half of the generics division's reported profit decline. The "hole" created by the drop in Inflated Profit would have been reflected in the Scorecards, LBEs and Work Plan. (FE-1, FE-2.)

125.     Similarly, even as additional generic drug manufacturers accurately reported poor results due to pricing pressure, the Defendants continued to deny that pricing pressure had any impact on Teva. On the May 9, 2016 earnings call, Olafsson noted "the number of companies citing a tougher pricing environment or price deflation seems to have grown at an almost incredible rate." However, he again denied that Teva had exposure to price deflation, and blamed other manufacturers' woes on those firms' business models:

> Throughout the **ongoing debate** this year about the level of generic price erosion in the United States, Teva has been very consistent and clear with investors. **Teva has not seen any fundamental change or worsening in the pricing environment**... What this boils down to is each individual company's business model.... **Nothing has happened in the last two quarters that has changed the pricing environment.**

Olafsson instead blamed Teva's decline in generic profits entirely on issues other than pricing, most prominently the lack of new product launches. He misleadingly asserted that Teva's prior success had come from sustainable sources such as "portfolio optimization, strengthening our capabilities in R&D, and manufacturing of complex products . . . and sales force effectiveness."

126.    The empirical facts internal to Teva and available to Olafsson through the Scorecards, LBE reports, Work Plans, and the Oracle database would have shown otherwise. Like its competitors, price deflation was substantially damaging Teva's profits. Since the fall of 2015, Teva's Inflated Profit plummeted from as much as $236 million in Q2 2015, to $218 million in Q3 2015, to a mere $124 million in the first quarter of 2016. *See* Figure 1.

127.    Deceived analysts credited Olafsson's false denials. J.P. Morgan wrote, "Reassuring Generics Outlook Ahead of [Actavis] Deal Close . . . ***Teva does not see any major changes in the price environment***." Jefferies wrote "Generic pharmaceutical bellwether TEVA has ***not witnessed a deterioration*** in the pricing environment, according to mgt. ***This directly contrasts*** with what has been stated by a number of competitors over the past few months."

128.    With Teva's debt offering scheduled to occur in the fall, and thus needing to keep investors optimistic about Teva's prospects, the Defendants continued their unrelenting flow of fraudulent statements and denials that Teva was seeing any increase in pricing pressure:

- <u>May 10, 2016</u> (Olafsson) "I know many of the competitors in the generic space ... are ***talking about a lot of pricing pressure***, but it shouldn't be. There is ***nothing that has happened*** over the last two quarters which has changed fundamental the market."

- <u>June 3, 2016</u> (Vigodman) "So we are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. That's ***not something which is different from what we said during 2015***. By the way, we continue saying it in 2016."

- <u>June 8, 2016</u> (Olafsson) "[R]eally, the ***environment hasn't changed***. When we signed that [Actavis] deal in July [2015], we talked about 4% price erosion in the US generic business. And we are ***still talking about the same number***, what we see in the base business."

129.    The undisclosed truth was that the rapid deterioration of the Price-Hike Strategy continued into the second quarter of 2016. Inflated Profits would decline 52% YOY.

130.     Only days after Olafsson's June 8 statements, undisclosed to shareholders, on June 21, 2016, Teva received a subpoena from the DOJ seeking information relating to generics pricing. And on July 12, 2016, Teva received a subpoena from the Connecticut AG. Teva did not make any further price increases for the duration of the Relevant Period.

131.     <u>Subpoenas Concealed; Notes Offering Is Accelerated:</u> The day immediately after receiving the subpoena from the Connecticut AG, on July 13, 2016, the Defendants announced that Teva was accelerating its $20 billion debt offering from the September timeframe it had announced just weeks earlier. Defendants filed the Registration Statement with the SEC that very day. To support this surprise announcement, Olafsson, Vigodman, and Desheh gave bullish guidance to investors for the end of 2016 through 2019. Again, with industry reports of pricing pressure in mind, a Citigroup analyst asked Olafsson on an investor call that day: "can you comment on the generics pricing assumptions that you have ***baked into your forecast?***" Olafsson responded: "we are assuming and now forecasting for the guidance for the remainder of the year ***same pricing assumption*** as we have had for the first half of the year," because "***we saw no change in the pricing***. We saw a stable environment . . . from first quarter into second quarter."

132.     But far from being "stable," the pricing environment for Teva's own generics portfolio had been deteriorating. Inflated Profit was down $122 million, or 52%, for the second quarter as compared to the same period in 2015. Teva was unable to offset this price deterioration with additional price increases. The pricing assumption Teva "baked into" the guidance was contemporaneously false and disprovable.

133.     Moreover, Teva's Price-Hike Strategy faced a brand new, and concealed, challenge. The Defendants made no mention of this or the DOJ subpoenas until after the Notes Offering was complete and the Actavis deal was closed.

134.     Without the true facts, investors were falsely reassured that Teva had somehow immunized itself from the downward industry trend. Piper Jaffray noted that "management stated that it did not see further pricing pressure on the overall generics business," which "may *ease recent worries* regarding the near-term trajectory of the business." Morgan Stanley wrote that "pricing and LT Guidance [was] encouraging . . . [m]gmt sees *US pricing environment as unchanged*."

135.     The $20 Billion Debt Offering: On July 18, 2016, Teva launched its $20 billion bond offering to finance the Actavis transaction, approximately $15 billion of which were U.S. dollar-denominated and sold directly to public investors. The offering was made pursuant to the Notes Offering Materials, which incorporated several of the false and misleading quarterly and full year financial disclosures. Despite dozens of pages of disclosures about other investigations and litigations, neither the Notes Offering Materials, nor the documents incorporated by reference therein, disclosed the DOJ and Connecticut AG subpoenas.

I.     **Third Quarter of 2016 – Disclosure of Declining Performance and Subpoenas; Generics Day**

136.     Second Quarter 2016 Results: On August 4, 2016, Teva announced disappointing second quarter 2016 results and disclosed for the first time the receipt of the DOJ and State AG subpoenas. The financial disclosures reported $115 million *less* in generic profit in Q2 2016, than in the second quarter of 2015, a decrease attributed mostly to increased expenses, the loss of exclusivity on certain products, and lower sales on products for which Teva had not taken price increases. This misleading attribution concealed that Teva earned as much as $122 million *less* in Inflated Profits for Q2 2016 YOY. On the disclosure of the poor results and the subpoenas, the price of Teva Securities declined.

137.    The Defendants scrambled to mitigate the bad news, making a series of false statements to reassure investors that Teva was still immune to the swelling pricing pressure. On the earnings call, a Citigroup analyst again asked whether decreased U.S. generic revenues had impacted Teva's views on pricing stability. Likewise, Olafsson once again falsely claimed that "the pricing is stable to the same degree as before . . . *very stable* from the first quarter." This was belied by facts that Olafsson was presented with on the daily Scorecards, and in the LBEs and Work Plan, that he shared with the other Officer Defendants, which would have revealed dramatically decreasing Inflated Profit.

138.    When a J.P. Morgan analyst asked whether Teva might increase prices following the Actavis acquisition, Olafsson fraudulently implied that Teva had never increased prices to drive profits, and that opportunities to do so were ephemeral and limited to times of shortage, stating, "pricing comes with shortages in the market . . . if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out." The concealed truth was that Teva had made 76 price increases on 60 drugs, and none had anything to do with shortages. And now, with those inflated prices under pressure, the Inflated Profit was declining.

139.    The false statements mollified unaware analysts. J.P. Morgan wrote, "[Teva's] US generics business [was] modest[ly] below expectations but generic pricing environment remains stable." Morningstar analysts similarly wrote that Teva's "Management also noted underlying price erosion remains consistent in the mid-single digits at approximately 4%."

140.    The table below reflects the change in Teva's profits as reported in the first half of 2016, as compared to the same period a year ago, as well as the change in Inflated Profits for the same period:

| 2016 ($ millions) | Q1 | Q2 | Half Year |
|---|---|---|---|
| Reported YOY Change in Generic Profit | -$215 | -$115 | -$330 |
| (Unreported) YOY Change in Inflated Profit | -$104 | -$122 | $-227 |

141.   Teva's Generics Day: On September 9, 2016, Teva held its "Generics Day" for investors, during which the Defendants touted the supposed opportunities of the combined Teva/Actavis business. Olafsson issued more misleading, categorical claims that Teva had never inflated its prices for generics drugs: "[t]here is no inflation in the generic pricing"; "people that say that . . . there's a big generic price inflation, *are simply wrong*." He falsely reiterated that price increases occurred only with market abnormalities like shortages: "When price increases are taken, there's some kind of abnormality in the business. There are shortages."

142.   Olafsson then falsely explained that Teva had a purported "secret sauce" that immunized the Company from pricing pressure. In reality, Teva had no "secret sauce"; it was suffering from pricing pressure on its drug portfolio which in reality had "big generic price inflation" from years of large price hikes made pursuant to the Price-Hike Strategy. The pricing pressure on that portfolio would have been reflected in the Scorecards, LBEs and Work Plan.

**J.    Fourth Quarter 2016 – Teva Reported as Target of Investigations; Poor Results; DOJ and State AG Charges; Executives Fired**

143.   *Bloomberg* Article; DOJ Charges & State AGs Loom: On November 3, 2016, *Bloomberg*, the leading real-time news source for Wall Street and investors, published an article titled, "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," revealing for the first time that "according to people familiar with the matter," "U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion" as the "antitrust investigation by the Justice Department, begun about two years ago, now spans more

than a dozen companies and about two dozen drugs," and "the first charges could emerge by the end of the year." Moreover, "Connecticut Attorney General George Jepsen . . . is seeking to lead a group of states . . . seeking damages." The article specifically mentioned Teva as one of the companies.

144.    Accordingly, Teva was now for the first time reported as a potential target of criminal and civil liability. The price of Teva securities fell immediately upon release of this article, with its ADS price plummeting 9%.

145.    <u>Poor Third Quarter Results; Continued Denials:</u> On November 15, 2016, Teva reported its third quarter 2016 results, its first post-Actavis financial report, disclosing disappointing numbers, particularly from Teva's legacy generics business. With revenues from Actavis removed, Teva's U.S. generics revenues declined $277 million YOY from the third quarter of 2015. Defendants fraudulently attributed the decline to causes such as divestments and lost sales from certain drugs. In truth, as much as $121 million, or 44%, of the overall YOY decline, was attributable to a YOY decline in Inflated Profit as the Price-Hike Strategy collapsed. This decline would, again, have been reflected in the Scorecards, and the "hole" between forecasts and actual revenues long ago captured in the LBEs, and circulated to Olafsson, Desheh, and Vigodman.

146.    Olafsson, however, falsely insisted that "like previous quarters, there ***hasn't been any fundamental change in the US drug pricing***." Indeed, Olafsson doubled down when a Wells Fargo analyst expressly asked whether the reported increase in price erosion to 7% was a "result of having to tame previous price increases, or give back some of those?" Olafsson flatly, and fraudulently, stated "No." He instead claimed the number increased because of divested drugs, and thus that it was an anomaly limited to the quarter. In reality, the increase in erosion was causing a dramatic decline in Inflated Profit. Figure 1. A puzzled J.P. Morgan analyst pressed him, observing

that "anyone that look[s] at the industry as a whole, it feels like this [is] a broader issue than [a] one-off market disruption." Olafsson adamantly insisted "there hasn't again been any fundamental change" in pricing.

147. The false statements comforted analysts otherwise troubled by the poor U.S. generic results. Deutsche Bank wrote: "management continue[d] to expect mid-single digit price erosion in 4Q and over the longer term."

148. <u>Olafsson Is Fired:</u> Less than three weeks later, on December 5, 2016, Teva unexpectedly announced Olafsson's "retirement." His replacement, Bhattacharjee, immediately took over as CEO, Global Generic Medicines Group. In reality, Olafsson, only 48 years old, was fired. He is now the CEO of Hikma Pharmaceuticals PLC, and a director of other companies.

149. Analysts readily saw through the implausible reason given for Olafsson's departure, concluding that he had been terminated due to the poor performance of Teva's generics division. In truth, the sudden change in performance was the materialization of the risks associated with the Price-Hike Strategy; Inflated Profit suddenly dropped; law enforcement was now pursuing Teva; a price-inflated generics portfolio was increasingly susceptible to pricing pressure; and Teva could not plug the hole in its financial results with price increases.

150. <u>DOJ Criminal Charges; State AGs Sue Teva:</u> On December 14, 2016, the DOJ announced it had charged (by information) Glazer and Malek, the former CEO and the former President, respectively, of Heritage, a competitor of Teva's, for their roles in conspiracies to fix prices, rig bids, and allocate customers, including manipulating the market for Glyburide from 2013 through the end of 2015. The connection between Teva and these charges was clear; Teva controlled over 75% of the market for Glyburide during the Relevant Period.

151.    The next day, December 15, 2016, the Connecticut AG announced that he and 19 other State AGs had filed a federal lawsuit for antitrust violations against Teva USA and five other major drug companies, alleging that Teva conspired on Glyburide. The State AGs' complaint cited emails, calls, and documents that evince explicit collusion between Teva and Heritage's principals, Malek and Glazer.

152.    The State AGs' complaint has since been amended to include 13 additional drugs, seven of which implicate Teva, and 47 State AGs, and the AGs from the District of Columbia and Puerto Rico. That complaint is based in part on the cooperation of Glazer and Malek, who have settled with the State AGs in exchange for cooperation. The State AGs are now investigating conspiracies regarding upwards of 200 drugs, and will file additional complaints in the future. Malek and Glazer have also pleaded guilty to Federal criminal charges, admitting that they participated in "a conspiracy to suppress and eliminate competition by allocating customers and fixing and maintaining prices for glyburide, from in or about April 2014 and continuing until at least December 2015," in violation of the Sherman Act.

**K.    First Quarter 2017 – Continued Decline of Generics Revenue**

153.    In view of Olafsson's departure, on January 6, 2017, Teva provided 2017 guidance a month early, announcing a significant reduction and surprising analysts. Vigodman attributed the reduction to previously-unannounced poor performance, and an "EBITDA gap of $1.2 billion emanating from our US generics business." Teva's legacy generics business "explain[ed] the majority of the gap." On this news, the price of Teva Securities plummeted.

154.    Vigodman concealed that the EBITDA "gap" was actually attributable largely to the collapse of Teva's Price-Hike Strategy, and the resulting steep decline in Inflated Profit. In 2016, Teva had generated only as much as $420 million in Inflated Profit, compared to $848

million in 2015. In each quarter of 2016, Inflated Profit declined at least 45% YOY. In 2016, Teva made only five modest (~25%) price increases, on drugs that had already been hiked.

155.     The following chart reflects the YOY reduction in Inflated Profits on a quarterly basis from 2015 to 2016:

| Inflated Profit ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| 2015 | $228 | $236 | $218 | $166 | $848 |
| 2016 | $124 | $114 | $97 | $86 | $421 |

156.     Vigodman, for his part, continued to fraudulently claim that Teva's profitability since 2014 was "accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure," and "not by price."

157.     Vigodman Is Terminated: On February 6, 2017, Teva announced Vigodman's termination, effective immediately. Without a permanent replacement, Teva appointed Peterburg, its Chairman of its Board since January 2015, as Interim President and CEO. Investors reacted negatively on this news, and the price of Teva Securities dropped significantly. Once again, the reality was that Vigodman was fired.

158.     On February 13, 2017, Teva announced its full year 2016 and fourth quarter 2016 results. The Defendants disclosed that, without the Actavis revenue, Teva would have reported a $233 million YOY decline in quarterly U.S. generics revenues, but concealed that as much as $80 million of that YOY decline resulted from the decline in Inflated Profit.

159.     As to the full year 2016, without Actavis, Teva would have reported a YOY U.S. generic revenue *decline* of $1.4 billion for the full year 2016, attributed to a loss of exclusivity,

lower sales of certain drugs, and the loss of revenues from divested product, when in fact as much as $427 million of the yearly decline resulted from the decline in Inflated Profit.

160.    <u>Desheh Finally Out, $6.1 Billion Charge Announced Weeks Later</u>: on June 8, 2017, Teva announced the nomination of four new directors to its Board, in an attempt to assure investors that the Company was attempting to redeem itself and regain lost credibility. By June 21, 2017, Desheh was also out, leaving Teva for another job.

**L.    August 3-7, 2017 – Teva Announces Massive $6.1 Billion Charge for U.S. Generics Business**

161.    On August 3, 2017, with Desheh, Vigodman, and Olafsson – the principal architects of Teva's Price-Hike Strategy – finally gone, and with new Board members in place, Teva took a $6.1 billion charge against its U.S. generics business, a permanent reduction in the entire business's valuation and a dollar-for-dollar hit to the Company's bottom line. In addition, after at least thirty years of maintaining its shareholder dividend, Teva announced a 75% reduction in its payout. In reporting a dismal loss of $5.94 per share, Teva also drastically revised the guidance issued in January (which already revised the July 2016 guidance); this guidance reduction was a direct result of the complete collapse of the Price-Hike Strategy, and evaporation of the Inflated Profits, which by this point amounted to just $53 million per quarter, with no reason to believe that the erosion would abate.

162.    As a result of this new negative information, Teva's ADS price fell $7.50 per share, or 24%, from a close of $31.25 on August 2, 2017 to a close of $23.75 on August 3, 2017, on high trading volume. The ordinary share price also declined ILS 1,980, or 17.79%, from a close of ILS 11,130 on August 2, 2017 to a close of ILS 9,150 on August 3, 2017. Teva's market capitalization was reduced by approximately $8 billion.

163.     On Friday, August 4, 2017, Fitch Ratings also downgraded Teva to BBB- (one step above junk), with a negative outlook. As a result of the news on August 3 and 4, Teva's ADS price continued to fall by an additional $3.15 per share, or 13.26%, from a close of $23.75 on August 3, 2017 to a close of $20.60 on August 4, 2017, on high trading volume. Teva's market capitalization was reduced by approximately $3.3 billion.

164.     The next trading day on the TASE, the ordinary share price continued to fall by ILS 2,022, or 22.10%, from a close of ILS 9,150 on Thursday, August 3, 2017 to a close of ILS 7,128 on Sunday, August 6, 2017.

165.     The next trading day, Monday, August 7, 2017, as the prices of Teva securities continued to drop, Morgan Stanley analysts downgraded Teva's ADS to "Underweight," noting specifically that they had "underappreciated the risk of generics pricing pressure to Teva's earnings and dividend, and we expect Teva to continue to underperform given overhangs." In other words, the analysts had been led to believe through Defendants' repeated and adamant denials that Teva was not vulnerable to the pricing pressure.

166.     As a result of the news on August 3 and 4, 2017, Teva's ADS price continued to fall by an additional $2.01 per share, or 9.76%, from a close of $20.60 on August 4, 2017 to a close of $18.59 on August 7, 2017, on high trading volume. Teva's market capitalization was reduced by approximately $2.2 billion.

167.     The ordinary share price also continued to fall by ILS 18, or 0.25%, from a close of ILS 7,128 on Sunday, August 6, 2017 to a close of ILS 7,110 on Monday, August 7, 2017.

168.     In total, over these three trading days, Teva's ADS price fell $12.66 per share, or 40.6%, and the ordinary share price fell ILS 4,020, or 36.2%. Teva's market capitalization was reduced by approximately $13 billion.

M.        **November 2, 2017**

169.      Teva announced its third quarter 2017 financial results on November 2, 2017, when it filed the Q3 2017 Form 6-K with the SEC. The Q3 2017 Form 6-K disclosed a 9% decline in U.S. Generic Medicine quarterly revenues compared to the third quarter of 2016.

170.      The decline in U.S. Generic Medicine revenue was misleadingly attributed to "pricing declines resulting from customer consolidation into larger buying groups and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

171.      Investors and analysts reacted negatively to this news. Analysts at Cowen and Company called the Company's full year guidance "unfavorable" and stated that, with a "difficult generic pricing environment and competitive pressures – which are not being properly offset by new product launches – the Teva business model is now upside down." Analysts at RBC Capital Markets stated that the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising." Wells Fargo Securities analysts found Teva's results to be "especially disappointing."

172.      As a result of this new negative information, the prices for Teva securities declined. The ADS price fell $2.79 per share, or nearly 20%, from a close of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017, on high trading volume. Teva's market capitalization was reduced by approximately $3 billion.

173.      The next trading day on the TASE, Teva's ordinary shares fell ILS 670, or 13.65%, from a close of ILS 4,908 on Wednesday, November 1, 2017 to a close of ILS 4,238 on Thursday, November 2, 2017.

### N.       February 8, 2018

174.    On February 8, 2018, Teva issued a press release announcing its fourth quarter and full year financial results, including a staggering $17.1 billion goodwill impairment mainly related to its generics business for 2017. On the conference call with investors held later that day, Teva explained that $11 billion of the impairment "related to our U.S. generics business as well as additional impairments of other long-lived assets of $3.2 billion, mainly related to a revaluation of generic products acquired from Actavis."

175.    Investors and analysts reacted negatively to this news. Analysts at Wells Fargo Securities stated that the Company missed consensus expectations "by a significant margin," but noted that:

> [W]e believe it will be the lower than consensus 2018 outlook that investors will be focused on, especially the commentary about generic pricing worsening in 4Q and the overall environment worsening for the value of future launches. Teva took a $17.1 billion goodwill impairment, which investors should see as reflective of how challenging the situation is.

BTIG analysts noted "another major write-down following last year's $6B goodwill impairment." Similarly, IBI Brokerage stated that the $11 billion "impairment charge [was] almost entirely for the generics business in the US" and that guidance for fiscal year 2018 was "way below market expectations."

176.    As a result of this new negative information, the prices for Teva securities declined. Teva's ADS price fell $2.21 per share, or over 10.5%, from a close of $20.85 on February 7, 2018 to a close of $18.64 on February 8, 2018, on high trading volume. Teva's market capitalization was reduced by approximately $2.3 billion.

177.    The next trading day on the TASE, the ordinary share price fell ILS 500, or 6.9%, from a close of ILS 7,200 on February 7, 2018 to a close of ILS 6,700 on February 8, 2018.

### O.    December 9, 2018 – End of the Relevant Period

178.    On December 9, 2018, the *Washington Post* published an interview with Joseph Nielsen, an assistant attorney general and antitrust investigator in Connecticut who has been a leading the State AGs investigation.  Mr. Nielson disclosed that the price-fixing investigation had expended to at least 16 companies and 300 drugs.

179.    Mr. Nielson noted that the State AGs' investigation "is most likely the largest cartel in the history of the United States, citing the volume of drugs in the schemes, that they took place on American soil and the "total number of companies involved, and individuals."

180.    Following the news of the expanded scope of the criminal investigation, Teva's ADS price fell $0.97 per share, or approximately 5%, to close at $18.44 on December 10, 2018. Likewise on the TASE, the price of Teva's ordinary shares fell ILS 390, or 5.34%, to close at ILS 6,910 per ordinary share on December 10, 2018.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

181.    During the Relevant Period, the Defendants made four types of false and misleading statements or omissions on conference calls with investors and in SEC filings:

- <u>False Statements Regarding Competition</u> These statements falsely indicated that Teva was participating in competitive and functioning markets for generic drugs. To the contrary, Teva made dozens of price increases in tandem with its competitors. Teva and these companies deliberately did not compete on price.

- <u>False and Misleading Financial and Pricing Statements</u> These statements concealed Teva's Price-Hike Strategy and the profits it generated. Later, the statements concealed that the Price-Hike Strategy fell apart as Teva was unable to make more price increases or sustain Inflated Profits. These statements were particularly misleading as the Defendants touted, and investors were highly attuned to, the sources of the generic segment's purported success. In turn, the Company's false and misleading statements and practices related to its pricing strategy resulted in the material overstatement of, *inter alia*, the value of Teva's goodwill on its balance sheet and reported operating income and net earnings by billions of dollars.

- <u>Concealed Receipt of Subpoenas</u> The Defendants failed to disclose in the Notes Offering Materials Teva's receipt of subpoenas from the DOJ and the State AGs in connection with their antitrust investigations into the generics industry.

- <u>Item 5</u> The Defendants violated their statutory duty to disclose material trends under Item 5 of Form 20-F. Defendants failed to disclose the material trend of generating profit as part of the concealed Price-Hike Strategy. They also concealed the trend of declining Inflated Profits, and that they could no longer make price increases as the strategy unraveled.

182.     The alleged false and misleading statements and omissions below were made in Teva's financial disclosures filed with the SEC, and were attributable to the Defendants as follows. Altman was responsible for and signed the Form 6-K filed on February 6, 2014, and the Form 20-F for February 10, 2014, when serving as Acting Chief Financial Officer.  Olafsson was responsible for the reporting for Teva's generics segment in each Form 20-F and 6-K from the third quarter of 2014 through the third quarter of 2016.  Oberman was responsible for the financial reporting for Teva's U.S. generics segment in Teva's Form 20-F for 2013, and Teva's 6-Ks for the first three quarters of 2014. Peterburg was responsible for and signed the Form 20-F for the period ended December 31, 2016 as Interim President and CEO.  Desheh was responsible for and signed each Form 20-F, and each 6-K from February 13, 2014 through June 29, 2017. Vigodman was responsible for each Form 20-F and 6-K filed during his tenure as Teva's CEO. Schultz was responsible for and signed Teva's Form 10-K.  McClellan was responsible for and signed the Form 10-K, each Form 8-K starting from January 2, 2018 through the end of the Relevant Period, and each Form 6-K starting from July 11, 2017 through the end of the Relevant Period.

### A.     Defendants' False and Misleading Statements Concerning Teva's Operation in a Competitive Market

183.     On February 10, 2014, Teva filed an Annual Report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 20-F").  The 2013 20-F contained representations that Teva faced

"intense" competition in the U.S. generic drug market, how competition typically forced the price of generic drugs down, and how Teva's competitive advantage lay in its "competitive pricing strategy" and capability to launch new generics:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

* * *

> In the United States, we are subject to intense competition in the generic drug market from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-effective production, our customer service and the breadth of our product line. We believe we have a focused and competitive pricing strategy.

184.    On February 9, 2015, Teva filed an Annual Report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 20-F").  The 2014 20-F contained representations that Teva faced "intense" competition in the U.S. generic drug market, how competition typically forced the price of generic drugs down, and how Teva's competitive advantage lay in its "competitive pricing strategy" and capability to launch new generics:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.

* * *

In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

185.    On July 27, 2015, Teva held a conference call with analysts and investors to discuss Teva's acquisition of Actavis.   During that call, in response to a question regarding competitiveness in the generic drug market, Defendant Olafsson stated that "the U.S. generic market is very competitive[,]" noting "fierce competition on most of the portfolio, if not all of the portfolio."

186.    On the same call, Defendant Vigodman touted Teva's commitment to a competitive market, stating, in relevant part:

[W]e promise to do everything in our power to basically take the company to be able to continue the improvement that we have been witnessing here. ***We believe in competition, and we'll do what is needed in order to win in all the markets we operate.***

187.    On October 29, 2015, Teva held a conference call with analysts and investors to discuss Teva's Q3 2015 financial and operating results.   During that call, Olafsson stated the following with respect to Teva's drug pricing:   "I think ***pricing is obviously based on the competition***. We have talked about that the overall pricing trend is down."

188.    On November 19, 2015, during another conference with analysts and investors, Defendant Desheh touted the competitive nature of the generics market and Teva's role as a fair-playing participant, stating, in relevant part:

Generic prices. There is – there are no – I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States . . . . So it is a highly competitive environment with players coming from all over the world with a very fierce price competition. The price of generic went down 50% over the past 10 years . . . . ***So we're playing a competitive game. We're playing it fairly. We of course play by the book and by the rule ... And we are in short playing in a very competitive market.***

189.    On February 11, 2016, Teva filed an Annual Report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 20-F").  The 2015 20-F contained representations that Teva faced "intense" competition in the U.S. generic drug market, how competition typically forced the price of generic drugs down, and how Teva's competitive advantage lay in its "competitive pricing strategy" and capability to launch new generics:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of new companies selling such product and the timing of their approvals.
>
> * * *
>
> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.

190.    On February 15, 2017, Teva filed an Annual Report on Form 20-F with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 20-F").  The 2016 20-F contained representations that Teva faced

"intense" competition in the U.S. generic drug market, how competition typically forced the price

of generic drugs down, and how Teva's competitive advantage lay in its capability to launch new

generics:

> Our generic drugs face intense competition. Prices of generic drugs typically decline, often dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of companies selling such product, including new market entrants, and the timing of their approvals.

* * *

> In the United States, we are subject to intense competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio.

191.    On February 12, 2018, Teva filed an Annual Report on Form 10-K with the SEC,

announcing the Company's financial and operating results for the quarter and year ended

December 31, 2017 (the "2017 10-K"). The 2017 10-K contained similar representations to Teva's

Forms 20-F, containing boiler-plate representations concerning the Company's competition in the

U.S. generic drug market:

> Our generic drugs face intense competition. Prices of generic drugs may, and often do, decline, sometimes dramatically, especially as additional generic pharmaceutical companies (including low-cost generic producers based in China and India) receive approvals and enter the market for a given product and competition intensifies. Consequently, our ability to sustain our sales and profitability on any given product over time is affected by the number of companies selling such product, including new market entrants, and the timing of their approvals.

* * *

57

In the United States, we are subject to competition in the generic drug market from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs.

192.    The statements referenced in ¶¶183-191 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) since July 2013, rather than competing on price, Teva had made, via the Price-Hike Strategy, 76 price increases without competition on price from competitors; (ii) on at least 48 of these occasions, Teva had made price increases in tandem with its competitors; (iii) Teva's increasing profitability was the result of lacking, not "intense," competition; (iv) the generic drug market was not operating competitively because Teva and its competitors refused to compete fairly, *i.e.*, not at all; (v) Teva had concealed how these price increases had driven its purported turn-around and success; (vi) Teva had concealed that in 2013, 2014, 2015,  Teva implemented the Price-Hike Strategy and undertook, respectively, at least 18, 31, and 18 systematic increases of generic drug prices to generate billions in Inflated Profits, by deliberately taking advantage of markets that lacked competition; and (vii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**B.    Defendants' False and Misleading Statements Concerning Financial Reporting and Generic Drug Pricing**

193.    On February 6, 2014, Teva issued a press release announcing the Company's financial and operating results for the fourth quarter 2013 (the "Q4 2013 Press Release").  The Q4 2013 Press Release stated U.S. generics revenues of $1.2 billion dollars for the fourth quarter, which represented a YOY increase of $144 million, or 14%, compared to the fourth quarter of

2012.  According to the Q4 2013 Press Release, these increases "resulted mainly from the exclusive launches of niacin ER . . . and temozolomide . . . in the third quarter of 2013, and launches of duloxetine . . . and tobramycin . . . in the fourth quarter of 2013, as well as higher sales of budesonide inhalation[.]"

194.    On February 10, 2014, Teva filed the 2013 20-F, which announced a YOY decline in generic profit of $400 million, or 19%.  The 2013 20-F stated that the decrease was "primarily" due to "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses" as well as "sales of higher profitability products in the United States."

195.    The statements referenced in ¶¶193-194 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) via the Price-Hike Strategy, Teva made a minimum of 18 systematic price hikes in July and August 2013, which contributed materially to the Company's announced results; (ii) for the fourth quarter 2013, up to $147 million in Inflated Profit resulted from these price increases, which made up the entirety of Teva's YOY U.S. generic revenue increases; and (iii) in 2013, these price increases generated up to $250 million in Inflated Profit without which Teva would have reported a $650 million, or a 31%, YOY decline rather than the 19% the 2013 20-F reported.  Such Inflated Profit was a significant contributor to the Company's results when compared to Teva's S&M expenses, which had a YOY decline of merely $26 million compared to 2012.

196.    On March 10, 2014, Teva issued a press release from its North Wales, Pennsylvania US headquarters, announcing its "2014 National Partnership" with Volunteers in Medicine ("VIM"), a national nonprofit organization dedicated to helping communities provide free primary healthcare clinics, "to make healthcare services more readily available to the uninsured." In the press release, Defendant Oberman touted the Company's purported commitment to "make quality

healthcare accessible to patients around the world", stating in relevant part that its partnership with VIM "is not only a business objective, but also a philanthropic commitment." Moreover, the press release asserted that "Teva provides access to healthcare not only through its business model of developing, manufacturing and marketing high quality generic and specialty medicines, but also through significant philanthropic programs, complemented by key alliances with partners – such as VIM – that advance a common commitment to address unmet medical needs."

197.    The statements referenced in ¶196 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Teva had implemented a Price-Hike Strategy, which artificially inflated the cost of generic pharmaceuticals for consumers; and (ii) consequently, patients in the United States, including the millions of uninsured, would suffer and struggle to afford the rising costs of the generic pharmaceuticals sold by Teva.

198.    On May 1, 2014, Teva held an earnings call with analysts and investors.  On the call, Defendant Desheh noted Teva's growth in its U.S. generic revenues was due to the Company's new product launches.  According to Desheh, Teva's generics division "experienced significant growth in the United States market, with 17% YOY growth, to a total of $1 billion with a number of new product launches."

199.    On May 2, 2014, Teva filed a Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the first quarter 2014 (the "Q1 2014 6-K").  The Q1 2014 6-K reported a YOY increase of $117 million in generic profit, or 31%.  According to the Q1 2014 6-K, the increase was "primarily" attributable to "higher revenues, higher gross profit and a reduction in selling and marketing expenses."  The Q1 2014 6-K attributed higher gross profit to "the change in the composition of revenues in the United States and Europe, mainly

products launched during the first quarter of 2014 and in the United States in the second half of 2013."

200.    The statements referenced in ¶¶198-199 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) via the Price-Hike Strategy, Teva made a minimum of 18 systematic price hikes in July and August 2013, which contributed materially to the Company's announced results; and (ii) for the first quarter 2014, up to $120 million in Inflated Profit resulted from these price increases, which made up almost the entirety of Teva's YOY increase in U.S. generic revenue growth, which was almost three times that of the $42 million YOY reduction in S&M expenses.

201.    On July 31, 2014, Teva filed a Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the second quarter 2014 (the "Q2 2014 6-K").  The Q2 2014 6-K reported a YOY increase of $156 million in generic segment profit, or 41%. According to the Q2 2014 6-K, the increase was "primarily" attributable to "a significant reduction in selling and marketing expenses, higher revenues and higher gross profit."  The Q2 2014 6-K attributed higher gross profit to "higher revenues in the United States, specifically of products launched during the first half of 2014 and in the second half of 2013, and higher revenues in Canada as well as the higher gross profit due to the change in the composition of revenues in Europe."

202.    On the same day, Teva held an earnings call with analysts and investors.  During the call, Defendant Desheh stated that the "better results" of Teva's generic segment resulted from launches of "generic Xeloda in March and generic LOVAZA this quarter in the U.S. market."

203.    The statements referenced in ¶¶201-202 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) via

the Price-Hike Strategy, Teva made a minimum of 30 systematic price hikes since July 2013, including 12 price hikes in April 2014, which contributed materially to the Company's announced results; and (ii) for the second quarter 2014, up to $160 million in Inflated Profit resulted from these price increases, which made up all of Teva's YOY increase in U.S. generic profit, and which was over one-and-a-half times the $101 million YOY reduction in S&M expenses attributed to the generic profit increase.

204.    On October 30, 2014, Teva filed a Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the third quarter 2014 (the "Q3 2014 6-K").  The Q3 2014 6-K reported a YOY increase of $160 million in generic profit, or 40%.  According to the Q3 2014 6-K, the increase was "primarily" attributable to "higher gross profit and a significant reduction in selling and marketing expenses."  The Q3 2014 6-K attributed higher gross profit to "lower expenses related to production, higher revenues from our API business as well as higher gross profit due to the change in the composition of revenues."

205.    On the same day, Teva held an earnings call with analysts and investors.  By this time, Congress had sent a letter to Vigodman asking for information related to drug price increases.  Additionally, these increases were gaining more attention in the public eye; Lannett and Impax had revealed subpoenas from the Connecticut AG, and articles were released discussing drug price increases on some drugs Teva did not sell.  Nevertheless, during the call, Defendant Vigodman attributed Teva's results to new product launches, stating, in relevant part: "I think overall, we have a good revenue of the new launches this year – capecitabine, the generic Lovaza, Omega-3 and entecavir. Entecavir was a new launch for us in the quarter. I think all these three products have been very significant contributors to the year."  A UBS analyst asked to "talk about Generics a little bit in the U.S. . . . . whether there were price increases in some of your base business and

whether that impacted" Teva's financial performance.  Vigodman rejected the notion that Teva was utilizing price increases. stressing that the any increases were the result of normal market conditions such as shortages or market dynamics:

> I think that pricing – I've said it before, there's never a price increase on the base business as a whole. Like any other business, if there's a pricing opportunity that comes in the market, we look for that. But the base business itself has been eroding overall because of the consolidation of the customers.

Vigodman instead stressed that any increases were the result of normal market conditions such as shortages or market dynamics:

> When there's an opportunity, when there is a shortage in the market, we obviously look for pricing like any other business. But overall, as I've said many times before, the base business itself is slowly eroding, the overall of the base business. Vigodman's statements were false and misleading because, far from price increases only occurring when there are shortages or market dynamics so dictate, Teva had adopted the Price-Hike Strategy. Vigodman concealed that Teva had increased prices on 50 drugs and that those concealed increases—the very subject of the UBS analyst's question—resulted in as much as $720 million in Inflated Profit reported since the start of the Relevant Period, and as much as $193 million in Q3 2014 alone, on drugs for which there were no shortages.

206.    The statements referenced in ¶¶204-205 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) via the Price-Hike Strategy, Teva made a minimum of 50 systematic price hikes since July 2013, including 20 price hikes in in the third quarter 2014, which contributed materially to the Company's announced results; and (ii) for the third quarter 2014, up to $193 million in Inflated Profit resulted from these price increases, representing a total YOY increase of $90 million; (iii) the $90 million YOY increase made up over 50% of Teva's YOY increase in U.S. generic profit, which was larger than the entire $81 million YOY reduction in S&M expenses attributed to generic profit increases.

207.    On December 11, 2014, Teva held a guidance call to discuss the Company's 2015 business outlook.  During the call, a Morgan Stanley analyst asked:

> [W]ith respect to generic inventory in the channel, both for Teva and for other generic manufacturers, I'm assuming that wholesalers have been seeing extraordinary price increases in recent years and has been buying inventory ahead of tremendous price increases?

Defendant Olafsson repelled the notion of any large price increases, noting any press to the contrary concerned "few" products on "individual" molecules:

> So first let me correct. I have to disagree that they have experienced tremendous price increase. I think, overall, the pricing in the U.S. of generics has been flat to a slight down. There has been a lot of press about price increases on individual molecules and this has been a hot political issue selecting a few products.

208.    The statements referenced in ¶207 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) via the Price-Hike Strategy, Teva made a minimum of 50 systematic price hikes since July 2013, including 32 price hikes in 2014, which contributed materially to the Company's announced results; (ii) Teva's price  increases generated up to $720 million in pure profit, which rose up to $943 million before the year's end; and (iii) Teva had generated 30% of its overall profit from generic drug price increases since 2013.

209.    On February 5, 2015, Teva issued a press release filed with the SEC announcing the Company's financial and operating results for the fourth quarter 2014 and full year 2014 (the "Q4 2014 Press Release").  The Q4 2014 Press Release stated a generic profit YOY increase of $47 million, or 9%, which the Company attributed "primarily" to Teva's "lower S&M expenses and lower R&D expenses."

210.    Teva filed the 2014 20-F on the same day.  The 2014 20-F reported a generic profit YOY increase of $480 million, or 29%, which Teva attributed to "lower S&M expenses and higher gross profit."  The 2014 20-F stated that the higher gross profit was "mainly a result of higher revenues in the United States, specifically of products launched during 2014 and in the second half of 2013,

and higher revenues in Canada, which led to higher gross profits, as well as higher gross profit from API sales to third parties."

211.   The statements referenced in ¶¶208-210 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) via the Price-Hike Strategy, Teva made a minimum of 50 systematic price hikes since July 2013, including 32 price hikes in 2014, which contributed materially to the Company's announced results; (ii) for the fourth quarter 2014, up to $219 million in Inflated Profit resulted from these price increases, representing a YOY increase of up to $72 million, which made  up the entirety of Teva's YOY increase in generic profit, in contrast to the $113 million YOY reduction in S&M expenses and $8 million YOY reduction in R&D expenses Defendants attributed the increased generic profit to; and (iii) increased prices accounted for up to $693 million in Inflated Profit in 2014, representing a YOY increase of up to $443 million, accounting for nearly all YOY increase in generic profit, which was more than the total $337 million S&M expense reduction Defendants attributed to the generic profit increase.

212.   Teva's ADS/Preferred Registration Statement signed by Vigodman, Desheh, and Griffin, as well as two prospectus supplements Teva filed with the SEC on December 3, 2015 (referred to hereafter as the "ADS Final Prospectus" and the "Preferred Final Prospectus," respectively), all incorporate by reference the false and misleading statements contained in the 2014 20-F.

213.   The below table shows Teva's improved profits as reported in 2014 and YOY change in Inflated Profits for the same period:

| 2014 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generic Profit | $117 | $156 | $160 | $47 | $480 |
| (Unreported) YOY Change in Inflated Profit | $120 | $160 | $90 | $72 | $443 |

214.     On April 30, 2015, Teva filed a Report on Form 6-K with the SEC, announcing the Company's financial and operating results for the first quarter 2015 (the "Q1 2015 6-K").  The Q1 2015 6-K reported a YOY increase of $296 million in generic profit, or 59%.  According to the Q1 2015 6-K, the increase was "primarily" attributable to "higher gross profit and lower selling and marketing expenses as well as lower research and development expenses."  The Q1 2015 6-K attributed higher gross profit to "mainly a result of the launch of esomeprazole in the United States during the quarter and improved profitability of our European business."

215.     On the same day, Teva held an earnings call with analysts and investors.  During the call, a Bank of America analyst asked, "how much more potential exists to increase generic segment margins purely from organic gains and operational efficiency?"  Olafsson responded by stating that the "1,000 basis points improvement over a two years period" in "operating profit in the generic segment" was a product of the following:

> [P]robably three or four things. First of all . . . significant improvement in our cost of goods . . . the next thing is the portfolio offering . . . [including] exclusive complex generics of offering . . . [as] when we have more of the launches, it will drive up the market. The third thing is the cost infrastructure.

Olafsson thus touted a number of factors that purportedly accounted for recent generic profitability increases that started in 2014, which were actually attributable to the Price-Hike Strategy.

216.     The statements referenced in ¶¶212-215 were false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) via the Price-

Hike Strategy, Teva made a minimum of 64 systematic price hikes since July 2013, including 14 price hikes in January 2015, which contributed materially to the Company's announced results; (ii) for the first quarter 2015, up to $228 million in Inflated Profit resulted from these price increases, representing a YOY increase of up to $108 million, which made up over a third of Teva's YOY increase in generic profit; (iii) the Inflated Profit increase amounted to more than double the $43 million YOY reduction in S&M expenses, and nine times the $12 million YOY reduction in R&D expenses, to which the Defendants attributed the increased generic profit; (iv) Olafsson's statements on the call concealed that the Price-Hike Strategy was a fundamental part of Teva's improvement; and (v) by the end of Q1 2015, Teva had generated as much as $1.1 billion in Inflated Profit on the price increases since July 2013.

217.     Teva's ADS/Preferred Registration Statement signed by Vigodman, Desheh, and Griffin, ADS Final Prospectus, and Preferred Final Prospectus all incorporate by reference the false and misleading statements contained in the Q1 2015 6-K.

218.     During a June 11, 2015 Goldman Sachs conference, Vigodman touted "the profound change in the generic business," since 2014, stating:

> These "are things that are not confined to numbers, but maybe numbers tell the story: 16.7% operating profit, 2013; 21.9% operating profit, 2014," and attributing this success solely to "[t]he execution of the cost reduction program: $600 million net savings, 2014; $500 million, 2015," and a "[f]ull transformation of our operational network," claiming that "[w]e closed or divested 11 plants during the last 12 months[;] [w]e centralized procurement.... So everything that was done during 2014 was based on organic . . . moves only."

219.     The statements referenced in ¶¶217-218 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that: (i) via the Price-Hike Strategy, Teva made at least 64 systematic price hikes since July 2013, which generated over $1.1 billion in Inflated Profit by the close of Q1 2015, contributing materially to

the results; and (ii) the excess profit of as much as $1.1 billion generated by the price increases accounted for all of the improved operating profit that Vigodman touted.

220.    On July 30, 2015, Teva filed its second quarter 2015 financial statements on a Form 6-K with the SEC (the "Q2 2015 6-K").  The Q2 2015 6-K disclosed a YOY increase in generic profit of $193 million, or 36%, attributed "primarily" to "higher gross profit as well as lower selling and marketing expenses," while claiming that higher gross profit was "mainly a result of higher gross profit in the United States, due to the launches of aripiprazole in the second quarter of 2015 and of esomeprazole during the first quarter of 2015, and lower production expenses."

221.    The statements referenced in ¶220 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) via the Price-Hike Strategy, Teva made at least 64 systematic price hikes since July 2013, contributing materially to the results; and (ii) these price increases generated $236 million in Inflated Profit in Q2 2015, a YOY increase of $76 million, which increase accounted for 39% of the YOY increase in generic profit, and amounted to over one and a half times the $53 million YOY reduction in S&M expenses to which Defendants attributed the increased generic profit.

222.    Teva's ADS/Preferred Registration Statement signed by Vigodman, Desheh, and Griffin, ADS Final Prospectus, and Preferred Final Prospectus all incorporate by reference the false and misleading statements contained in the Q2 2015 6-K.

223.    On October 29, 2015, Teva filed its third quarter 2015 financial statements on a Form 6-K with the SEC (the "Q3 2015 6-K").  The Q3 2015 6-K disclosed a YOY increase in generic profit of $20 million, or 4%, attributed "primarily" to "lower selling and marketing expenses, partially offset by lower gross profit," which in turn was partially offset "by higher gross profit of our API business."

224.     During an earnings call on the same day, Vigodman disavowed that any of the improvement in Teva's results over the previous years were driven by generic pricing:

> We're very – and are very responsible in everything that portends to prices on the Generics side and on the Specialty side. And I would even put it another way, all the improvement you see in our – in margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015, and that's a very important message.

225.     In light of recent legislative proposals that would penalize generic manufacturers for raising prices above the rate of inflation, an analyst from Barclays asked for management's thoughts on "the potential limit to generic drug price increases."  Olafsson minimized the extent and effect of Teva's practice of increasing prices and implied that Teva was not dependent on such profit and, thus, was immune to the effects of the proposed legislation:

> In terms of the proposed legislation on pricing control on generics, first of all we don't really know what it's going to be. But let me give you an example. So Teva has the largest portfolio on the U.S. market. We are offering approximately 275 products. And we have told you that overall on our whole portfolio, we have a decline in price. The talk about the inflation in generics when you have a big portfolio is really not there. 95% of our portfolio is declining due to the consolidation of the customers I talked about. There might be 5% of the portfolio that is either flat or increasing in pricing due to some abnormalities in the market.

226.     The statements referenced in ¶¶222-225 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that: (i) via the Price-Hike Strategy, Teva made at least 71 systematic price hikes since July 2013, often by well over 100%, generating over $1.6 billion in Inflated Profit over that time, including as much as $690 million in 2014 and as much as $680 million in the first three quarter of 2015 alone, and seven of which had been implemented in July 2015, contributing materially to the results; (ii) these price increases generated as much as $218 million in Inflated Profit in Q3 2015, a YOY increase of $25 million, which accounted for all the YOY increase in generic profit; (iii) the Inflated Profit contributed significantly to improving Teva's generic profit margin, as that Inflated Profit was

devoid of any material corresponding costs, directly contradicting Vigodman's statements; (iv) the 60 drugs subject to these price increases made up 22% of Teva's generic drug portfolio, and none of these price increases were due to "some abnormalities in the market" like a shortage or an increase in demand; and (v) by the end of Q3 2015, Defendants' Price-Hike Strategy had generated over $1.6 billion in Inflated Profit.

227.    Teva's ADS/Preferred Registration Statement signed by Vigodman, Desheh, and Griffin, ADS Final Prospectus, and Preferred Final Prospectus all incorporate by reference the false and misleading statements contained in the Q3 2015 6-K.

228.    On November 19, 2015, Jefferies held a conference, at which Desheh was pressed by the Jefferies analyst, who asked, "let's talk about everyone's favorite topic the last 2 months, pricing and specialty pharmacy.  Could you just give us your 20,000 foot view on pricing, is it an issue?  Your particular products, where do you go on pricing?"  Desheh minimized the extent of Teva's policy and practice of making price increases and its financial dependence on profit therefrom:

> Now there's a lot of noise around pricing issues. Some of it's coming from politicians who are driving agenda, which is very, very legitimate. Our exposure to all these things is very minimal. . . . And Teva was not associated with any of that. So we're playing a competitive game. We're playing it fairly. We of course play by the book and by the rule. And we believe that our exposure to any initiative on price reduction in the United States is as a small as anybody can have.

229.    The statements referenced in ¶¶227-228 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:    (i) Teva was critically dependent on Inflated Profit from price increases, and the ability to make additional price increases to increase profits, to fill any holes in its financial projections; (ii) Defendants' Price-Hike Strategy was greatly exposed to any initiative that addressed generic drug pricing, such as those which would grant Medicare the ability to negotiate prices, which could lead

to price deflation; (iii) without the benefit of the Price-Hike Strategy, Teva could not generate additional Inflated Profit or fill financial holes, while Teva's past practice of generating massive profits through inflated prices left it very exposed to any efforts that would cause price deflation of those already-increased drugs; and (iv) these statements implied to investors that Teva had not and was not engaging in any practice of increasing prices.

230.    On November 30, 2015, Teva filed the ADS/Preferred Registration Statement, as well as two preliminary prospectus supplements, filed pursuant to Rule 424(b)(5), which disclosed certain details regarding Teva's intention to offer additional ADS and newly created Mandatory Convertible Preferred Shares ("Preferred Shares") to the public.  On December 3, 2015, Teva filed the ADS Final Prospectus and the Preferred Final Prospectus.

231.    The ADS/Preferred Registration Statement, the ADS Final Prospectus, and the Preferred Final Prospectus each incorporated by reference the 2014 20-F, Q1 2015 6-K, Q2 2015 6-K, and Q3 2015 6-K.  The incorporated 2014 20-F and Q1, Q2, and Q3 2015 6-Ks contained false and misleading financial disclosures, as discussed above.

232.    At a January 11, 2016, J.P. Morgan conference, a J.P. Morgan analyst asked Olafsson, "McKesson this morning announced some maybe challenging pricing on the generics side or an expectation of that going forward. Could you just comment a little bit on how you see generic pricing as we look out not just this year but in the future and how Teva is able to navigate the current environment?"  In answer to this question, Olafsson responded:

> The generic pricing – we need to keep in mind there's a lot of talk about inflations in generic pricing. ***But what we see is there's – overall on our total portfolio of 270 products, there is a slight decrease in pricing.*** It's low single digit, but year on year we see a low single-digit decrease because on 95% of our portfolio, we experience price decline. And then on 5%, we might be flat or a slight increase. So, overall, we see that in the business. There's a lot of headlines of examples of big price increases in generics. But when you are a company of the size of Teva and

you have the portfolio that we have today – as I said, 270 products for the whole of the portfolio – there is a decline.

233.    The statements referenced in ¶¶230-232 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:   (i) they minimized the impact of price increases—which by the end of Q3 2015 had generated as much as $1.7 billion in Inflated Profit—on Teva's bottom line since July 2013, and, thus, Teva's potential exposure to price deflation that its competitors and wholesalers were already reporting; (ii) by this time, Teva had increased the prices of 60 of its generic drugs, three of which Teva had recently increased the prices on July 29, 2015, and many of which were increased by more than 100%; and (iii) these drugs made up 22% of Teva's generic drug portfolio, flatly contradicting Olafsson's claim that 5% of Teva's generic portfolio "might be flat or a slight increase."

234.    On February 11, 2016, Teva filed with the SEC a press release reporting the Company's fourth quarter 2015 and full year 2015 financial results ("Q4 2015 Press Release"). The Q4 2015 Press Release disclosed a YOY increase in generic profit of $7 million, or 1%, attributed "primarily" to "the reduction in S&M expenses, partially *offset*" by, in part, "lower sales of budesonide (Pulmicort®) in the United States."

235.    The same day, Teva filed its Form 20-F for the fiscal year ended December 31, 2015 with the SEC (the "2015 20-F") reporting the Company's full year 2015 financial results. The 2015 20-F disclosed a YOY increase in generic profit of $500 million, or 24%, attributed "primarily" to "lower S&M expenses *and* higher gross profit," which was purportedly "mainly a result of higher revenues from new products launched in the United States during 2015, lower other production expenses and higher gross profit from API sales to third parties."

236.    The statements referenced in ¶¶234-235 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i)

Inflated Profit had declined from as much as $219 million in Q4 2014 to $166 million in Q4 2015, a decline of $53 million or 24%; (ii) this decline occurred because the Price-Hike Strategy was unsustainable and under increasing investigation by governmental agents and, thus, Teva's ability to make further increases was reduced; (iii) having attributed the source of the profit increase, the Defendants had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 71 systematic price hikes since July 2013, contributed materially to the results; and (iv) the price increases generated as much as $848 million in Inflated Profits in 2015, a YOY increase of $155 million that amounted to 31% of the YOY increase in generic profit.

237. Teva's Post-Effective Amendment No. 1 to Form F-3 that it filed with the SEC on July 13, 2016, which was signed by Vigodman, Desheh, and Griffin (the "Notes Registration Statement"), and Teva's final prospectus for the Notes Offering that it filed with the SEC on July 19, 2016 pursuant to Rule 424(b)(5) (the "Notes Final Prospectus"), both incorporate by reference the false and misleading statements contained in the 2015 20-F.

238. On the same day, Teva held an investor earnings conference call. In his opening statements, Olafsson touted "2015 was a very good year for Teva Generics," while explicitly denying that pricing had played any role in that supposed success, stating:

> We continued improving the operating profit of the generic business, coming from $1.68 billion operating profit in 2013, or 17% of revenue, to $2.68 billion operating profit in 2015, or 28% of revenue. This is $1 billion improvement in operating profit over 24 months period. So how did we do this? Not by pricing but by portfolio mix, new products, and efficiency measures.

239. Later in the call, and repeated in his slide presentation, Olafsson minimized Teva's participation in price increases, and thus their impact on the Company's bottom line:

> Briefly, on pricing. As I've previously stated, we and the generic industry overall don't see price inflation of generics as it sometimes is portrayed in the media. On the contrary, for 2015, we saw a mid-single-digit price decline for the overall business.

240.    Olafsson denied that Teva was seeing any change in its pricing environment, stating:  "In the US, our largest market, we saw approximately 4% price erosion . . . . We expect to see the same in 2016.  Nothing today points to a significant change in the generic pricing environment."  A Guggenheim Securities analyst asked:  "[S]ome of your competitors have talked about pricing pressure in the generics business during the quarter. Curious if you saw that, and if so what might be driving that."  Olafsson responded:  "As I mentioned in the beginning, we didn't see anything change in fourth quarter.  We saw approximately 4% pricing pressure or price decline in the US business over 2015 flat over the year."

241.    The slides Olafsson presented during the call echoed these statements:  "Also do not see the sharp drop in prices other competitors have seen recently[;] Mid-single digit decrease in 2015[.]"

242.    The statements referenced in ¶¶237-241 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:   (i) they are directly contradicted by the empirical data showing that Teva had, in 2014 and 2015, made as much as over $1.5 billion in Inflated Profit from price increases—more than the $1 billion improvement touted by Olafsson; (ii) Teva had made at least 71 price increases since July 2013, many for over 100% or more; (iii) the Inflated Profit from the increases implemented as part of Defendants' Price-Hike Strategy was a necessary foundation of Teva's purported financial success over that time; and (iv) while Defendants claimed not to have seen any changes in the pricing environment, (a) internally, Teva's profits from price increases had decreased precipitously, from as much as $236 million in Q2 2015, to $218 million in Q3 2015, to $166 million in Q4 2015, a decline of $70 million, or 30%, in two quarters, and (b) Teva was increasingly unable to implement further price increases, as it had in the past.

243.     The table below reflects Teva's improved profits as reported by the Company in 2015, as well as the YOY change in Inflated Profits for the same period:

| 2015 ($ millions) | Q1 | Q2 | Q3 | Q4 | Full Year |
|---|---|---|---|---|---|
| Reported YOY Change in Generic Profit | $296 | $193 | $20 | $7 | $516 |
| (Unreported) YOY Change in Inflated Profit | $108 | $76 | $25 | -$53 | $155 |

244.     During a March 8, 2016 Cowen conference, Olafsson touted the increased profitability of Teva's generics segment, attributing it to sources other than price increases:

In terms of growing the profitability, from 2013 to 2015, we grew the operating profit of the generic business from 17% in 2013, and we exited for the full year of 2015 we were at 28.1%. So it's about 1,100 basis points we improved the profitability on approximately $10 billion in revenue. So it was a significant improvement over a 24-month period. Part of that was due to the improvement in our cost of goods sold, very important in consolidation of plants and looking for the money there. But also part of it was due to portfolio selection and the cost infrastructure.

245.     Later on the call, a Cowen analyst asked Olafsson:  "Can you discuss what you're seeing," in generics pricing, "what you're observing, and then maybe in the context of what you're hearing from others, both US and ex-US?" In response, Olafsson declared:

So we came out in our fourth quarter results, and told the market that we had seen approximately 4% price decline in the US market in 2015.... I think overall the pricing hasn't changed that much. ***There was a lot of talk about inflation in generic pricing. But we never saw that.... [I]nflation never really happened in the generic business.... I don't see any big changes in the pricing environment. It's relatively stable***. 4% is worse than maybe two years ago. But it's similar to what we saw in 2014.

246.     The statements referenced in ¶¶243–245 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:   (i) Teva had by then generated over $1.7 billion in profit from price increases on dozens of generic

drugs from 2013 through 2015, pursuant to the Price-Hike Strategy, which was far more than the $1.1 billion in improved generic profit touted by Olafsson; (ii) via the Price-Hike Strategy, Teva had inflated the prices on 60 base-business generic drugs from July 2013 through Q1 2016, and had generated well over $1.7 billion in Inflated Profit from the beginning of the Relevant Period through the end of 2015; (iii) the Inflated Profit generated by the Price-Hike Strategy had drastically fallen and "the pricing" had changed and was not like it had been in 2014; and (iv) Teva implemented at least 32 price increases that year alone, while, in 2016, it would make only five, all of which were on prices of drugs that had been previously increased.

247.    On May 9, 2016, Teva filed its first quarter 2016 financial statements on Form 6-K with the SEC (the "Q1 2016 6-K").  The Q1 2016 6-K disclosed a YOY decline in generic profit of $215 million, or 27%, attributed "primarily" to "lower gross profit, as well as higher R&D expenses," while lower gross profit was purportedly "mainly a result of lower sales of high gross profit products in the United States, higher production expenses and lower gross profit in our European markets."

248.    The statements referenced in ¶247 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Teva's Inflated Profit declined from as much as $228 million in Q1 2015 to $124 million in Q1 2016, a decline of $104 million or 46%; (ii) that YOY decline in Inflated Profit comprised as much as 48% of the YOY decline in generic segment profit, and was more than four times the $25 million YOY increase in R&D expenses to which the Defendants attributed the results; and (iii)  the Price-Hike Strategy was unsustainable, as the Inflated Profits were drastically declining, and Teva was increasingly unable to make more hikes.

249.   Teva's Notes Registration Statement signed by Vigodman, Desheh, and Griffin, and the Notes Final Prospectus both incorporate by reference the false and misleading statements contained in the Q1 2016 6-K.

250.   On the same day, Teva held an investor earnings call. In his opening remarks, Olafsson explained away the decline in generic profit margin by blaming it on issues other than pricing:

> When compared to first quarter 2015, the operating profit declined by 360 basis points, fully explained by the exclusive launch of generic Nexium, esomeprazole, in the first quarter 201[5]. Excluding the exclusivity period of esomeprazole in first quarter, the profit margin of the generic segment was 24.4%.

251.   Also on that call, Olafsson, while asserting he would "do my best to provide you with as much color as possible," claimed that Teva was immune from downward pricing trends:

> Teva has not seen any fundamental change or worsening in the pricing environment – something we have been consistent about telling investors all year. Teva experienced approximately 4% price erosion in the United States last year, and our guidance for this year is that it will remain the same.... From where I sit today, there is nothing that changes my mind about that. Nothing has happened in the last two quarters that has changed the pricing environment. What this boils down to is each individual company's business model[.]

252.   The slides presented by Olafsson during the conference call echoed Olafsson's statements:

> What has changed in the US pricing environment since Q4 2015? The short answer is . . . nothing . . . . There is no change in the pricing environment . . . . It all comes down to each company's business model . . . . Why is Teva generics performance better than most Gx companies? Portfolio optimization . . . [and] [n]ew products[.]

253.   During the May 9, 2016 earnings call, Olafsson also offered the supposed reasons why Teva's generics division had achieved success over several years, and thus was differently positioned compared to its competitors who were reporting increased pricing pressure:

> We have taken a significant step to transform our generic business, solidify our foundation, increase our profitability, and to better position us to generate sustainable long-term growth. These many steps have included portfolio

optimization, strengthening our capabilities in R&D, and manufacturing of complex products, regaining a leading position in submission on first-to-files, enhancing our go-to-market, and sales force effectiveness capabilities, and much, much more. These are the very capabilities that companies must possess in order to thrive at the global level. We have created a unique and differentiated platform, positioned to extract significant value in the global growing generic space.

254.    The statements referenced in ¶¶249-253 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) they excluded entirely the decline in Teva's Inflated Profits from the unsustainable Price-Hike Strategy, including the steep decline of $42 million in Inflated Profit from Q4 2015 to Q1 2016, and the $104 million YOY decline compared to Q1 2015; (ii) that YOY decline comprised 48% of the decline in YOY generic profit that Olafsson attributed to a decline in sales of generic Nexium, reflecting that Defendants could no longer maintain the Inflated Profits generated by the increases implemented since July 2013, nor could they make further price increases; (iii) far from not seeing "any fundamental change or worsening in the pricing environment," Teva's Price-Hike Strategy of generating billions in profits from price increases was collapsing; (iv) in Q3 2015, Teva earned as much as $218 million in Inflated Profits from price increases, while in Q1 2016 it earned $124 million; (v) while, in 2015, Teva made 21 price increases on generic drugs, in 2016 it would implement only five, all of which were on prices of drugs which had previously been increased; (vi) while attributing Teva's supposed past success to other factors, Olafsson had a duty to disclose but concealed the full truth that Teva had generated as much as $1.9 billion in Inflated Profits from price hikes reported since the start of the Relevant Period; and (vii) Teva's Inflated Profits had begun to dry up due to the unsustainability of the Price-Hike Strategy, and the materialization of the risks concealed by Defendants (recently reported by Teva's competitors, namely the risk of increased pricing pressure due to increased public, Congressional, and regulatory scrutiny of

generic drug price increases), which would result in increased competition and the inability to take further price increases.

255.    On May 10, 2016, Olafsson participated in a Bank of America conference, and claimed that Teva was immune from pricing pressure:

> [T]here's nothing I have seen which shows a worsening pricing environment. We saw a price erosion in the US last year of approximately 4%[.]

> I know many of the competitors in the generic space, and in the specialty space, are talking about a lot of pricing pressure, but it shouldn't be. There is nothing that has happened over the last two quarters which has changed fundamental the market. And I feel that we are blaming the environment on individual company's business model more than anything else because as long as you have the right portfolio, you have had the right investment in R&D, you really have a strong opportunity.

256.    During a June 3, 2016 Sanford C. Bernstein conference, in response to an analyst question regarding pricing pressure, Vigodman stated Teva was not facing increased pricing pressure:

> So we are very consistent. Our message was conveyed, and we will continue to convey. What we see is a 4% to 5% erosion. That's what we see. That's not something which is different from what we said during 2015. By the way, we continue saying it in 2016. I think our results in Q1 demonstrated that.

257.    During a June 8, 2016 Goldman Sachs Global Healthcare Conference, Olafsson conveyed a similar response to a question from a Goldman Sachs analyst regarding pricing pressure:

> But really, the environment hasn't changed. When we signed that deal in July, we talked about 4% price erosion in the US generic business. And we are still talking about the same number, what we see in the base business.

258.    The statements referenced in ¶¶255-257 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Teva was experiencing a drastic decline in Inflated Profits from price increases, the inability to make additional price increases, and, in the past two quarters, the acceleration of the deterioration

of the pricing environment; (ii) Teva's Price-Hike Strategy was proving to be unsustainable, with Inflated Profits declining by $104 million in Q1 2016 as compared to Q1 2015, as the risks concealed by Defendants' strategy began to materialize; and (iii) these risks including increased pricing pressure and the inability to take further price increases due to increased public, legislative, and regulatory scrutiny of generic drug price increases, which resulted in increased competition.

259.    In a July 13, 2016 call held by the Defendants to announce the acceleration of Teva's debt offering, including the Notes Offering, to the end of July, which, on the May 9, 2016 investor call, had been scheduled to occur in September 2016 or in Q4 2016, a Citigroup analyst asked about pricing:  "[C]an you comment on the generics pricing assumptions that you have baked into your forecast? Following on that, Siggi, maybe you could just comment on the generics pricing environment, more broadly, that you are currently seeing in the marketplace."  In response Olafsson indicated that Teva had still not seen any change in the pricing environment, and that this stable pricing was baked into the assumptions underlying Teva's guidance and projections:

> Our assumption and what we assume is basically approximately 5% organic growth that we see year on year.... In terms of generic pricing in the second quarter, we saw no change in the pricing. We saw a stable environment, as we talked about, from first quarter into second quarter. Obviously, in second quarter, as we have highlighted to investors, there was no significant new launches that we saw in Teva, which obviously impacts the overall generic numbers. The pricing has remained stable. . . . Our assumption for the rest of the year is basically assuming the same pricing erosion. It is difficult to say; but as I'm sitting here today, with the information I have in hand, we are assuming and now forecasting for the guidance for the remainder of the year same pricing assumption as we have had for the first half of the year.

260.    The statements referenced in ¶259 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that: (i) Teva's price erosion assumption was not based on "stable" pricing in which there was "no change" in the second quarter or the "first half of the year"; (ii) Teva was at that time experiencing a drastic decline in Inflated Profit from price increases, the inability to make additional price increases, and, over the

past year, the acceleration of the deterioration of the pricing environment; (iii) Teva generated $10 million less in Inflated Profits from the first quarter of 2016 to the second quarter of 2016, which was part of a trend of steep decline; (iv) Teva generated $122 million less Inflated Profits in the second quarter 2016 than it had in the second quarter of 2015; (v) in the first two quarters of 2015, Teva made as much as $464 million in Inflated Profits; (vi) in the first two quarters of 2016, Teva made $238 million; (vii) in the first half of 2015, Teva had made 14 price increases; and (viii) in the first half of 2016, Teva only made five price increases, generating less than $12 million by the end of the Relevant Period.

261.    On July 13, 2016, Teva filed the Notes Registration Statement, signed by Vigodman, Desheh, and Griffin.  On July 19, 2016, Teva filed the Notes Final Prospectus.  The Notes Registration Statement and the Notes Final Prospectus incorporated by reference the 2015 20-F and the Q1 2016 6-K.  The incorporated 2015 20-F and Q1 2016 6-K contained false and misleading financial disclosures, as described above.

262.    On August 4, 2016, Teva filed its second quarter 2016 financial statements on Form 6-K with the SEC (the "Q2 2016 6-K").  The Q2 2016 6-K disclosed a YOY decline in generic profit of $115 million, or 16%, attributed "primarily" to "lower gross profit," which in turn was purportedly "mainly a result of loss of exclusivity on certain products as well as increased competition on other products in the United States . . . and higher production expenses[.]"

263.    On the same day, Teva held an investor earnings conference call.  During the call, Desheh attributed the poor performance of the Company's generic segment to factors other than a decrease in Inflated Profits:  "Revenues of our US generics business was impacted by competition to our Aripiprazole, Esomeprazole, and Budesonide which were the major drivers of our generic business in the US in the second quarter last year."

81

264.    Also during that call, and in response to a Citigroup analyst's inquiry regarding pricing stability, Olafsson denied seeing any change in the pricing environment:

> [T]he pricing is stable to the same degree as before. We saw approximately in the US, 4% price erosion in the business, in a way very stable from the first quarter. And the global pricing impact we saw in the business, in the generic business was approximately 5%. So we are pleased with the environment.

265.    Olafsson then reiterated the same false and misleading sentiment later in the call: "So overall, the business itself is fairly stable.  As I mentioned in the beginning, we are seeing exactly the 4% price erosion . . . 4% price erosion in the US."

266.    In response to a question from a J.P. Morgan analyst regarding whether Teva could implement price hikes following the Actavis acquisition, Olafsson stated:

> I think the pricing comes with shortages in the market. If you have an exclusive product, if there's some kind of dysfunction in the market, there might be a small pricing opportunity that usually comes in and comes out. But overall, the size, and being a combined company doesn't play into that.

267.    The statements referenced in ¶¶261-266 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:   (i) Inflated Profits declined from as much as $236 million in Q2 2015 to $114 million in Q2 2016, a decline of $122 million or 52%; (ii) that YOY decline in Inflated Profits comprised nearly all of the YOY decline in generic profit; (iii) the statements further concealed that the Price-Hike Strategy was unsustainable, as the Inflated Profits were drastically declining, and Teva was increasingly unable to implement further hikes; (iv) in Q2 2016, Teva suffered a $122 million YOY reduction in Inflated Profits from price increases compared to Q2 2015, and Teva was increasingly unable to implement further price hikes, implementing only five, immaterial increases during 2016, compared to 21 in 2015, and 32 in 2014, during the height of the strategy; (v) the statements minimized Teva's Price-Hike Strategy when, in reality, Teva took 76 price increases on 60 drugs, most of which were for 100% or more, that were not associated with any such shortage or

dysfunction; and (vi) this left Teva very exposed to the pricing pressure facing the industry at the time.

268.    On September 7, 2016, Desheh participated in a Wells Fargo conference where he was asked by a Wells Fargo analyst, "Teva has said during this whole, the last couple years, that you're not really seeing the same generic erosion, pricing erosion that some of the other companies have mentioned or blamed. Is that still the case?"  Desheh responded by claiming that Teva was not experiencing increased pricing pressure:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there.... [Y]ou don't see -- there you don't see the erosion. Where we see erosion is ... [when] you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down. But when we look at the base, there's no – there's no pressure on prices.

269.    On Teva's September 9, 2016 Generic Medicines Business Overview call with analysts, the slides presented echoed that Teva was not experiencing a change in pricing pressure: "Price erosion is nothing new . . . . Diverse portfolio and competitive cost structure allows for long-term value creation."

270.    The statements referenced in ¶¶268-269 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) while Desheh claimed that Teva's base business was experiencing "no pressure on prices," and the slides claimed that "price erosion is nothing new," Teva was suffering massive declines in Inflated Profits and the inability to implement further hikes due to increased pricing pressure that was itself the materialization of the risks concealed by the Defendants; and (ii) in Q2 2016, Teva suffered a massive $122 million YOY reduction in Inflated Profits from price increases compared to Q2 2015, and Teva implemented only five immaterial hikes in 2016, compared to 21 in 2015, and 32 in 2014, demonstrating the unsustainability of the Price-Hike Strategy.

271.     During the same call, Olafsson categorically denied Teva had increased prices on its generic drugs:  "There is no inflation in the generic pricing, which I will talk about."  Later during that same call, in response to a Bank of America analyst's question regarding the impact of specialty drug pricing on generics, Olafsson responded:  "[S]o first of all, we need to differentiate generics from branded pricing.  And people that say that the generic – there's a big generic price inflation, are simply wrong."  Olafsson even claimed that Teva had a "*secret sauce*" that immunized the Company from price fluctuations.

272.     The statements referenced in ¶271 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that each of these statements minimized:  (i) Teva's practice of making price increases pursuant to the Price-Hike Strategy, often by raising the price over 100% above the pre-inflation price, on 60 drugs or 22% of its portfolio; (ii) the importance of the Inflated Profits from those price increases to the Company; (iii) the unnatural price inflation in Teva's book of generic drugs caused by those increases and the attendant risks associated with such inflation; and (iv) that Teva was at the time experiencing a dramatic drop in Inflated Profits from those price increases and an inability to implement further increases as a result of the materialization of the risks concealed by the Defendants.

273.     During the September 9, 2016 call, Olafsson also responded to a question as to whether Teva would be taking price increases following the Actavis acquisition, stating:

> So first of all, it doesn't work like we wake up when we are one Company, and we can take price increases. Simply, it doesn't work like that in generics. When price increases are taken, there's some kind of abnormality in the business. There are shortages.

274.     The statements referenced in ¶273 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) they implied that because Teva only increased prices in limited circumstances, it was not exposed to price

deflation; and (ii) actually, Teva had raised the prices of 60 drugs, or 22% of its portfolio, via 76 price increases frequently by more than 100% of the original price, and thus had enormous price inflation in its portfolio; none of the price increases related to shortages.

275.    On November 15, 2016, Teva filed its third quarter 2016 financial statements on Form 6-K with the SEC (the "Q3 2016 6-K").  The Q3 2016 6-K disclosed a YOY increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis.  But, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%.  In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were "partially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide . . . due to increased competition and the loss of exclusivity on esomeprazole."

276.    On the same day, Teva held an investor earnings conference call.  During the call, a Credit Suisse analyst asked

> You mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward . . . . [W]hat's going to happen in the coming quarters [that] will be different than what you saw this quarter?"

Olafsson responded:

> Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what we saw in the difference between the 5% or mid single-digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

Olafsson doubled down on this explanation when pressed by an incredulous analyst from J.P. Morgan, who asked how Teva was sure that the decline was not the same pricing pressure seen throughout the market.  Olafsson reiterated "where I sit here today, experiencing the market, there hasn't again been any fundamental change."

277.     On the same call, a Wells Fargo analyst asked whether the stated 7% price erosion experienced that quarter was a "result of having to tame previous price increases, or give back some of those?"  Olafsson denied the existence of a pricing trend beyond that caused by Actavis-acquisition related divestitures:

> No, basically, the main reason . . . was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it. What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio. So there was an instability that happened in the market during the month of August, when the new owners were taking market share. It didn't change the fundamental of the market. It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

278.     The statements referenced in ¶¶275-277 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Inflated Profit declined from as much as $218 million in Q3 2015 to $97 million in Q3 2016, a decline of $121 million or 56%; (ii) that YOY decline in Inflated Profit comprised as much as 44% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis; (iii) the Price-Hike Strategy was unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to implement further hikes; (iv) Teva was in fact experiencing a sustained and material decline in the pricing environment, particularly with regard to the drugs whose price Teva had previously raised pursuant to the Price-Hike Strategy, in direct contradiction to Olafsson's specific denials; (v) Teva had inflated prices on 60 drugs, profited by as much as over $2.1 billion since the start of the Relevant Period, and was now suffering from drastic YOY reductions in Inflated Profits generated from those price hikes and an inability to implement more; (vi) Teva's Inflated Profits from price hikes had declined drastically, contributing just $97 million in Q3 2016, a YOY reduction of $121 million, or 56%; (vii) the sharp decline in

Inflated Profits was a result of the materialization of the risks that the Defendants concealed as they implemented their Price-Hike Strategy, namely increased pricing pressure resulting from increased public, legislative, and regulatory scrutiny of generic drug pricing, which in turn resulted in increased competition and the inability to implement further price hikes; and (viii) these were not single-quarter issues related to divested products, as suggested by Olafsson, but rather a long-term trend.

279.    On September 15, 2016, Teva issued a press release from its North Wales, Pennsylvania US headquarters, announcing that "the National Business Group on Health (NBGH), a non-profit association of 425 large U.S. employers, honored Teva for having one of the best workforce well-being programs in the nation." Teva included in the press release a statement of Lesley Billow, SVP HR, Americas, Teva, in which she claims that Teva maintains a "culture of well-being… rooted in [its] purpose of 'improving health, making people feel better,' [which] is demonstrated within Teva by promoting healthy work environments and developing outstanding programs for our employees that encourage good overall health."

280.    The statements referenced in ¶279 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that Teva's "culture" had encouraged executives and employees to implement the Price-Hike Strategy, which artificially inflated the cost of generic pharmaceuticals for consumers, and caused substantial harm to be borne by millions of patients in the United States.

281.    During a December 8, 2016 Citi Global Healthcare Conference, Vigodman announced that Teva would provide 2017 guidance early in January 2017.  During the call, Vigodman claimed Teva's past success was not due to Inflated Profits from price hikes, stating:

> Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business. In the first three years of this great effort, we

have been able to improve significantly the margins of Teva's standalone generics business. This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure.

282.   The statements referenced in ¶281 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that via Price-Hike Strategy, Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributing over $2.2 billion to Teva's profit from the start of the Relevant Period through, at least, the end of 2016.  Critically, Defendants' failure to disclose the Price-Hike Strategy precluded investors from learning that the Company's growth and financial results were unsustainable, at risk of significant decline, and expose the Company to substantial criminal and civil liability.

283.   On February 13, 2017, Teva filed with the SEC a press release ("Q4 2016 Press Release") reporting the Company's fourth quarter 2016 and full year 2016 financial results.  Two days later, on February 15, 2017, Teva filed its Form 20-F for the fiscal year ended December 31, 2016 with the SEC (the "2016 20-F") reporting the Company's FY 2016 financial results (collectively, the "Q4 and FY 2016 Statements").  The 2016 20-F disclosed a YOY decline in U.S. generic revenues of $200 million, or 5%.  When removing the impact of Actavis' $1.168 billion in U.S. generic revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $1.4 billion, or 29%.  Per the 2016 20-F this decline purportedly:

> [R]esulted mainly from the loss of exclusivity on esomeprazole . . . and aripiprazole . . . a decline in the sales of budesonide . . . due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the decline in sales of capecitabine.

284.   The statements referenced in ¶283 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Teva's Inflated Profits declined from as much as $848 million in 2015 to $421 million in 2016, a decline

of $427 million or 50%; (ii) that YOY decline in Inflated Profit comprised 31% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis; (iii) even giving Teva the benefit of Actavis' 2016 revenues, the YOY decline in Inflated Profit was more than double the $200 million YOY decline in U.S. generic revenues; and (iv) Teva's Price-Hike Strategy was unsustainable, as Inflated Profits were drastically declining, and Teva was unable to implement more hikes.

285.    On May 11, 2017, Teva filed with the SEC a press release ("Q1 2017 Press Release") reporting the Company's first quarter 2017 ("Q1 2017") financial results, and held an investor earnings conference call (the "May 10, 2017 Earnings Call"). That same day, Teva filed its Form 6-K for the fiscal quarter ended March 31, 2017 with the SEC (the "Q1 2017 6-K") reporting the Company's Q1 2017 financial results.

286.    The Q1 2017 6-K disclosed total revenues from generic medicines in the United States, of $1.4 billion in the first quarter of 2017, an increase of 41% compared to the first quarter of 2016. The Company primarily attributed the increase in revenue to "the inclusion of Actavis Generics revenues and products sold in the first quarter of 2017 that were not sold in the first quarter of 2016," which were also "partially offset by a decline in sales due to increased competition, mainly to aripiprazole (the generic equivalent of Abilify) and budesonide (the generic equivalent of Pulmicort) and loss of revenues following our divestment of certain products in connection with the acquisition."

287.    The statements referenced in ¶¶285-286 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that via Price-Hike Strategy, Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributing over $2.2 billion to Teva's profit from the

start of the Relevant Period through, at least, the end of 2016.  Critically, Defendants' failure to disclose the Price-Hike Strategy precluded investors from learning that the Company's growth and financial results were unsustainable, at risk of significant decline, and expose the Company to substantial criminal and civil liability.

288.    The statements referenced in ¶286 were materially false and misleading because, having attributed the sources offsetting the increased revenues from Actavis, the Defendants had a duty to disclose but concealed the full truth that its generic drug revenue and Inflated Profits declined YOY.  Further, Defendants failed to disclose that via Price-Hike Strategy, Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributing over $2.2 billion to Teva's profit from the start of the Relevant Period through, at least, the end of 2016.  Critically, Defendants' failure to disclose the Price-Hike Strategy and the impact of increased scrutiny on its Strategy precluded investors from learning that the Company's growth and financial results were unsustainable, at risk of significant decline, and expose the Company to substantial criminal and civil liability.

289.    On the May 10, 2017 Earnings Call, Jami Rubin, Goldman Sachs & Co., pressed the Company's executives as "to what extent has pricing pressure in the business paid or had an impact on [Teva's] gross margins?"

290.    Desheh failed to acknowledge increased legal scrutiny on Teva's Price-Hike Strategy following the DOJ and State AGs investigations, which would result in material price-erosion for the Company's generic drug portfolio. Rather, Desheh simply responded that "pricing pressure . . . did not have an impact on our gross margin. I think we said in the prepared remarks, the gross profit margin of our U.S. business or U.S. Generic business remains exactly the same,

it's around 55% or a bit higher and did not suffer – was not impacted by pricing pressure in generics in Q1."

291.    The statements referenced in ¶¶289-290 were false and misleading because, having concealed that Teva was in fact experiencing a sustained and material decline in the pricing environment, was disproportionately reliant upon its Actavis acquisition for revenue, and was now suffering from drastic reductions in Inflated Profits generated from those price hikes and an inability to implement more, were particularly misleading.

292.    On August 3, 2017, Teva filed with the SEC a press release ("Q2 2017 Press Release") reporting the Company's second quarter 2017 ("Q2 2017") financial results. That same day, Teva filed its Form 6-K for Q2 2017 with the SEC (the "Q2 2017 6-K") reporting the Company's Q2 2017 financial results.

293.    The Q2 2017 6-K disclosed that Teva's revenues from generic medicines in the United States during the second quarter of 2017 were $1.3 billion, an increase of 45%, compared to the second quarter of 2016. However, it was further stated that "[t]he increase resulted mainly from the inclusion of Actavis Generics revenues and products sold in the second quarter of 2017 that were not sold in the second quarter of 2016, partially offset by a decline in sales due to increased competition, mainly to budesonide (the generic equivalent of Pulmicort®) and aripiprazole (the generic equivalent of Abilify®) and loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition."

294.    The statements referenced in ¶¶292-293 were materially false and misleading because, having attributed the sources offsetting the increased revenues from Actavis, the Defendants had a duty to disclose but concealed the full truth that its generic drug revenue and Inflated Profit declined YOY.  Further, Defendants failed to disclose that via Price-Hike Strategy,

Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributing over $2.2 billion to Teva's profit from the start of the Relevant Period through, at least, the end of 2016. Critically, Defendants' failure to disclose the Price-Hike Strategy and the impact of increased scrutiny on its Strategy precluded investors from learning that the Company's growth and financial results were unsustainable, at risk of significant decline, and expose the Company to substantial criminal and civil liability.

295.    The Q2 2017 6-K further disclosed that "Teva recorded a goodwill impairment charge of $6.1 billion related to its U.S. generics reporting unit in the second quarter of 2017. The remaining goodwill allocated to this reporting unit amounts to $15.5 billion as of June 30, 2017." The Q2 2017 6-K stated in relevant part:

> ***During the second quarter of 2017, Teva identified certain developments in the U.S. market, which negatively impacted Teva's outlook for its U.S. generics business. These developments included: (i) additional pricing pressure in the U.S. market as a result of customer consolidation into larger buying groups to extract further price reductions;*** (ii) accelerated FDA approval of additional generic versions of off-patent medicines, resulting in increased competition for these products; and (iii) delays in new launches of certain of Teva's generic products. These developments caused Teva to revisit its assumptions supporting the cash flow projections for its U.S. generics reporting unit, including: (i) expected price erosion and certain revenue growth assumptions; (ii) the associated operating profit margins; and (iii) the terminal growth rate of its U.S. generics reporting unit.
>
> Teva determined the fair value of the reporting units using a weighting of fair values derived from the income approach. The income approach is a forward-looking approach to estimating fair value and utilizes the 2017 remaining year forecast, projections for growth off that base with an associated price erosion as well as terminal growth rate. Within the income approach, the method that was used is the discounted cash flow method. Teva started with a forecast of all the expected net cash flows associated with the reporting unit, which includes the application of a terminal value, and then applied a discount rate to arrive at a net present value amount. Cash flow projections are based on Teva's estimates of revenue growth rates and operating margins, taking into consideration industry and market conditions. The discount rate used is based on the weighted-average cost of capital adjusted for the relevant risk associated with country-specific characteristics.
>
> ***Based on the revised discounted cash flows analysis, Teva recorded a goodwill impairment charge of $6.1 billion related to its U.S. generics reporting unit in the***

*second quarter of 2017.* The remaining goodwill allocated to this reporting unit amounts to $15.5 billion as of June 30, 2017.

296.    The above-statements were also false and misleading because, as a result of its illegal Price-Hike Strategy, Teva overstated the value of its goodwill on its balance sheet and understated  the Company's goodwill impairment charge. Consequently, the Company's reported operating income and net earnings were inflated by billions of dollars.

297.    On November 2, 2017, Teva filed with the SEC a press release ("Q3 2017 Press Release") reporting the Company's second quarter 2017 ("Q3 2017") financial results, and held an investor earnings conference call (the "November 2, 2017 Earnings Call"). That same day, Teva filed its Form 6-K for Q3 2017 with the SEC (the "Q3 2017 6-K") reporting the Company's Q3 2017 financial results.

298.    Teva reported revenues from generic medicines in the United States during the third quarter of 2017 of $1.2 billion, a decrease of 9%, compared to the third quarter of 2016. The Company attributed decline in revenue "to pricing declines resulting from customer consolidation into larger buying groups and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta authorized generic) due to the launch of a competing product, partially offset by the inclusion of three months of Actavis Generics revenues in this quarter, compared to two months in the third quarter of 2016."

299.    Teva also stated in the Q3 2017 6-K, that "[g]iven certain developments in its businesses and especially the significant decline of its share price during the third quarter of 2017, Teva reassessed its cash flow projections for its reporting units as of September 30, 2017, focusing on its specialty reporting unit and its U.S. generics reporting unit." The Company added that "[a]s part of this assessment, Teva considered the sensitivity of estimates and assumptions used in the

latest projections and the sensitivity of changes to the prior projections on its June 30, 2017 impairment testing."

300.    Teva elaborated on the various "developments in the U.S. [generics] market" which it claimed to identify as effecting its operations, stating in relevant part:

### U.S. generics reporting unit

During the second quarter of 2017, Teva identified certain developments in the U.S. market, which negatively impacted Teva's outlook for its U.S. generics business. These developments included: (i) additional pricing pressure in the U.S. market as a result of customer consolidation into larger buying groups to extract further price reductions; (ii) accelerated FDA approval of additional generic versions of off-patent medicines, resulting in increased competition for these products; and (iii) delays in new launches of certain of Teva's generic products. These developments caused Teva to revisit its assumptions supporting the cash flow projections for its U.S. generics reporting unit, including: (i) expected price erosion and certain revenue growth assumptions; (ii) the associated operating profit margins; and (iii) the terminal growth rate of its U.S. generics reporting unit.

In determining the discounted cash flow of Teva's U.S. generics reporting unit, Teva used the following key assumptions: Teva expects revenue and operating profits to continue to decline in the next two years, as its ability to successfully launch new generic products is not expected to offset or exceed the price and volume erosion for its existing portfolio prior to 2020, following which time, in 2020 and 2021, Teva expects to return to moderate growth. Teva assumes a terminal growth rate of 2% for the coming years, in line with recent general outlook for the U.S. generics market. The resulting cash flow amounts were discounted using a WACC of 6.8%, which Teva uses for most of its worldwide operations, except for the specialty reporting unit, as described above. If Teva holds all other assumptions constant, a reduction in the terminal growth rate by 0.1% or an increase in discount rate by 0.1% would each result in an additional impairment of approximately $450 million.

Based on the revised discounted cash flows analysis, Teva recorded a goodwill impairment charge of $6.1 billion related to its U.S. generics reporting unit in the second quarter of 2017. *The remaining goodwill allocated to this reporting unit amounted to $15.5 billion as of June 30, 2017, and remained unchanged as of September 30, 2017.*

As of September 30, 2017, Teva adjusted the projections for its U.S. generics reporting unit to reflect favorable events, partially offset by further increased pressure in the U.S. generics market. Teva believes that risks are appropriately reflected in the cash flow projections and therefore no risk premium is required to the discount rate of 6.8%. The adjustments to the projections resulted in a slight

increase of the fair value over carrying value with a percentage difference of 1%. Goodwill allocated to this reporting unit remained unchanged as of September 30, 2017.

301.    On the November 2, 2017 Earnings Call, Teva's executives were again questioned on "the pricing trends in the Generic's base business" and the "pricing declines of – or pressures in the high single digit range." Dipankar Bhattacharjee answered on behalf of Teva, and failed to attribute the increased pricing erosion on the increased scrutiny of its Price-Hike Strategy:

> I will take the question on price erosion. As you may recall, last quarter we explained the methodology that we adopt for our price erosion for the base business, which excludes our new products, which are products that have been launched in the past 12 months, and transition products, which are products, which for one reason or another, had either enjoyed exclusivity or are enjoying some kind of a market exclusivity, for which they have had higher prices and volumes and are now going through a transition of lower prices and volumes.
>
> So in the second quarter we reported a price erosion of a little over 6% for our base business, compared to the comparable quarter of the prior year. Since then in our third quarter we have seen an increase in price erosion. And as Mike explained that we have now seen in the third quarter the price erosion to be 10%.
>
> ***This is primarily driven by two factors. The first is that the increasing FDA approvals that are happening for products, for which already generics players exist in the market. So the new players try and drive some gains in market share based on volumes – based on lower prices.***
>
> ***And the second is that the consolidation of the three – of the customers into three GPOs, which now account for more than 85% of Generics purchases in the U.S. market, has also via their RFP, have created additional pricing pressure.***

302.    The statements referenced in ¶¶295-301 were materially false and misleading because, having attributed the decline to "larger buying groups and accelerated FDA approvals", and the sources of offsetting increased revenues from Actavis, the Defendants concealed the full truth that Teva's generic drug revenue and Inflated Profits declined YOY.  Further, Defendants failed to disclose that via Price-Hike Strategy, Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributing over $2.2 billion to Teva's profit from the start of the Relevant Period through, at least, the end of 2016.  Critically,

Defendants' failure to disclose the Price-Hike Strategy and the impact of increased scrutiny on its Strategy precluded investors from learning that the Company's growth and financial results were unsustainable, at risk of significant decline, and expose the Company to substantial criminal and civil liability.  Additionally, the above-statements were false and misleading because, as a result of its illegal Price-Hike Strategy, Teva overstated the value of its goodwill on its balance sheet and understated  the Company's goodwill impairment charge. Consequently, the Company's reported operating income and net earnings were inflated by billions of dollars.

303.    On November 15, 2017, Teva issued a press release from its North Wales, Pennsylvania US headquarters, announcing "the launch of a prescription copay assistance program in the U.S. for the Company's generic equivalent to Gleevec®1 (imatinib mesylate) tablets." The press release included a statement by Andy Boyer, Teva's President & CEO, Global Generic Medicines, North America, where he claimed that "[t]his effort further reinforces Teva's long-standing commitment to providing access to our medicines… Given today's economic climate, programs that help alleviate the high copay costs that many patients face are increasingly important."

304.    The press release concluded:

Teva remains committed to strengthening its generics business with continued investment in new and diverse, high quality products. With nearly 600 generic medicines available, Teva has the largest portfolio of FDA-approved generic products on the market and holds the leading position in first-to-file opportunities, with over 100 pending first-to-files in the U.S. **Currently, one in seven generic prescriptions dispensed in the U.S. is filled with a Teva generic product**.

305.    The statements referenced in ¶¶303-304 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Teva had implemented a Price-Hike Strategy, which artificially inflated the cost of generic pharmaceuticals for consumers; (ii) consequently, patients in the United States would suffer and

struggle to afford the rising costs of the generic pharmaceuticals sold by Teva; and (iii) Teva maintained its market leading position in generic pharmaceutical prescriptions through an illegal Price-Hike Strategy.

306.   On February 2, 2018, the Company filed its annual report on Form 10-K with the SEC (the "2017 10-K"), announcing reporting the Company's fourth quarter 2017 ("Q4 2017") and full year 2017 ("FY 2017") financial results.

307.   The 2017 10-K touted its generic drug portfolio:

In 2017, we led the U.S. generic market in total prescriptions and new prescriptions, with approximately 583 million total prescriptions, representing 15.2% of total U.S. generic prescriptions, according to IQVIA data.[4] We will continue to focus our efforts in the United States on maintaining our position as an industry leader in introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that will create value for our patients. We will conduct a substantial optimization of the generics portfolio globally, and most specifically in the United States, through a more tailored approach to the portfolio with increased focus on profitability. These efforts will be supported by our strong emphasis on customer service, the breadth of our product pipeline and our commitment to quality and regulatory compliance.

308.   The Company disclosed that it generated $5 billion in revenues from generic medicines in the United States in FY 2017:

Revenues from generic medicines in the United States in 2017 were $5.0 billion, an increase of 11% compared to $4.6 billion in 2016. The increase resulted mainly from the inclusion of Actavis Generics revenues for the full year of 2017 compared to five months in 2016 and products sold in 2017 that were not sold in 2016, partially offset by:

- decline in sales of budesonide (the generic equivalent of Pulmicort®) and methylphenidate extended-release tablets (Concerta® authorized generic) due to increased competition;

- price erosion resulting from the following factors:

- customer consolidation into larger buying groups; and

---

[4] IQVIA (formerly IMS Health Inc.) is a provider of market research to the pharmaceutical industry,

- accelerated FDA approvals for additional generic versions of competing off-patent medicines; and

- loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition.

309.    The 2017 10-K also revealed that the Company incurred a ***$10.4 billion*** impairment charged related to its U.S. generics reporting unit in the fourth quarter of 2017:

> ***U.S. generics reporting unit***
>
> ***During the second quarter of 2017, Teva identified certain developments in the U.S. market, which negatively impacted Teva's outlook for its U.S. generics business. These developments included: (i) additional pricing pressure in the U.S. generics market as a result of customer consolidation into larger buying groups to extract further price reductions; (ii) accelerated FDA approval of additional generic versions of off-patent medicines, resulting in increased competition for these products; and (iii) delays in launches of certain of Teva's new generic products. These developments caused Teva to revisit its assumptions supporting the cash flow projections for its U.S. generics reporting unit, including: (i) the expected duration and depth of price erosion and certain revenue growth assumptions; (ii) the associated operating profit margins; and (iii) the long term growth rate.***
>
> In estimating the discounted cash flow value of Teva's U.S. generics reporting unit as of the second quarter of 2017, Teva used the following key assumptions: Teva expected revenue and operating profits to continue to decline in 2018 and 2019, as its ability to successfully launch new generic products was not expected to offset or exceed the price and volume erosion for its existing portfolio prior to 2020, following which time, in 2020 and 2021, Teva expected to return to moderate growth. Teva assumed a terminal growth rate of 2% for the coming years, in line with recent general outlook, at the time, for the U.S. generics market. The resulting cash flow amounts were discounted using a weighted average cost of capital ("WACC") of 6.8%.
>
> Based on the second quarter revised discounted cash flows analysis, Teva recorded a goodwill impairment of $6.1 billion related to its U.S. generics reporting unit.
>
> During the third quarter of 2017, Teva adjusted the projections for its U.S. generics reporting unit to reflect a potentially beneficial event, offset by further pricing pressure in the U.S. generics market, and concluded that no additional impairment was required.
>
> During the fourth quarter of 2017, Teva noted further deterioration in the U.S. generics market and economic environment and further limitations on Teva's

ability to influence generic medicines pricing in the long term and a decrease in value from future launches:

• *Pricing challenges due to customer consolidation*. In prior periods, it appeared to be reasonable that as price erosion in the generics market continued, other manufacturers would exit particular generic markets, resulting in opportunities to eventually reduce overall erosion with price increases for certain products with decreasing competition after the exit of other manufacturers. However, increasing consolidation among purchasers of generic medicines, particularly Group Purchasing Organizations ("GPOs"), has led to three such GPOs representing approximately 80% of generics purchases in the United States. This led to a continuation and increase in the trend of "lowest price" tenders. Therefore, it now appears likely that there will be few, if any, opportunities to increase prices even when other generics manufacturers exit a market.

• *Pricing challenges due to government regulation*. There is an increasing trend of enacting and proposing state-level legislation in the United States imposing penalties and/or restricting price increases, making pricing more challenging. The inconsistent rules across states add to the complexity of how to make decisions about the best economic outcome to maximize profit on a given generic product and the most restrictive law will likely restrict Teva's business practices nationwide, as marketing, sales and pricing are typically not administered on a state-by-state basis. Restrictive bills have passed in at least seven states, including high-population states such as California and New York, and bills are in the process of being re-submitted in ten additional states where they were previously rejected, with approximately half of them already passed and/or submitted for vote by January 2018.

• *Increasing generic approvals.* The FDA is approving more generic formulations than they have in the past, which is affecting the value of already launched products. On January 3, 2018, the FDA commissioner announced new steps to facilitate efficient generic drug review to enhance competition, promote access and lower drug prices. The commissioner also stated that the FDA had several record-breaking months for the number of generic medicines approved, including November 2017, when it approved the highest number of generic medicines in the FDA's history.

Being the first to market a generic version of a product, and particularly as the only company authorized to sell during the 180-day period of exclusivity in the U.S. market, can substantially increase sales, profits and profitability in the period following the introduction of such a product and prior to a competitor's introduction of an equivalent product. Even after the exclusivity period ends, there is often continuing benefit from having the first generic product in the market. Pricing is generally higher during periods of limited competition. The FDA has also limited the availability of exclusive or semi-exclusive periods for new products with an increase in shared first to file awards, which reduces the economic benefit from being first-to-file for generic approvals

99

In contrast to the FDA's accelerated approval of additional generic versions of off-patent medicines, the rate of FDA approval for a generic version of originator drugs without generic competition has not significantly increased. Thus, Teva's ability to launch profitable new products has not benefited from the FDA's increased focus on approving generic applications. Additionally, much of Teva's future pipeline is concentrated in complex or unique products coupled with devices, which take longer time for FDA approval.

•       ***Originator strategies to maintain market share***. Originator companies increasingly engage in strategies beyond authorized generics, to maintain market share of their originator drugs, reducing the value of newly launched complex or novel generics.

•       ***Changes to traditional distribution model.*** The traditional model for distribution of pharmaceutical products is also undergoing disruption as a result of the entry or potential entry of new competitors and significant mergers among key industry participants, which Teva believes will limit its future growth in the U.S. generics market. For example: (i) in January 2018, several major hospital groups announced a plan to form a non-profit company that will provide U.S. hospitals with a number of generic drugs; (ii) in January 2018, Amazon Inc., Berkshire Hathaway Inc. and JPMorgan Chase & Co. announced that they plan to join forces by forming an independent health care company for their combined one million U.S. employees; and (iii) the consolidation resulting from the merger announced in December 2017 between CVS Health and Aetna, if consummated, is expected to create a vertically integrated organization with increased control over the physician and pharmacy networks and, ultimately, over which medicines are sold to patients. Each of these events has the potential to drive further price erosion and limit the growth opportunities for Teva's U.S. generics unit.

•       ***U.S. tax reform.*** Recently-enacted U.S. tax reform legislation is expected to limit Teva's ability to achieve targeted tax efficiencies compared to prior estimates. See note 15.

In response to these developments, Teva's recently appointed President and Chief Executive Officer, Kåre Schultz, and the management team that was reorganized under him, announced a comprehensive restructuring plan in December 2017, aimed to increase the profitability of Teva's U.S. generics business, among other things. This plan focuses on discontinuation of loss generating products and reductions of infrastructure costs, by closing facilities and executing divestments, as well as a reduction in R&D expenditures, focusing on fewer, more profitable opportunities to launch new generic medicines. In addition, Teva further evaluated its assumptions and approach to valuing its pipeline and related projections. Due to the increased risks and variables now impacting generics launches, Teva, with the assistance of a global consulting firm, used a "Monte Carlo" model to simulate the different outcomes for launch value to better predict the estimated value to be derived.

As a result of the factors discussed above, Teva adjusted certain of its assumptions used in its cash flow projections in the fourth quarter of 2017 to determine the fair value of its U.S. generics reporting unit. In comparison to previous periods, Teva expects less revenues and profitability from newly launched products as well as larger pricing declines. As a result, Teva estimates a longer period will pass before it returns to revenue and profitability growth in its U.S. generics reporting unit.

***The resulting cash flow amounts were discounted using a slightly increased rate of 7.3% compared to prior quarters, reflecting market participants' assumptions regarding increased uncertainties in the U.S. generics market. Teva still assumes a terminal growth rate of 2%.***

***Based on the new estimates incorporating all of the above factors, Teva recorded a goodwill impairment of $10.4 billion related to its U.S. generics reporting unit in the fourth quarter of 2017. The aggregate goodwill impairment related to Teva's U.S. generics reporting unit in 2017 was $16.5 billion.***

310.    The statements referenced in ¶¶306-309 were materially false and misleading because, having attributed the decline to "larger buying groups" and "accelerated FDA approvals", and the sources of offsetting increased revenues from Actavis, the Defendants concealed the full truth that Teva's generic drug revenue and Inflated Profit declined YOY.  Further, Defendants failed to disclose that via Price-Hike Strategy, Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributing over $2.2 billion to Teva's profit from the start of the Relevant Period through, at least, the end of 2016.  Critically, Defendants' failure to disclose the Price-Hike Strategy and the impact of increased scrutiny on its Strategy precluded investors from learning that the Company's growth and financial results were unsustainable, at risk of significant decline, and expose the Company to substantial criminal and civil liability.  Additionally, the above-statements were false and misleading because, as a result of its illegal Price-Hike Strategy, Teva overstated the value of its goodwill on its balance sheet and understated the Company's goodwill impairment charge. Consequently, the Company's reported operating income and net earnings were inflated by billions of dollars.

311.     On May 3, 2018, Teva filed a Form 10-Q with the SEC (the "Q1 2018 10-Q")

reporting the Company's financial results for first quarter 2018 ("Q1 2018").  The Company touted

in the filing that "[i]n the first quarter of 2018, we led the U.S. generics market in total prescriptions

and new prescriptions, with approximately 584 million total prescriptions, representing 15% of

total U.S. generic prescriptions according to IQVIA data."'

312.     However, the significant market share was unable to stem the loss of the Price-Hike

Strategy, and the Company reported that "revenues in [Teva's] North America segment in the first

quarter of 2018 decreased by 23% to $1.1 billion, compared to the first quarter of 2017, *mainly*

*due to lower volumes and continued price erosion*."

313.     The statements referenced in ¶¶311-312 were materially false and misleading

because, the Defendants concealed the full truth that Teva's generic drug revenue and Inflated

Profit declined YOY due to its inability to continue its illegal Price-Hike Strategy.  Further,

Defendants failed to disclose that via Price-Hike Strategy, Teva made at least 76 systematic price

hikes since July 2013, many of which were in excess of 100% of the prior price, contributing over

$2.2 billion to Teva's profit from the start of the Relevant Period through, at least, the end of 2016.

Critically, Defendants' failure to disclose the Price-Hike Strategy and the impact of increased

scrutiny on its Strategy precluded investors from learning that the Company's growth and financial

results were unsustainable, at risk of significant decline, and expose the Company to substantial

criminal and civil liability.

314.     On May 29, 2018, Teva issued a press release from its North Wales, Pennsylvania

US headquarters, announcing "the launch of Life Effects[], a new patient-centric website

developed in collaboration with patients for people living with one or more chronic conditions,

focusing on the impact that a chronic condition has on a patient's day-to-day life."  Brendan

O'Grady, Teva's Executive Vice President and Head of North America Commercial, touted the Company's recent efforts to "align[]" itself "to meet the evolving needs and expectations of chronically ill patients around the country."  The press release continued:

> Earlier this year, Teva announced a new brand positioning--***Teva is committed to providing innovative and high-quality medicines to enable people around the world to live better day***s--and a visual identity, including a new logo. The brand unifies Teva's businesses around the world after decades of acquisitions and incorporates ***the company's untold story on how it impacts the lives of millions of people globally every day***. In addition to the U.S., Teva has rolled out the new brand in Canada, France, Russia and Argentina over the past year. Launches in additional markets are planned throughout 2018.

315.    Iris Beck-Codner, Teva's Executive Vice President for Global Brand and Corporate Communications, added that that ***"[t]he new brand is integral to making our mission of bringing valuable medicines to patients easier to execute***… Life Effects underscores our fresh, updated approach to being more than the world's largest medicine cabinet. ***It also demonstrates, in a tangible way, how we are evolving our proposition based on consumer and patient insights and putting patients at the heart of what we do each and every day***."

316.    The statements referenced in ¶314-315 were materially false and misleading because Defendants made false and/or misleading statements and/or failed to disclose that: (i) Teva had implemented a Price-Hike Strategy, which artificially inflated the cost of generic pharmaceuticals for consumers; and (ii) consequently, patients in the United States would suffer and struggle to afford the rising costs of the generic pharmaceuticals sold by Teva.

317.    On August 2, 2018, Teva filed a Form 10-Q with the SEC (the "Q2 2018 10-Q") reporting the Company's second quarter 2018 ("Q2 2018"). Therein, the Company reported  that in "the second quarter of 2018, [Teva] led the U.S. generics market in total prescriptions and new prescriptions, with approximately 576 million total prescriptions, representing 14.8% of total U.S. generic prescriptions according to IQVIA data."

318.     However, the Company also reported a continued deterioration of its U.S. generics business:

> Revenues from our North America segment in the second quarter of 2018 were $2.3 billion, a decrease of $906 million, or 29%, compared to the second quarter of 2017, mainly due to a decline in revenues of COPAXONE® as well as an equally significant decline in revenues in our U.S. generics business and the loss of revenues from the sale of our women's health business, partially offset by higher revenues from AUSTEDO® and our distribution business.

319.     The statements referenced in ¶¶317-318 were materially false and misleading because, the Defendants concealed the full truth that Teva's generic drug revenue and Inflated Profit declined YOY due to its inability to continue its illegal Price-Hike Strategy.  Further, Defendants failed to disclose that via Price-Hike Strategy, Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributing over $2.2 billion to Teva's profit from the start of the Relevant Period through, at least, the end of 2016. Critically, Defendants' failure to disclose the Price-Hike Strategy and the impact of increased scrutiny on its Strategy precluded investors from learning that the Company's growth and financial results were unsustainable, at risk of significant decline, and expose the Company to substantial criminal and civil liability.

320.     On August 2, 2018, Teva filed a Form 10-Q with the SEC (the "Q2 2018 10-Q") reporting the Company's second quarter 2018 ("Q2 2018"). Therein, the Company reported  that in "the second quarter of 2018, [Teva] led the U.S. generics market in total prescriptions and new prescriptions, with approximately 576 million total prescriptions, representing 14.8% of total U.S. generic prescriptions according to IQVIA data."

321.     However, the Company also reported a continued deterioration of its U.S. generics business, with revenues from its North America segment in the third quarter of 2018 of $2.265 billion, a decrease of $778 million, or 26%, compared to the third quarter of 2017. The Company

attributed the decline in revenues in its U.S. generics business to, among other things, "a decline in revenues in our U.S. generics business."

322.   The statements referenced in ¶¶320-321 were materially false and misleading because, the Defendants concealed the full truth that Teva's generic drug revenue and Inflated Profit declined YOY due to its inability to continue its illegal Price-Hike Strategy.  Further, Defendants failed to disclose that via Price-Hike Strategy, Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributing over $2.2 billion to Teva's profit from the start of the Relevant Period through, at least, the end of 2016. Critically, Defendants' failure to disclose the Price-Hike Strategy and the impact of increased scrutiny on its Strategy precluded investors from learning that the Company's growth and financial results were unsustainable, at risk of significant decline, and expose the Company to substantial criminal and civil liability.

**C.     Defendants' False and Misleading Statements Concealing Teva's Receipt of The DOJ and State AGs' Subpoenas**

323.   The Defendants concealed Teva's receipt of a subpoena from the DOJ on June 21, 2016, and a subpoena from the State AGs on July 12, 2016, each pursuant to their respective investigations into potential antitrust violations regarding pricing practices by generics manufacturers (collectively, the "Subpoenas"). Specifically, the Defendants failed to disclose these subpoenas in the Notes Offering Materials. This was actionably false and misleading because the subpoenas called into question Teva's future earnings potential. They rendered uncertain the Company's ability to maintain its earnings from the undisclosed Price-Hike Strategy. Indeed, after Teva received the DOJ subpoena, it was unable to make any additional price increase pursuant to the Price-Hike Strategy. Consistent with this, the Note Issuance Documents listed "governmental investigations into sales and marketing practices" as among the "[i]mportant factors" that could

cause Teva's future financial performance to "differ significantly from [anticipated] results, performance or achievements."

324.    Additionally, the Notes Offering Materials incorporated by reference the 2015 20-F and the Q1 2016 6-K, which included extensive risk disclosures but did not disclose the subpoenas. Among these is a section titled "Government Investigations and Litigation Relating to Pricing and Marketing," that include an extensive description of litigation related to "marketing and promotion of [Teva's] specialty pharmaceutical products," and to litigation by "[a] number of state attorneys general ... relating to reimbursements or drug price reporting under Medicaid or other programs." The detailed and extensive nature of this section falsely and misleadingly indicated that the disclosures were complete, while omitting the highly material DOJ and State AGs subpoenas.

325.    Teva only disclosed that it received the Subpoenas on August 4, 2016, when it filed the Q2 2016 6-K, which stated that:

> On June 21, 2015, Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products. On July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations.

326.    When the Company filed its next quarterly report on November 15, 2016, the Q3 2016 6-K, it revealed that "Actavis has also received a similar subpoena from the Connecticut Attorney General. Teva and Actavis are cooperating fully with these subpoenas."  Moreover, it tried to ease its investors' worries by stating that "***Teva is not aware of any facts that would give rise to an exposure to the Company with respect to these subpoenas***."

327.    Also on November 15, 2016, the Company held an earnings call for the quarter, during which Defendants further denied any wrongdoing. First, Vigodman claimed that legal compliance has been a "top priority" since at least 2014:

Since becoming Teva CEO in 2014, *I have made compliance a top priority in everything we do. The compliance [sic] foregone that Teva has in place is serious, rigorous and comprehensive, and is designed to protect the Company and its subsidiaries against future violation.* Today, Teva is a compliance culture that begins with a strong tone at the top, including our executive regional and local management, a culture of compliance that underpins every single business decision that Teva makes.

328.     Vigodman finished his prepared remarks on the call by specifically addressing the

Subpoenas, stating in relevant part:

Finally, I cannot conclude this part of my remarks without briefly addressing the U.S. Department of Justice investigation into price collusion in the generics drug industry, which has been in the news this month*. I would like to emphasize that based on all of our efforts to-date, internal and external, we disclosed and I am reiterating it here today that we are not aware of any fact that will give rise to an exposure to Teva with respect to the investigation*.

329.     Teva continued to categorically deny all of the reported collusive practices.

Specifically, in each of the Q1 2017 6-K, Q2 2017 6-K, Q3 2017 6-K, 2017 10-K, Q1 2018 10-Q,

Q2 2018 10-Q and Q3 2018 10-Q filings, "Teva denie[d] having engaged in *any conduct* that

would give rise to liability with respect to the above-mentioned subpoenas and civil suits."

330.     The statements identified in ¶¶323-329 concerning Teva's receipt of the DOJ and

State AGs' Subpoenas were materially false and misleading when made by, *inter alia*, "den[ying]

having engaged in any conduct" when it had purposefully engaged in an illegal pricing cartel since

at least 2013, in knowing violation of applicable civil and criminal antitrust laws, and,

consequently, exposing the Company to significant undisclosed legal and financial risks.

### D.     Defendants Violated Their Statutory Duty to Disclose Pricing Trends

331.     During the Relevant Period, Defendants were under a statutory duty of disclosure

pursuant to Item 5 of Form 20-F ("Item 5"), interpreted by the SEC and courts to require the same

disclosures as Item 303 of Regulation S-K ("Item 303"). Item 303 (and Item 5) require that a

foreign issuer like Teva must, in the Management Discussion and Analysis ("MD&A") section of

its Forms 20-F, describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or, unfavorable impact on net sales or revenues or income from continuing operations. The failure to disclose a material trend or uncertainty in violation of Item 303 is an omission that is actionable under the securities laws.

332.     According to the SEC's interpretive release regarding Item 303, disclosure is necessary where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations. Even if Defendants were not certain about the likely effect of the event or trend on their future revenues, Defendants were still required under Item 303 to disclose the manner in which that then-known trend, event, or uncertainty might reasonably be expected to materially impact Teva's future revenues.

333.     SEC Staff Accounting Bulletin No. 104 explains this disclosure duty further, requiring that management disclose in the MD&A section the impact of artificial or collusive price increases, demanding that: "Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

334.     During the Relevant Period, under Item 303, Defendants failed to disclose at least two trends related to the pricing of Teva's generic drugs. First, Defendants failed to disclose the trend that Teva's financial success was driven in a material way by the Price-Hike Strategy. These prices increases, as discussed, generated as much as $2.3 billion in Inflated Profit for Teva over the Relevant Period. Yet, the Price-Hike Strategy and the Inflated Profits it generated were risky and unsustainable as the Price-Hike Strategy was susceptible to actual competition, as well as public scrutiny, and scrutiny by legislatures, regulators and criminal investigators.

335. Second, starting no later than the beginning of 2016, Defendants failed to disclose the by-then known trend that the Price-Hike Strategy was beginning to fail. Teva could not maintain the Inflated Profits as industry-wide pricing pressure, which Defendants consistently denied, was reducing the inflated prices on Teva's generic drug portfolio. Teva was also finding it increasingly difficult, if not impossible, to make additional price increases because of the scrutiny from the public, Congress, and the DOJ and State AGs investigations; and indeed, Teva effectively could not make any price increases after the DOJ subpoena was served on June 21, 2016.

336. SEC Release No. 33-8350 provides MD&A disclosure guidance that is a nearly perfect analogy to the facts here, requiring that:

> if a company's financial statements reflect materially lower revenues resulting from a decline in the volume of products sold when compared to a prior period, MD&A should not only identify the decline in sales volume, but also should analyze the reasons underlying the decline in sales when the reasons are also material and determinable. The analysis should reveal underlying material causes of the matters described, including for example, if applicable, difficulties in the manufacturing process, a decline in the quality of a product, loss in competitive position and market share, or a combination of conditions.

Instead, in violation of its duties under Item 303, Teva only disclosed trends that did not bear on the issue of price inflation (through price increases), or price erosion. Teva's failure to disclose the pricing trends was particularly misleading given that (i) price increases were a core but concealed business strategy; (ii) management concurrently denied that pricing had impacted Teva's bottom line and that the Company made price increases simply for profit; (iii) management consistently minimized the positive impact of price increases on Teva's profits; (iv) management consistently denied that price increases had resulted in price inflation; and (v) management denied that price deflation was materially affecting Teva, even as its revenues from the former price increases cratered.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

337.    Together with the above-alleged facts, the Defendants each acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements identified herein.

### A.    Former Employee Allegations

338.    As alleged in the Class Action, several former Teva employees provided information on a confidential basis supporting the strong inference that the Defendants acted with scienter in making the alleged material false and misleading statements and omissions. The former employees' accounts corroborate one another and the additional facts alleged herein.

339.    Senior Product Operations Manager [or FE-1] started at Teva in 2005 and, until 2011, FE-1 worked in new generic drug forecasting. From 2011 to July 2014, FE-1 was a manager, responsible for forecasting and analysis of a product group, and from July 2014 through April 2016 was a Product Manager and then Senior Product Manager responsible for supply chain and inventory management of Teva's base-line generics business. In FE-1's most recent role, FE-1 reported to Bryan Bart who, in turn, reported to Galownia, Senior Director of Marketing. According to FE-1, based on personal knowledge:

(i) Teva stored drug-by-drug pricing, sales, and revenue data on the Company's Oracle ERP System; (ii) the Company's long-range "Work Plan" forecasting 3-5 years of revenue on a granular level, and prepared annually following a predetermined scheduled, was reviewed and approved by Teva's U.S and Israeli executives; (iii) daily or weekly "Scorecards" that tracked generic drug revenues and informed Teva executives of any "holes" or "red flags" were distributed to Teva's top U.S. executives, including Griffin, Cavanaugh, Olafsson, and Oberman; (iv) quarterly Latest Best Estimates ("LBEs") comparing results to Work Plan forecasts were sent to U.S. and Israeli executives; (v) Teva increased prices when other companies did, when it had a monopoly, and when there was a shortage; (vi) Olafsson claimed that every company he joined acquired his previous employer; (vii) Nisha Patel ("Patel") was Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016, and Patel was on maternity leave on or about August to December 2013; and (viii)

that compensation structure for Teva's national account managers was not tied to individual performance.

340.    Senior Director of Trade Relations [or FE-2] worked at Teva from 2006 until August 2012. During his tenure, FE-2 was in charge of sales for the branded, generics, and injectables groups. FE-2 later, and until leaving Teva, oversaw the branded drug national account managers, reporting to the Head of U.S. Brands. FE-2 also remained involved and knowledgeable about Teva's U.S. generics. According to FE-2, based on personal knowledge:

> (i) Teva aligned its generic and branded segments under the "One Teva" motto; (ii) Galownia evaluated Teva's generics drug portfolio on a "constant and ongoing" basis to find opportunities to increase prices; (iii) Galownia was "just the guy doing the evaluation," as the decision to increase prices was made by senior executives, including Cavanaugh and Griffin, who would conduct their own evaluations of the costs and financial benefits of each price increase on a drug-by-drug basis, a process in which Christine Baeder, VP Commercial Operations, was also involved; (iv) Cavanaugh and Griffin reported directly to Oberman, and would later report to Olafsson; (iv) the process for increasing price could take up to 60 days, required formal notice to customers, and was done in batches; (v) it was critical to ensure that price increases would "stick," *i.e.*, competitors would not undercut Teva's price increases; (vi) "everyone would have known," including, Oberman, and later Olafsson, if a large price increase generated significant profit, something which Cavanaugh, Griffin, Oberman, and later Olafsson, would track closely, if not daily; (vii) executives used price increases to "fill the hole," when actual revenue did not meet forecasts; (viii) each year the finance and operations teams created a budget that included revenue forecasts; and (ix) the senior managers including Griffin, Cavanaugh, and Oberman, received reports on whether revenues were meeting forecasts up to four times per quarter;

341.    Associate Manager of Customer Marketing [or FE-3] worked at Teva from September 2014 until May 2016 and was a member of the pricing team. FE-3 reported to a person who reported to Galownia, who reported to Baeder and, for a time, to Cavanaugh. FE-3 was responsible for evaluating requests for proposals and assessing market pricing for generic drugs. According to FE-3, based on personal knowledge:

> (i) members of the Pricing Group could only lower prices of generic drugs after undertaking an extensively researched and documented analysis; (ii) when prices were increased, the Pricing Group was "told" to increase the price in a meeting or via email, often from Galownia; (iii) Galownia did not have the authority to raise

prices, decisions to raise prices came from higher-level management; (iii) customers were informed of price increases; (iv) even a small change in price (*e.g.*, $0.25) could have a "huge impact" on revenues; (v) a shared Excel file, kept on a shared electronic drive, contained pricing information and was readily accessible to the Pricing Group and top Teva executives; (vi) the Company stored pricing and revenue data "down to the NDC code" on the Oracle system; and (vii) executives, including Cavanaugh, Oberman, and Olafsson, had access to the Oracle ERP System, and were routinely filled in on sales numbers.

342.    Manager of Customer Operations [or FE-4] was employed at Teva from April 2008 to April 2014 and was responsible for metrics for the phone system and managing the process for customer calls to Teva regarding generic drugs. FE-4 reported directly to Baeder until 2012, and later to Michelle Osmian. According to FE-4, based on personal knowledge:

(i) in the early part of 2013, at a quarterly marketing group "all-hands" meeting that FE-4 attended, along with additional pricing, sales, finance, and customer service employees at Teva's North Wales U.S. headquarters, Galownia informed the attendees that Teva was implementing a strategy to increase the prices of generic drugs; (ii) Galownia could not approve price increases, as Cavanaugh, or an executive above her made these decisions; (iii) after a price increase, Teva would send letters to customers informing them of the increase; the letters were also emailed to Teva employees whose work was impacted by price increases; (iv) Teva regularly raised prices on generics from 2013 onward and was "getting more aggressive with pricing" by raising prices more frequently up until the time of FE-4's departure in April 2014; and (v) consumer complaints would rise following price increases, and the complaints were logged and sent to Baeder on a monthly basis.

### B.    The Defendants Were Motivated to Use Teva's ADS as "Currency" for a "Transformational" Acquisition

343.    The Defendants were motivated to make false statements to inflate the price of Teva Securities in order to complete a "transformational" acquisition. By January 2014, once the Price-Hike Strategy was fully implemented and had generated material profits toward fourth quarter 2013 results, Desheh announced this motivation in setting out that "the stock price will go up and we'll be able to ***use our share as a currency . . . to fund transactions***." Upon his hiring in February 2014, Vigodman was reported to also favor significant M&A activity.

344.    Unbeknown to investors, Teva was already focused on acquiring Actavis by as early as the middle of 2014. Soon after joining Teva from Actavis in August 2014, Olafsson announced at an "all-hands" quarterly meeting at the North Wales U.S. headquarters that he had never joined a new company that did not subsequently purchase his former employer. (FE-1.) By the end of 2014, with the strategy resulting in numerous batches of systematic price hikes, involving 46 drugs, and generating as much as $943 million in Inflated Profit, the ADS was trading in the mid-$50s. By then, as Vigodman would later acknowledge on July 27, 2015, the Defendants had developed a list of acquisition targets and Actavis was at the top. Concealed from investors at this time, Teva had already approached Actavis, but was rejected.

345.    By the end of the first quarter 2015, the Price-Hike Strategy resulted in another batch of hikes, involving 11 drugs. All told, over $1.1 billion in Inflated Profit had been generated, and Teva's ADS was trading near $63. The Defendants' "willingness" to perform a "'*transformational*' acquisition in the generics space" was well-known to analysts, as was their "urgency to diversify via M&A" as Barclays and Leerink wrote on April 7 and 16, 2015, respectively.

346.    Undeterred, during a June 10, 2015 Goldman Sachs conference, Teva again announced glowing results, with Vigodman emphasizing to investors the "***profound change in the generic business***" and Olafsson noting the improvement of **"$1 billion . . . in 14 months, 16 months**," while concealing that the Price-Hike Strategy had generated over $1.1 billion in profits for the generics unit over that time. Fueled by profits from the fraud, by July 27, 2015, the price of Teva's ADS reached an all-time high of $72.

347.    That day, Teva announced the $40 billion acquisition of Actavis from Allergan. Vigodman explained that the improvement in generics was a "***precondition***" for accomplishing

their motivation for a deal. Indeed, without the inflated securities as a "currency," Teva did not have the cash; the $40 billion price tag was roughly *twenty years* of Teva's average annual income from 2013 to 2015. They raised the cash from public investors.

348.    By the second quarter 2015, however, the Price-Hike Strategy had peaked. Teva began to experience pricing pressure on its generic drugs, and was increasingly unable to make additional large price increases. Inflated Profits began to deteriorate, even as the Defendants needed to raise the capital necessary to pay Actavis's $40 billion price tag. As questions were raised regarding the deteriorating pricing environment and Teva's weakening financials, the Defendants flatly denied that Teva was making profits from price increases, or that Teva was facing pricing pressure. It was not until the Defendants had completed over $27 billion in public offerings by July 28, 2016, and closed the deal on August 2, 2016, that they disclosed that their generics business was now the subject of government subpoenas. Soon after that, the truth began to leak into the marketplace, and the fraud fell apart.

## C.    Conscious Misbehavior or Recklessness

### 1.    Implementation of The Price-Hike Strategy

349.    In early 2013, Teva expressly adopted the Price-Hike Strategy as a means to turn the Company around by revitalizing its dwindling generics business. This deliberate strategy was announced by Kevin Galownia, then-Senior Director of Marketing, at a quarterly "all-hands" meetings at Teva's U.S. headquarters that was attended by members of the sales, customer service, finance, and pricing groups. (FE-4.) At that meeting, Galownia, a frequent presenter at these quarterly meetings, explained that Teva would raise prices on its generic drugs in a systematic manner. (FE-4.) This marked a sharp break from the Company's prior strategy of focusing on branded drugs, set by then-CEO Levin in 2012. This significant change in direction necessarily

came only from Teva's highest executives, (FE-4) and could not have been decided by Galownia alone. (FE-4, FE-3, FE-2, FE-1.)

350.    Indeed, carrying out the price increases required the explicit approval of the senior executives at the U.S. headquarters. The Inflated Profits would be captured by the daily and weekly reports circulated to Cavanaugh, Griffin, Oberman and later Olafsson. (FE-1.) They were also reflected in the intra-quarter reports that these Officer Defendants assembled and sent to Teva's senior executives in Israel. (FE-1, FE-2.) Consistent with this, according to FE-2, "everyone would have known" of large price increases that had a significant financial impact, including Oberman, especially if it was used to fill a "hole" between revenues and forecasts.

## 2.    Only Senior Executives Could Make Price Increases

351.    The Defendants' scienter is also supported by the fact that the execution of the Price-Hike Strategy required that senior executives personally analyzed and approved each price increase, pursuant to an established and formalized process that was in place by 2012 when FE-2 was employed at Teva. (FE-2.) Galownia and the Pricing Group would initiate the process. (FE-2, FE-4.) Galownia would analyze Teva's portfolio of established generic drugs on a "constant and ongoing basis," and would produce a "list of opportunities" and recommendations of potential price increases to Teva USA COO Maureen Cavanaugh and Deborah Griffin, who was Chief Accounting Officer of Teva and the CFO of Teva USA. (FE-2.)

352.    However, Galownia was "just the guy doing the evaluation," (FE-2), as his superiors made the actual decision to increase the price of a generic drug. (FE-2, FE-3, FE-1.) Accordingly, Cavanaugh and Griffin would each separately evaluate whether Teva would make a price increase, and if so, when. (FE-2.) Cavanaugh would review the price increases from the operational perspective, while Griffin would undertake a financial cost-benefit analysis that would evaluate both whether and when to implement the price increases. (FE-2.) In particular, Griffin

would have to factor in specific contract terms and costs associated with increasing pricing, and determine the right timing for the increase. (FE-2.) Sometimes, Griffin's decision was to raise a price, but wait until the next quarter when the contractual implications would be more favorable. (FE-2.) This recommendation and evaluation process could be quick, but could also span weeks, with the implemented price hike following as many as 60 days after Galownia's initial recommendation. (FE-2.)

353.    The members of the Pricing Group would routinely engage in a bottom-up analysis in deciding to lower prices. This required them to conduct and provide senior executives with detailed analysis and documentation justifying their decisions to reduce prices. (FE-3.) Price increases, in contrast, came from the top down. When prices were increased, the Pricing Group was simply "told," by email or in a meeting, to raise the prices of certain drugs, without conducting any analysis justifying the increase. (FE-3.) Members of the Pricing Group did not have authority to implement price increases. (FE-3.) Defendants became "more aggressive with pricing" by frequently increasing prices from 2013 onward. (FE-4.) Empirical evidence confirms this observation. *See* Appendix A.

354.    As was the case during the Relevant Period, and as the empirical evidence confirms, approved price increases would often be batched together and announced on the same day. (FE-2.) Once a price increase was made, Teva would send letters to affected customers informing them of the price increase. (FE-2, FE-4.) Galownia or his team would also email these letters to all Teva employees whose work would have been impacted by price increases. (FE-4.)

355.    Given this formalized process involving Griffin and Cavanaugh, there is a strong inference that Defendants were aware of, or at least recklessly disregarded, the 76 price increases,

ranging from 50% to 1500%, over the course of over three years, that generated over $2 billion in Inflated Profit.

### 3.   Continuous Access to Documents and Information Tracking Profits from Price Increases

356.   The Defendants were given documents that tracked the financial impact of the Price-Hike Strategy against the detailed revenue goals for Teva's U.S. generics business, as often as on a daily basis. (FE-1.) They also had access to Company-wide databases with detailed drug-by-drug information about the price, sales, and profits of each drug on a real-time basis. (FE-1, FE-3.) Given the close attention paid to revenue and its sources, and the readily available information concerning these topics, there is a strong inference that the Defendants knew or recklessly ignored that billions of dollars in Inflated Profit were generated through the Price-Hike Strategy, and its collapse caused the later short-falls in profits.

357.   Long Range Work Plan: Among the documents the Defendants created and received was a long-range Work Plan, generated annually, that included generic revenue forecasts for three to five years, and that contained granular pricing details down to the NDC level. (FE-1.) The employees preparing the Work Plan would receive feedback from executives over the course of a pre-established schedule. (FE-1.) The process began around March each year, with the U.S.-based executives, including Oberman and Olafsson reviewing and approving the Work Plan over the late summer. (FE-1.) The U.S.-based executives would then present the Work Plan to Teva's executives in Israel, including Vigodman and Desheh, each year. (FE-1.)

358.   Daily Scorecards: Weekly or daily Scorecards were circulated among Teva's top executives, including Olafsson and Oberman. (FE-1, FE-2.) These Scorecards provided these executives with regular access to U.S. sales and revenue data for generic drugs. (FE-1.) The Scorecards also compared Teva's actual revenue figures to longer-term revenue goals. (FE-1.) The

executives used the Scorecards to track "holes" between the actual revenues and forecasts, including the Work Plan. (FE-1, FE-2.) The price increases were used to "fill" the holes. (FE-2.)

359.   <u>Latest Best Estimates:</u> Teva's U.S. executives also tracked, and would report to the executives in Israel, U.S. generic performance on a quarterly basis through the LBEs which showed how a current financial quarter compared to long term forecasts. (FE-1.) The LBEs would also be circulated to the executives in Israel. (FE-1.)

360.   <u>Oracle ERP System:</u> Teva housed its pricing, revenue and sales data of its generic drugs on its Oracle ERP system, a Company-wide database. (FE-1, FE-3.) Through this system, pricing, sales and revenue information for each generic drug was readily and easily available at the granular level, "down to the NDC code." (FE-3.) Teva executives, including Griffin, Cavanaugh, Oberman, and Olafsson all had access to Oracle. (FE-1, FE-3.) Oracle was the source for the data used for the Scorecards, Work Plan and the LBEs. (FE-1.)

### 4.    The Defendants Spoke Repeatedly About the Pricing of Generic Drugs

361.   The Defendants repeatedly claimed that they had accurate knowledge of the sources of Teva's generics profitability.

362.   The Defendants claimed to have intimate knowledge of whether Teva had taken price increases and whether those price increases contributed to the increased profitability of Teva's generics division. For example, on October 29, 2015, Vigodman claimed awareness that "all the improvement . . . in our . . . margins is not driven by price. It is driven by quantities and by mix and by efficiency measures. Not by price, 2014, 2015." Similarly, on February 11, 2016, Olafsson claimed he knew that the "$1 billion improvement in operating profit over 24 months period," was achieved "[n]ot by pricing but by portfolio mix, new products, and efficiency

measures." On November 19, 2015, when asked about industry price increases, Desheh claimed that "Teva was not associated with any of that."

363.    The Defendants also claimed knowledge of when Teva would take price increases, limiting them to instances with shortages. For example, on October 30, 2014 Vigodman claimed he knew that Teva looked for pricing only "when there is a shortage in the market." On August 4, 2016, Olafsson claimed that Teva would increases prices only where there were "shortages in the market," then "there might be a small pricing opportunity."

364.    The Defendants further claimed they were aware of the rate of pricing decline that Teva was experiencing in 2016, and how it compared to prior years. For example, on June 3, 2016, Vigodman asserted he knew that "[w]hat we see is a 4% to 5% erosion. . . . That's not something which is different from what we said during 2015." Earlier, on May 9, 2016, Olafsson asserted awareness that despite "a tougher pricing environment or price deflation," "Teva has not seen any fundamental change or worsening in the pricing environment.... What this boils down to is each individual company's business model.... Nothing has happened in the last two quarters that has changed the pricing environment." Similarly, on September 7, 2016, Desheh claimed that the pricing environment for Teva's base generic business was "very stable," and that "there's no pressure on prices."

365.    The Defendants also claimed knowledge of whether Teva was competing in a functional and competitive generics market. For example, on July 27, 2015, Olafsson asserted that he knew that "there's fierce competition on most of [Teva's] portfolio, if not all the portfolio." During that same call, Vigodman added, "We believe in competition, and we'll do what is needed in order to win all the markets we operate." On November 19, 2015, Desheh claimed he knew that Teva was "playing a competitive game . . . playing it fairly . . . by the book and by the rule."

366. This self-proclaimed personal involvement by the Defendants' supports a strong inference that they possessed knowledge of the true state of affairs of the business, and thus had knowledge that their representations were misleading, or were reckless in not knowing.

### 5. Defendants' and Analysts' Focus on Generics

367. The fact that the Defendants recurrently publicized that Teva's generics segment, fueled by its U.S. division, was driving the Company's turnaround during the Relevant Period supports a strong inference of scienter. For example, on May 13, 2015, Desheh described the turn-around in generics as "nothing short of a revolution." On June 10, 2015, Olafsson touted improvement of the "generic business by . . . $1 billion [] in 14 months, 16 months." That same day, Vigodman touted "the profound change in the generic business," citing increased operating profit from 2013 to 2014.

368. Analysts accordingly focused on Teva's generics businesses, and particularly its U.S. division, as a financial driver for the Company, further supporting a strong inference of scienter. For example, in a February 5, 2015 report, Piper Jaffray noted that "the profitability of the generics business [is] continuing to improve." On April 30, 2015, J.P. Morgan wrote: "Teva continues to make progress on generics profitability . . . we remain encouraged by the recovery in Teva's generic business." The same day Cowen and Company noted that Teva's "outperformance was a result of better than expected U.S. generic sales."

369. Similarly, when industry pricing pressure damaged Teva's competitors, analysts peppered the Defendants with questions about pricing pressure over the course of several months, which were met with detailed answers: For example, on February 11, 2016, Guggenheim asked Olafsson about "pricing pressure in the generics business," with Olafsson claiming to know that "on the pricing . . . we didn't see anything change in fourth quarter." On September 7, 2016, Wells Fargo asked whether Teva was "seeing the same generic erosion, pricing erosion that some of the

other companies" had, to which Desheh asserted he knew that "the base [generics] business . . . the prices are very stable there."

### 6.    The Magnitude, Importance and Duration of the Fraud

370.    The fact that the Price-Hike Strategy generated as much as $2.3 billion in Inflated Profit supports a strong inference of scienter. Indeed, the Inflated Profit drove Teva's reported financial turnaround throughout the Relevant Period. In 2014 and 2015, Inflated Profits comprised an increasingly large portion of Teva's overall net income. As to the generic segment's profits, the Inflated Profits accounted for 15% of segment profits in 2013; 32% in 2014; and 32% in 2015. The Inflated Profits accounted for an even larger portion of the Company's overall net income: in 2013, Inflated Profits accounted for 20% of net income; in 2014, 23%; in 2015, 54%, and in 2016, more than all of Teva's overall profit. The stronger inferences that the Defendants knew of the source of these profits.

371.    Likewise, in 2016, the Price-Hike Strategy deteriorated as Teva began to experience significant pricing pressure and accelerated price erosion, and was no longer able to implement additional price hikes; as a result Teva's generic drug profits plummeted. Indeed, Teva's deteriorating financial condition in 2017 called into question whether it could service its massive $35 billion debt, forced the Company to take a staggering $6.1 billion impairment charge to its generics business, and reduce its dividend. The stronger inference by far is that the Defendants were aware of the source of this decline, or were reckless in not knowing.

### 7.    Contemporaneous Red Flags Indicated That the Defendants' Statements Were False or Misleading

372.    Contemporaneous red flags alerted the Defendants to the possibility that their statements were false and misleading. At a minimum, the Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

373.   <u>Congressional Inquiry:</u> On October 2, 2014, Congress sent Vigodman a personal letter seeking answers to "the underlying causes of recent increases in the price of [Teva's] drugs." This should have placed the Defendants on alert to discover whether Teva had taken price increases and to what extent. Despite this, on October 30, 2014, Vigodman, when faced with an analyst question on the subject, denied that Teva derived revenues from price increases. Similarly, Congress invited Teva to testify at a November 20, 2014 hearing on whether "there was a rational economic reason as to . . . huge price increases." Again, this should have sparked an internal inquiry from Teva's executives. Yet, on December 11, 2014, when faced with the assertion from an analyst that wholesalers were seeing large price increases, Olafsson flatly denied that Teva was involved in those practices.

374.   <u>The State AG and DOJ Investigations:</u> The fact that the DOJ and the State AGs began investigations into Teva's competitors related to their pricing practices also supports a strong inference of scienter. The fact of those investigations should have triggered an internal inquiry at Teva into the facts of its own pricing practices, including the dozens of price increases that Teva made in tandem with its competitors.

375.   <u>GAO Report:</u> On September 12, 2016, the GAO, which Congress had commissioned over two years earlier, publicly released its report on "Generic Drugs Under Medicare," documenting its audit of Medicare Part D data from June 2015 to August 2016. The GAO found hundreds of unexplained "extraordinary price increases," defined as the price of a particular drug increasing over 100% within a 12-month period, and that some drug prices increased more than 1,000%. Teva had numerous drugs that showed extraordinary price increases in the GAO report. The facts of the GAO report support the inference that the Defendants spoke the alleged false statements with scienter.

### 8.    Officer Terminations Support Scienter

376.    That three of the Officer Defendants – Olafsson, Vigodman, and Desheh – resigned from Teva or had their employment with Teva terminated at a critical time, as the Company's Price-Hike Strategy was deteriorating and Teva was in regulators' crosshairs, further supports scienter. There is a strong inference that the termination of Olafsson was connected to his fraudulent cover-up of the Price-Hike Strategy and the subsequent decline in Teva's profits as the strategy collapsed. The explanation for his termination as "retirement" was false, and the first charges from the DOJ and State AGs regarding their pricing investigations were released only days later. There is a similarly strong inference regarding Vigodman's termination. He was fired without a replacement just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and one week before Teva reported disappointing financial results for Q4 2016. Finally, less than two months after Desheh left Teva, and in the very first reporting period after all Defendants were gone, Teva took a staggering $6.1 billion charge against its U.S. generics business, and announced a radical 75% reduction in dividend payments to shareholders. This supports an inference that it was these Defendants who were blocking the true financial state of the Company from coming to light.

### 9.    Other Facts Supporting Scienter

377.    <u>The Receipt of the Subpoenas:</u> Teva's receipt of subpoenas from the DOJ and the Connecticut AG on June 21, 2016 and July 12, 2016, respectively, supports a strong inference of the Defendants' scienter. Particularly, the Defendants failed to disclose them in the mandatory SEC disclosures filed in conjunction with the Notes Offering and Notes Offering materials, but then disclosed them approximately two weeks after completing the Offering. The failure to disclose receipt of the subpoenas until the Notes Offering was completed supports scienter, as does the fact that many of Teva's competitors disclosed their receipt of a subpoena immediately, in the

very next SEC disclosure. Moreover, those subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices. Yet, the Defendants thereafter made materially false and misleading statements about their exposure to price erosion, including during Teva's September 9, 2016, Generics Day.

378.    _Bloomberg_ Article: The November 3, 2016 _Bloomberg_ article revealed that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and State AGs could likely bring charges later in the year. Despite this, Vigodman, almost two weeks later, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation." The State AGs suit and the DOJ charges against Glazer and Malek soon followed, and, subsequently, those investigations have expanded massively. The close proximity of Vigodman's statement to the announcement of the charges diminishes the plausibility of innocent explanations or denials from the Defendants.

### D.    Corporate Scienter

379.    Teva possessed scienter by virtue of the fact that the Officer Defendants, who acted with scienter as set forth above had binding authority over the Company. In addition, certain allegations herein establish Teva's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

380.    It can be inferred that senior corporate executives at Teva possessed scienter such that their intent can be imputed to the Company. For instance, in 2013, Galownia, Teva's Senior Director of Marketing who led Teva U.S.'s pricing department, knew of and discussed Teva's new Price-Hike Strategy at a quarterly "all-hands" meeting of the sales, customer service, finance, and pricing groups. Given the nature of this strategy, that it required the involvement of numerous

divisions within Teva to implement, including the Operations department under U.S. COO Cavanaugh and the Finance department under U.S. CFO Griffin, and that it had a material impact on Teva's financial statements, additional unknown executives sufficiently senior to impute their scienter to Teva were also aware of the Price-Hike Strategy.

381.    As yet unidentified employees also approved the false statements despite knowing of their false and misleading nature. As discussed, Teva had in place extensive processes to track its financial performance on a daily, quarterly, and yearly basis. From this, it can be inferred that someone at Teva approved of the false and misleading statements in Teva's financial statements concerning the source of its generics profits, while knowing that the true source of the profits were Inflated Profits from the Price-Hike Strategy. Indeed, according to FE-2, "everyone" would have known of price increases that had a material impact on Teva's financial reporting for the U.S. It can also be inferred that someone approved the false and misleading statements that Teva was competing intensely on price, someone who knew of the Price-Hike Strategy, and that it was largely dependent on a lack of competition.

## VII.    TEVA ENGAGED IN COLLUSION, RENDERING THE STATEMENTS FALSE AND MISLEADING AND FURTHER SUPPORTING A STRONG INFERENCE OF SCIENTER

382.    Teva engaged in a series of anticompetitive conspiracies as to particular drugs. Plaintiffs make this allegation based on information identified in: (i) the Class Action investigation; and (ii) the State AGs allegations in their Consolidated Amended Complaint against Teva and others ("CAC"), filed June 18, 2018.

383.    The States AGs identify evidence culled from their long-running investigation, which began in 2014, including documents obtained pursuant to multiple subpoenas and cooperation by defendants who have settled with the State AGs and pled guilty to federal antitrust violations. That investigation remains ongoing. Connecticut's AG, George Jepsen, who initiated

and led the State AGs' investigation, has publicly emphasized that the CAC's allegations have a strong basis in direct evidence. In an October 31, 2017 interview with CNBC, held after the States filed their proposed CAC, Jepsen emphasized that the CAC's now-expanded allegations rested on compelling evidence: "We've uncovered – through emails, text messages, and telephone patterns, plus cooperating witnesses – a very compelling case of systematic and pervasive price fixing within the industry."

## VIII.   TEVA COLLUDED WITH OTHER MANUFACTURERS TO FIX PRICES

384.   <u>Parallel Price Increases:</u> The Class Action plaintiffs' investigation has identified 17 sudden and aberrational price increases undertaken by Teva.

385.   That show strong indicia of collusion. These price increases, the details of which are reflected in Appendix B, relate to 16 drugs (the "Collusive Drugs"), collectively generated as much as $1.23 billion dollars in Inflated Profit for Teva.

386.   In each instance, the drug's major manufacturers, including Teva, enacted large price increases at or around the same time, raising prices to exactly, or nearly exactly, the same level. For some, Teva was the first to raise prices, and others followed; other times, Teva followed another manufacturer's lead. The Class Action plaintiffs' investigation identified, in addition to these lock-step price increases, corroborating indicia of collusion, detailed below, including: (i) motive and opportunity to increase prices; (ii) price increases against apparent self-interest; and (iii) interfirm communications.

387.   <u>Motive and Opportunity:</u> Companies and individuals involved in generic drug pricing, sales, and marketing are, as in any other industry, motivated to increase the profit earned on their products. In the generic drug industry specifically, the natural profit motive may bend toward a motive to collude, due to the cold realities of marketing products that are, despite their scientific sophistication, a commodity. Because federal law requires generic drugs to be "readily

substitutable," price is the only meaningful mechanism by which generic drug manufacturers may differentiate their products, a circumstance which over time, and absent collusion, drives prices down to a point just above the manufacturers' marginal costs of production. Each of the Collusive Drugs is a long-established generic in a mature market in which prices had leveled off to a steady equilibrium. The manufacturers of the Collusive Drugs, therefore, had a common motive to increase their profits by conspiring to raise prices in tandem, overriding the natural downward pressure on prices.

388.    In the context of this motive, each Collusive Drug's market is characterized by factors that, as a matter of economics, present the opportunity to collude, including:

- <u>High Concentration</u> The market for each Collusive Drug was an oligopoly by a handful of manufacturers who collectively controlled substantially all of the market.

- <u>High Barriers to Entry</u> Entering a generic pharmaceutical market requires significant lead time for development and regulatory approval. The cost is significant; the process of obtaining regulatory approval alone can cost millions. Further, there is financial risk that the recoupment of any investment could be delayed or never happen. Regulatory approval, known as an "ANDA" approval, could be denied or delayed for months or years due to technical failures or other factors. According to the GAO and others (including Teva), during the Relevant Period the FDA was significantly "backlogged," and thus potential market entrants could have to wait years for approval. It has been reported that in 2015 ANDA approvals often took 40 months or more.

- <u>Demand Inelasticity</u> The Collusive Drugs are all important, and in many cases absolutely critical, to the end-consumer's health and well-being. As a general matter, demand for such drugs is inelastic, *i.e.*, the quantity demanded does not vary significantly as price changes, as the consumer cannot simply walk away as prices rise. Another factor contributing to demand inelasticity is that health insurance plans typically will pay for medications regardless of price, so long as the drug is on the plan's approved list. The Class Action plaintiffs' undertook statistical analysis of the market for each of the Collusive Drugs, and confirmed inelasticity for each drug and empirically observed that volume did not change as the price increased.

- <u>Lack of Alternative Products</u> Doctors choose to prescribe specific drugs to their patients for reasons related to the specific pharmacological distinctions among the drugs in a particular class and, consequently, they cannot simply substitute one product for another when price varies. This is true of the Collusive Drugs. For instance, Pravastatin is one of several generic statins,

but unique for its relatively low level of binding to blood plasma proteins, which may have life-altering implications for certain patients.

- <u>Inherent Fungibility of Generic Drugs</u> Each manufacturer's version of each of the Collusive Drugs is, by nature, interchangeable with any other manufacturer's. By law, all generic drugs must be readily substitutable for another generic of the same brand drug.

389.   <u>Price Increases Against Self-Interest:</u> There was no reasonable commercial or economic justification for the price increases in the Collusive Drugs. In no case was a shortage reported during the Relevant Period for any of the Collusive Drugs, nor any sudden significant increase in demand. Thus, absent a collusive understanding among competitors, a manufacturer that acted alone to enact significant price increases ran a tremendous risk of losing all, or most, of its market share if competitors undercut the suddenly-inflated price. As an empirical fact, each manufacturer was able to substantially increase, and maintain increases on, the prices for the Collusive Drugs within a short period of time; no competitor sought to seize increased market share by undercutting the other market participants with even a slightly-smaller price increase. Without a deliberate strategy, such price increases would have been against Teva's self-interest, further supporting the Defendants' scienter.

390.   The "risk" Teva would have undertaken without collusion was particularly acute with respect to the six Collusive Drugs for which Teva was the first to increase the price, namely Ketoconazole (cream and tablets), Nystatin, Theophylline, Diclofenac, Propranolol, and Estradiol. Appendix B. The fact that Teva was so often willing to expose its market share to predation by other manufacturers whose prices sat many multiples below Teva's plausibly supports that, in reality, there was no risk at all; Teva had reached a collusive understanding that other market participants would themselves raise prices soon thereafter, and/or that Teva's "fair share" of the market would remain untouched despite its extraordinary price increase.

391.   <u>Inter-Firm Communications:</u> The State AGs' CAC describes evidence showing Teva engaged in extensive direct communication with other manufacturers. For example, the State AGs allege that over 1,500 communications occurred between certain of Teva's "senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs" and employees at 15 other manufacturers between July 1, 2013 and July 30, 2014.

392.   Furthermore, the Class Action plaintiffs' investigation identified a multitude of trade shows and conferences that afforded individuals responsible for Teva's generic drug prices an opportunity to interact with their counterparts at other manufacturers during the relevant period, many of which occurred in close proximity to price increases that Teva and/or another manufacturers implemented on the Collusive Drugs. A list of such events, indicating attendance by Olafsson, Oberman, Cavanaugh, Galownia and Patel is attached hereto as Appendix C. In all instances identified in Appendix C, representatives of at least one other manufacturer – and typically many more – also attended.

393.   Trade shows and conferences provided opportunities for one-on-one meetings with between Teva personnel, including several of the Defendants, and those of other manufacturers. For instance, at both the 2013 and 2014 annual meetings of the National Association of Chain Drug Stores ("NACDS"), Teva reserved a "strategic exchange" bungalow. NACDS advertised "strategic exchange" bungalows as "opportunities to meet and discuss strategic issues with key trading partners." In essence, Teva paid for a secluded area where its personnel could meet privately with others, including other manufacturers.

394.   <u>Government Investigations Corroborate an Inference of Collusion:</u> Corroborating the inferences drawn from the Class Action plaintiffs' investigation, the State AGs' CAC alleges, based on specifically-described communications, seven drug markets where Teva conspired to fix

prices and/or allocate markets, namely the markets for: Acetazolamide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Nystatin, and Theophylline. Nystatin and Theophylline – two drugs where the States uncovered evidence that Teva, in coordination with Heritage, agreed to "take the lead" on price increases, overlap with the set of drugs where the Class Action plaintiffs' investigation found strong indicia of collusive price-fixing.

395.   The State AGs focus many of their drug-specific collusion allegations on the communications of Malek, Heritage's President. In dealing with Teva, Malek coordinated market allocation and price increases with a particular Teva employee, with whom he had a preexisting relationship. This employee joined Teva in April 2013, and was on maternity leave from August through December 2013. On information and belief, this employee is Nisha Patel ("Patel"), Teva's Director of Strategic Customer Marketing from April 2013 to August 2014 and Director of National Accounts from September 2014 to December 2016. Patel was on maternity leave from August through the end of 2013, (FE-1), and her tenure at Teva, based on publicly available social media sites, aligns with that of Malek's Teva contact. Patel had responsibilities relating to pricing prior to her shift to National Accounts. (FE-1, FE-3.) The following is a brief timeline of those interactions, and their anticompetitive outcomes:

- <u>July 2013</u> After three calls between Malek and Patel spanning more than 43 minutes, Nystatin appeared on an internal Teva list of "potential" price increases, despite a Nystatin price increase having met internal resistance the prior month, when Teva first considered the prospect. Patel went on maternity leave soon afterwards.
- <u>February 7, 2014</u> After several contacts between Patel and Malek, Nystatin again appeared on an internal Teva spreadsheet as a candidate for a price increase.
- <u>April 4, 2014</u> Teva increased WAC for Nystatin and Theophylline.
- <u>April 15, 2014</u> Malek and Patel had a 17 minute conversation, during which they discussed price increases and/or market allocation as to at least the seven drugs referenced above. Patel and Malek determined that, as Teva had raised WAC on Nystatin and Theophylline days earlier, Teva would "take the lead" on implementing price increases for those drugs, and other competitors would follow. Heritage would lead on the other five.

- April 16-17, 2014 Multiple Teva employees communicated with Zydus, a competitor in the market for Acetazolamide.

- May 1-6, 19-22, 2014 Patel had at least three calls and exchanged at least 30 text messages with the Actavis pricing manager responsible for Glyburide-Metformin.

- May 9, 2014 A Teva employee responsible for pricing spoke with their counterpart a Mylan, a competitor in the market for Glipizide-Metformin; these employees remained in close communication through 2014.

- July 8, 2014 Teva refused to bid when a large Heritage customer requested a quote on Nystatin from Teva, in response to Heritage's price increase on the drug.

- By July 9, 2014 Teva had increased prices on Nystatin, Theophylline, Glyburide, and Glyburide-Metformin, and Heritage had increased prices on all seven drugs Malek and Patel had discussed on April 15. If Teva did not increase prices, it furthered the agreement by refraining from bidding competitively, lowering prices, or, in the case of Leflunomide, leaving the market entirely.

- July 25, 2014 After a large wholesaler solicited bids from Teva and Aurobindo on Glyburide, Teva spoke with Heritage (and Heritage with Aurobindo) "to ensure uniformity and compliance with the scheme," and resolved that Teva and Aurobindo would decline to provide a bid.

396. These seven examples of Teva's reaching anticompetitive agreements are drawn just from the limited subset of drugs manufactured by both Teva and Heritage, a relatively small player in the industry. The State AGs have indicated that the CAC's common thread is Heritage, and that they plan to bring separate complaints focused on companies other than Heritage. The States are investigating collusive conduct relating to nearly 200 additional drugs.

397. The DOJ also continues to actively investigate Teva, as evidenced by its motion to stay discovery in the *Propranolol Antitrust* matter on the ground that the plaintiffs' allegations of price-fixing "overlap[] substantially with one aspect of [DOJ's] criminal investigation." The S.D.N.Y., in sustaining the *Propranolol Antitrust* allegations over Teva's motion to dismiss, reasoned that "[t]he presence of an ongoing investigation into the same subject matter as alleged in the pleadings here raises an inference of conspiracy." The DOJ intervened similarly in the *Generic Pharmaceuticals* MDL, seeking stays and asserting that the drugs at issue – including the

Collusive Drugs Baclofen, Fluocinonide, Pravastatin, and Propranolol – overlap with the DOJ's criminal investigation, further corroborating the existence of illegal price-fixing as to those drugs.

### A.    Evidence of Collusion Further Supports a Strong Inference of Scienter

398.    Teva's collusion additionally supports a strong inference of scienter. Given all the information available to them, the Defendants knew, or recklessly disregarded, that in order for the Price-Hike Strategy to generate the high level of Inflated Profits apparent in data regularly available and reported to them, Teva would likely have had to, and did, coordinate, communicate, and potentially reach illegal agreements with other manufacturers.

399.    As alleged, Teva's price increase approval processes necessarily involved senior management. Indeed, Patel, or any person in her position, did not have the authority or ability to raise prices or to determine which drugs Teva would bid on, including the ones that Malek and Patel had discussed. (FE-2, FE-1, FE-3.) Teva's senior management and executives, including Griffin and Cavanaugh, approved all price increases.

400.    Moreover, many of the Collusive Drugs were major drugs for Teva and the profits from the price hikes were substantial. In all, the Collusive Drugs generated $1.2 billion over the Relevant Period. The financial implications of the price increases would have been reflected in the analysis that Griffin and Cavanaugh undertook in deciding whether to take the price increase, and when. (FE-1, FE-2.) That financial impact would also be reflected in the financial reporting for which they and Oberman and Olafsson were responsible, and which was presented to Vigodman and Desheh. (FE-2, FE-1.) These included regularly updated forecasts and scorecards. The information was also available on the Oracle ERP system.

401.    With the knowledge gained from these reports and data, Teva's executives and the generic segment CEO (Oberman and then Olafsson), Teva CAO and CFO of Teva USA (Griffin), and COO of Teva USA (Cavanaugh) could see when price increases were effective for an

abnormally long time, or whether an abnormal quantity of price increases remained effective in contravention of rational economics.

402.    Moreover, the State AGs have alleged that for years Teva adhered to a "widespread" "code of conduct," among generic drug manufacturers that allowed them to "fix prices and allocate markets to suppress competition." The "code's" objective was to attain a price equilibrium where manufacturers had no incentive to compete for additional market share by lowering price. Under that code, "competitors" would agree collectively to raise or maintain drug prices, dictating that a competitor should not "punish" another for price increases by underbidding the competitor who raised prices, as that would be "irresponsible." Manufacturers also would enter into collusive "fair share" market allocation agreements by making knowingly uncompetitive bids, refusing to bid, or readjusting market share by walking away from customers.

403.    The State AGs have stated that evidence they have secured shows that executives at the highest levels in many of the defendant companies conceived and directed many of the schemes. This assertion corroborates the investigation conducted by plaintiffs in the Class Action, including that Cavanaugh and Griffin were involved in pricing decisions, and Olafsson and Oberman would have received and reviewed reports and forecasts reflecting the Inflated Profit generated thereby.

404.    Furthermore, Oberman, Olafsson, and Cavanaugh personally attended numerous trade shows and conferences during the relevant period, affording them the opportunity to interact with individuals responsible for pricing and marketing decisions at other manufacturers (Appendix C).

### B.     The Undisclosed Fact of Teva's Collusion Constitutes an Independent Basis for Falsity

405.     The false and misleading statements regarding the source of Teva's profits as described in its SEC disclosures identified above in Section III.C.3, and the false and misleading statements regarding competition in Teva's SEC disclosures as identified above in Section III.C.2, were false and misleading, in addition to the reasons enumerated above, because Teva conspired with other manufacturers to fix prices for certain generic drugs. Statements regarding the supposed source of Teva's revenues were false because they omitted the fact that Teva's revenues were partly generated by collusive means. Statements describing the supposed competitiveness of the U.S. generic drug market were false because Teva was in reality participating in series of anticompetitive conspiracies that distorted competitiveness.

## IX.     LOSS CAUSATION

406.     In addition to the allegations herein, the Defendants' fraudulent conduct directly and proximately caused Plaintiffs to suffer substantial losses as a result of purchasing Teva Securities at artificially inflated prices during the Relevant Period.

407.     The Defendants, through each category of false and misleading statements and omissions, concealed the truth about Teva's core business strategy that materially contributed to Teva's financial and operational success during the Relevant Period. By concealing, among other things, the Price-Hike Strategy, that Teva was not competing on price, that the strategy was driving known material trends, and that as the strategy failed and pricing competition increased Teva's financial condition was deteriorating, the Defendants also concealed the numerous and related risks associated with their false statements and omissions, including but not limited to, the risks that:

- the strategy was highly risky and not sustainable, and as the strategy failed, Teva's profits would collapse; by their nature, especially when

done in tandem with competitors, price hikes might appear to arise from anti-competitive and/or collusive conduct and, thus, draw the attention of government investigators and law enforcement agencies, precipitating possible legal actions, civil liabilities, and criminal sanctions;

- should the Price-Hike Strategy come under public, legislative, or law enforcement scrutiny, the viability of sustaining the Inflated Profits and/or implementing new price hikes would be severely undermined, and would thereby undercut a major driver of the generic segment's profit;

- if pricing pressure or competition increased, Teva would be far more susceptible to a rapid and material decline in Inflated Profits, resulting in poor financial results and undercutting reported and forecasted profits;

- upon the failure of the Price-Hike Strategy, the Company could be further disrupted by the termination of the senior managers who were responsible for the strategy, and by any increased difficulty in hiring qualified replacements; and

- as the Price-Hike Strategy in fact failed over time, Teva's Inflated Profits declined, and Teva was prevented from making additional price increases, those trends would continue.

The concealed risks bear directly on Teva's ability to generate and sustain its profits and its ability to service the over $30 billion in debt payable to public investors.

408.    Beginning in August 2016, the concealed risks began to materialize through a series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of the Defendants' Relevant Period statements and omissions. Despite these partially corrective events and disclosures, Teva Securities' prices remained artificially inflated and were prevented from declining to their true value by the Defendants continuing to make materially false and misleading statements that had the effect of, at least temporarily, concealing their fraud. As the relevant truth leaked out into the market from August 2016 to August 2017, public investors, including Plaintiffs, suffered losses, which were foreseeable and caused by the materialization of the risks that the Defendants' fraudulent conduct concealed from investors, as set forth below.

### A.    August 4-5, 2016

409.    After the close of trading on August 4, 2016, Teva filed its Q2 2016 6-K, reporting Q2 2016 results, which announced (i) poor generics segment earnings, including a $115 million

YOY decline in profits for the generics segment; and (ii) that "[o]n June 21, 2015 [sic], Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."

410.    On this news, the prices of Teva Securities declined. Between the close of trading on August 4, 2016 and on August 5, 2016, the price of Teva's ADS fell $1.24 or 2.24% to close at $54.21.

411.    Likewise on the TASE, the price of Teva's ordinary shares fell ILS 2,860, or 12.98%, from ILS 22,040 on August 3, 2016, to close at ILS 19,180 on August 5, 2016.

412.    This marked the beginning of the relevant truth leaking out, as Teva's Price-Hike Strategy had begun to collapse, as Teva lost its ability to profit from the 76 historic price hikes, or to implement new increases in 2016. The disclosure of the subpoenas was a materialization of the risk that, after nearly two years of ongoing investigations, the DOJ and State AGs would seek evidence from Teva in connection with Teva's pricing practices.

**B.    November 3, 2016, December 13-16, 2016**

413.    On November 3, 2016, during the trading day on the NYSE, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," describing the DOJ's "sweeping" two-year investigation related to the soaring prices of generic drugs and how executives from more than a dozen generic pharmaceutical manufacturers, including Teva, were suspected of colluding to raise the prices of generic drugs. The article broke the news that the first criminal charges against executives of those companies could emerge by the end of the year, and that State AGs were seeking to bring claims against generic manufacturers.

414.   On this news, the prices of Teva Securities declined once again. Between the close of trading on November 2, 2016 and the close of trading on November 3, 2016, Teva's ADS price fell $4.13 or 9.53% to close at $39.20.

415.   The next trading day on the TASE, the ordinary shares fell ILS 710, or 4.5%, from ILS 16,040 on November 3, 2016 to ILS 15,330 on November 6, 2016.

416.   In a November 3, 2016 article titled "News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling," *The New York Times* reported that the news that the DOJ and State AGs' investigations found serious evidence of criminal conduct caused significant declines in the price of Teva Securities. On November 4, 2016, S&P Capital IQ lowered its rating of Teva ADS from "buy" to "hold" and its 12-month price target by $34 to $50 per share, noting that "[w]e think this could pose yet another challenge to an industry that has been hit hard by charges of high drug prices and will be an overhang on the shares." HSBC in its November 4, 2016 analyst report, downgraded Teva from "buy" to "hold" and lowered its price target from $66 per share to $44 per share, noting "US DOJ investigation into alleged US generic drug price collusion creates significant uncertainty" for Teva and for investors. In a November 10, 2016 article titled "DOJ's price-fixing investigation could lead to sizable liabilities, analyst says," *Fierce Pharma* reported that analysts tracking the generic drug industry believed that liability from the investigations could have a sizeable financial impact on Teva, estimated at $700 million.

417.   Within weeks the expected governmental actions materialized. On December 13, 2016, the DOJ, by means of an Information, charged Malek and Glazer, the top two executives at Heritage, with two felony counts of violating Section 1 of the Sherman Act partly for fixing the price of Glyburide, a drug for which Teva held 75% of the market.

418.    On December 14, 2016, led by the Connecticut AG, the State AGs filed their lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing Teva of conspiring to allocate the markets for and fix the prices of generic drugs, including for Glyburide, and of participating in a larger market-wide collusive conspiracy. *Forbes* reported the next day, in an article titled "State Attorneys General Accuse Six Generic Companies Of Fixing Drug Prices," that the AG's complaint revealed new information regarding Teva's potential exposure, made "clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing," and also noted that Glazer and Malek were cooperating.

419.    On the news of the DOJ charges and the filing of the State AGs' complaint, the prices of Teva Securities continued to decline. Between the close of trading on December 13, and December 16, 2016, the ADS price fell $1.15 or 3% to close at $36.51.

420.    Likewise, on the TASE, the ordinary share price fell ILS 140, or 0.98%, from a close of ILS 14,240 on December 15, 2016 to a close of ILS 14,100 on December 18, 2016.

**C.    November 15, 2016**

421.    On November 15, 2016, before trading opened on the NYSE, Teva filed a press release with the SEC reporting its Q3 2016 financial results, which were well below consensus expectations largely due to poor sales in Teva's generics divisions, including a $277 million YOY decline in revenue in Teva's "legacy" U.S. generics segment (*i.e.*, in the pre-Actavis-transaction portion of Teva's U.S. generics business). In the Company's November 15, 2016 earnings call, the Company also revised downward its 2016 guidance, and disclosed for the first time that the rate of price erosion for its generic drugs has increased from 5% to 7%, although Olafsson falsely claimed that the increase was the result of divestitures from the Actavis transaction, and thus was limited to one quarter.

422.     On this news, the prices of Teva Securities continued to decline. Between the close

of trading on November 14 and 15, 2016, the ADS price fell $3.43 or 8.36% to close at $37.60.

Likewise, on the TASE, the ordinary share price fell ILS 720, or 4.58%, from a close of ILS 15,710

on November 14, 2016 to a close of ILS 14,990 on November 15, 2016.

423.     Analysts responded negatively to the new information concerning the Company's

disappointing financial results. That day, in a report titled, "Are The Wheels Coming Off? Sure

Feels That Way," Piper Jaffray lowered its price target from $57 per share to $43 per share, noting

that "it appears to us that Teva painted an overly sanguine picture of its generics business at its

investor event in September [during the Generics Day]," and describing Q3 2016 as a "credibility-

damaging quarter," because, in the face of Olafsson's explanation that the price erosion would be

limited, it was "difficult for us to take that assertion at face value." Also that day, Deutsche Bank

wrote "TEVA reported 3Q revenue that was below our estimate on lower generic sales . . . the

company saw higher than expected price erosion in 3Q" and, as a result, lowered its price target

for the Company from $68 per share to $54 per share on "lower growth assumptions for generics."

Likewise, in a November 16, 2016 report, Morgan Stanley lowered its price target for the Company

from $63 per share to $42 per share, as a result of the lower than expected generics growth and

worse than expected price erosion.

**D.     December 5-6, 2016**

424.     After the close of trading on December 5, 2016, Teva filed a Form 6-K announcing

that Olafsson would be stepping down as President and CEO of the Company's Global Generic

Medicines Group and that, effective immediately, he would be replaced by Bhattacharjee. Teva

offered no explanation for Olafsson's departure, instead claiming he was "retiring" even though

he was only in his late 40s and quickly obtained other employment.

425.    On this news, on December 6, 2016, the prices of Teva Securities continued to decline. Between the close of trading on December 5 and on December 6, 2016, the ADS price fell $2.01 or 5.43% to close at $35.03. Likewise, on the TASE, the ordinary share price fell ILS 690, or 4.91%, from a close of ILS 14,050 on December 5, 2016 to a close of ILS 13,360 on December 6, 2016.

426.    Analysts tied Olafsson's termination to the disappointing results in Teva's generics segment and concerns over pricing pressure. On December 6, Morningstar reported: "Teva's announcement [that it] will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence. *Recent pricing pressure* in the generic drug market . . . remain[s] significant near-term challenge[] for Teva, which makes the abrupt leadership change a *concerning development at a critical time* for the company." A December 5 BTIG report noted "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained *focused on price erosion for the [company's] base generic business*" and that "the departure of Mr. Olaffson [sic] creates more uncertainty as we head into 2017."

**E.      January 6, 2017**

427.    On January 6, 2017, before the beginning of the trading day on the NYSE, Teva filed a press release on Form 6-K announcing a significant reduction in the 2017 guidance previously released on July 13, 2016. In the investor conference call that day, Vigodman claimed the "significantly" reduced guidance resulted from "significant headwinds" faced by "[t]he entire healthcare sector" to which Teva "ha[d] not been immune," and "some issues specific to Teva" resulting in "an EBITDA gap of $1.2 billion emanating from our US generics business." In addition to the materialization of the concealed risks described herein, this was the materialization of the risk of the Defendants using an "assumption" for price erosion in the July 13, 2016 guidance that was empirically false at the time; specifically, Defendants assumed a pricing environment that

was "stable"— *i.e.*, 4%-5% erosion rate disclosed in prior years and quarters—when, in fact, pricing pressure was causing a more rapid decline.

428.    As a result of this new negative information, the prices of Teva Securities continued to decline. Between the close of trading on January 5 and January 6, 2017, the ADS price fell $2.86 or 7.53% to close at $35.10.

429.    Likewise, on the TASE, the ordinary share price fell ILS 790, or 5.49%, from a close of ILS 14,390 on January 5, 2017 to a close of ILS 13,600 on January 8, 2017.

430.    Analysts tied this disclosure to the fact that the prior guidance was "inflated" as a result of understating generic drug price erosion. In a report dated January 6, 2017, Evercore ISI conducted its own price erosion analysis for the Company and noted that, as a result of its lower than expected revenues and EPS, "I think it's ***pretty clear that mgmt's prior expectation for 2017 were very inflated***." Similarly, the same day, Maxim Group downgraded its rating of the Company from "buy" to "hold" and its price target for the Company from $49 per share to $41 per share and noted "challenges in the near term to the core generic . . . business are becoming bigger issues." In a January 8, 2017 report, Piper Jaffray stated that "Teva once again provided disappointing guidance, further eroding what in our view was already ***limited management credibility***."

**F.    February 6-7, 2017**

431.    On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and the conclusion of his service on the Board of Directors.

432.    On this news, the prices of Teva Securities continued to decline. Between the close of trading on February 6 and on February 7, 2017, the ADS price fell $2.16 or 6.29% to close at $32.19.

433.     Analysts tied Vigodman's abrupt departure to the Company's poor financial performance in its generics business since no later than Q2 2016, as well as sustained difficulties for the generics business ahead. For example, in a February 6, 2017 report titled "CEO Transition Adds Further Uncertainty to Story," J.P Morgan reported "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges. With Teva facing headwinds across both its generics (incremental competition, pricing headwinds) and branded business ... we continue to believe a near-term recovery in the company's business is unlikely." Similarly, that day, Wells Fargo concluded that "more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

### G.     August 3-7, 2017

434.     On August 3, 2017, before the NYSE opened, Teva filed a press release on a Form 6-K announcing lower-than-expected Q2 2017 financial results. The Company (i) attributed its poor financial results to poor performance in its U.S. generics business (with reported profits of only $691 million, far below analyst expectations) and "accelerated price erosion"; (ii) was required to take a $6.1 billion accounting charge permanently writing-down the value of the generics business; and (iii) imposed a 75% reduction in the Company's longstanding dividend. The Company also significantly lowered its guidance for 2017, revising downward its earlier-reported guidance from January 2017 for the Company's net revenues, operating income, EBITDA, EPS, and cash flow. On the Company's earnings conference call held that day, McClennan, Teva's interim CFO, explained that the poor results and reduced guidance were partly the result of increased price erosion and price pressure. Importantly, Bhattacharjee further noted the "impact of the shelf stock adjustments that [Teva has] done," as a "key element" of the revised outlook. Shelf stock adjustments are contractual provisions that require charge backs to customers

when prices decline. It was highly foreseeable that prices would decline on at least the 60 drugs subject to the Price-Hike Strategy, drugs for which Teva had increased price by at least 50%, and as much as 1543% over the Relevant Period. Teva's $6.1 billion permanent impairment charge directly reduced Teva's bottom line dollar-for-dollar.

435.    Analysts reacted harshly. That day, J.P. Morgan wrote, "Teva reported weaker-than-expected results but more importantly lowered in 2017 sales and EPS guidance . . . and cut its dividend by 75%. . . . U.S. *generic weakness appears to be at the heart of these reductions*." Jefferies wrote, "Mgt Had Effectively No Choice but to Cut the Dividend; Maintaining Debt Covenants a Key Concern." Oppenheimer noted, "it may be difficult for Teva's board to attract top talent (meaningful pharma CEO experience) given the company's ongoing challenges," as the CEO and CFO positions remained unfilled. Analysts were further concerned about Teva's ability to sustain its debt and debt rating. Jefferies wrote: "Can It Get Any Worse?," noting that "[a]t present, Teva has a debt covenant that requires a minimum leverage of 4.25 x (net debt/EBITDA) by YE17 ... If mgt's ever-shrinking EBITDA guidance ... erodes much further, *it is possible Teva may not meet the [debt] obligation*." The reality was that Teva's poor results, guidance reduction, and the risk that it could not satisfy its debt obligations were the materialization of the risks associated with the Price-Hike Strategy and its ultimate demise. There was no realistic prospect that the strategy could be revived, or that it could again generate the same Inflated Profits. The result was the write down of the generics business by $6.1 billion, and Teva cutting its dividend by 75%.

436.    With the true financial condition of the Company more evident, credit rating agencies immediately issued rating downgrades. On August 3, 2017, Moody's downgraded Teva's debt rating to Baa3 (one step above "junk"), with a negative outlook, reflecting slower-than-

anticipated deleveraging "as Teva contends with weakness in its US generics business." Likewise, on August 4, Fitch Ratings also downgraded Teva to BBB- (one step above "junk"), with a negative outlook.

437.    As investors digested the news, the prices of Teva Securities dropped. Between the close of trading on August 2 and the close of trading on Monday, August 7, 2017, the price of Teva's ADS fell $12.66 or 40.51% to close at $18.59.

438.    The ordinary share price also declined ILS 1,980, or 17.79%, from a close of ILS 11,130 on August 2, 2017 to a close of ILS 9,150 on August 3, 2017. Teva's market capitalization was reduced by approximately $8 billion. The next trading day on the TASE, the ordinary share price continued to fall by ILS 2,022, or 22.10%, from a close of ILS 9,150 on Thursday, August 3, 2017 to a close of ILS 7,128 on Sunday, August 6, 2017. The ordinary share price continued to fall by ILS 18, or 0.25%, from a close of ILS 7,128 on Sunday, August 6, 2017 to a close of ILS 7,110 on Monday, August 7, 2017.

**H.      November 2, 2017**

439.    On November 2, 2017, Teva filed its Q3 2017 Form 6-K, reporting the Company's third quarter 2017 financial results, including a 9% decline in U.S. Generic Medicine quarterly revenues compared to the third quarter of 2016. The decrease was misleadingly attributed to "pricing declines resulting from customer consolidation into larger buying groups and accelerated FDA approvals for additional generic versions of competing off-patent medicines as well as volume decline of methylphenidate extended-release tablets (Concerta® authorized generic) due to the launch of a competing product."

440.    Investors and analysts reacted negatively to this news. Analysts at Cowen and Company called the Company's full year guidance "unfavorable" and stated that, with a "difficult generic pricing environment and competitive pressures – which are not being properly offset by

new product launches – the Teva business model is now upside down." Analysts at RBC Capital Markets stated that the results were even "below our cautious expectations," and that the "magnitude of weakness in the US generics business in both revenue and margins was surprising." Wells Fargo Securities analysts found Teva's results to be "especially disappointing."

441.     As a result of this new negative information, the prices for Teva securities declined. The ADS price fell $2.79 per share, or nearly 20%, from a close of $14.02 on November 1, 2017 to a close of $11.23 on November 2, 2017, on high trading volume. Teva's market capitalization was reduced by approximately $3 billion.

442.     The next trading day on the TASE, Teva's ordinary shares fell ILS 670, or 13.65%, from a close of ILS 4,908 on Wednesday, November 1, 2017 to a close of ILS 4,238 on Thursday, November 2, 2017.

## I.     February 8, 2018

443.     On February 8, 2018, Teva issued a press release announcing its fourth quarter and full year financial results, including a staggering $17.1 billion goodwill impairment mainly related to its generics business for 2017. On the conference call with investors held later that day, Teva explained that $11 billion of the impairment "related to our U.S. generics business as well as additional impairments of other long-lived assets of $3.2 billion, mainly related to a revaluation of generic products acquired from Actavis."

444.     Investors and analysts reacted negatively to this news. Analysts at Wells Fargo Securities stated that the Company missed consensus expectations "by a significant margin," but noted that:

> [W]e believe it will be the lower than consensus 2018 outlook that investors will be focused on, especially the commentary about generic pricing worsening in 4Q and the overall environment worsening for the value of future launches. Teva took a $17.1 billion goodwill impairment, which investors should see as reflective of how challenging the situation is.

BTIG analysts noted "another major write-down following last year's $6B goodwill impairment." Similarly, IBI Brokerage stated that the $11 billion "impairment charge [was] almost entirely for the generics business in the US" and that guidance for fiscal year 2018 was "way below market expectations."

445.    As a result of this new negative information, the prices for Teva securities declined. Teva's ADS price fell $2.21 per share, or over 10.5%, from a close of $20.85 on February 7, 2018 to a close of $18.64 on February 8, 2018, on high trading volume. Teva's market capitalization was reduced by approximately $2.3 billion.

446.    The next trading day on the TASE, the ordinary share price fell ILS 500, or 6.9%, from a close of ILS 7,200 on February 7, 2018 to a close of ILS 6,700 on February 8, 2018.

**J.    December 9-10, 2018**

447.    On December 9, 2018, the *Washington Post* published an interview with Joseph Nielsen, an assistant attorney general and antitrust investigator in Connecticut who has been a leading the State AGs investigation.  Mr. Nielson disclosed that the price-fixing investigation had expended to at least 16 companies and 300 drugs.

448.    Mr. Nielson described the State AGs investigation as "most likely the largest cartel in the history of the United States," citing the volume of drugs in the schemes, that they took place on American soil and the "total number of companies involved, and individuals."

449.    Following the news of the expanded scope of the criminal investigation, Teva's ADS price fell $0.97 per share, or approximately 5%, to close at $18.44 on December 10, 2018. Likewise, on the TASE, Teva's ordinary shares fell ILS 390, or 5.34%, to close at ILS 6,910 per ordinary share on December 10, 2018.

## X.      PRESUMPTION OF RELIANCE AND FRAUD-ON-THE-MARKET DOCTRINE

450.      Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the markets for Teva's securities were efficient for the following reasons, among others:

(a)      Teva's securities met the requirements for listing, and were listed and actively traded on the NYSE and the TASE, a highly efficient and automated market;

(b)  The average weekly trading volume of Teva Securities was significant;

(c)      As a regulated issuer, Teva filed public reports with the SEC, the NYSE and the TASE;

(d)  Teva was eligible to file simplified SEC filings;

(e)      Teva regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases on major newswire services, through communications with the financial press, and through other wide-ranging public disclosures; and

(f)      Numerous securities and credit analysts followed Teva and wrote reports that were published, distributed, and entered the public domain.

451.      Accordingly, the markets for Teva Securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Teva Securities. Under these circumstances all purchasers of Teva Securities during the Relevant Period suffered similar injury through their purchases at artificially inflated prices. A presumption of reliance therefore applies.

452.      In addition, or in the alternative, Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that the Defendants had a duty to disclose.

XI.     **CLAIMS FOR RELIEF**

## COUNT I

### For Violation of Section 10(b) of the 34 Act and Rule 10b-5
### (Against the Defendants)

453.    Plaintiffs incorporate each and every allegation above by reference as if fully set forth herein.

454.    During the Relevant Period, the Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

455.    The Defendants violated § 10(b) of the 34 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemed, and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Teva Securities during the Relevant Period.

456.    Plaintiffs suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Teva Securities. Plaintiffs would not have purchased Teva Securities at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially and falsely inflated by the Defendants' misleading statements.

457.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Teva Securities during the Relevant Period.

## COUNT II

### For Violation of Section 20(a) of the 34 Act
### (Against the Defendants)

458.    Plaintiffs incorporate each and every allegation above by reference as if fully set forth herein.

459.    During the Relevant Period, the Defendants acted as controlling persons of Teva within the meaning of § 20(a) of the 34 Act. By virtue of their positions and their power to control public statements about Teva, the Officer Defendants had the power and ability to control the actions of Teva and its employees. Teva controlled the Officer Defendants and its other officers and employees. By reason of such conduct, the Defendants are liable pursuant to § 20(a) of the 34 Act.

## COUNT III

### For Violation of the Israel Securities Law, 1968
### (Against the Defendants)

460.    Plaintiffs incorporate each and every allegation above by reference as if fully set forth herein.

461.    Throughout the Relevant Period, Teva's common shares were dually listed on both the NYSE and the TASE.

462.     Israeli securities law provides unique treatment for securities of certain firms that are "dual listed," *i.e.*, available for trading on both the TASE and the national U.S. stock markets. For dual-listed firms incorporated in Israel, and dual-listed firms like Teva incorporated elsewhere but approved for such treatment by the Israeli Securities Agency ("ISA"), Israeli law applies the reporting requirements (including the anti-fraud provisions) of the country of primary listing. *See* Israeli Securities Law, 1968 ("Securities Law"), §§ 1, 35T, 35DD, 35EEE.

463.     Accordingly, to construe the propriety of Teva disclosures to investors, Israel

***applies U.S. laws and regulations***, including the anti-fraud provisions of the U.S. securities laws,

to enforce disclosure obligations for dual-listed stocks. *See* Securities Law, §§35T, 35 DD, 35EE;

*Verifone Holdings, Inc.* v. *Stern*, Class Action 3912-01-08, decision rendered Nov. 16, 2008; *Stern*

v. *Verifone Holdings, Inc.*, Class Action 3912-01-08, decision rendered Aug. 25, 2011, subsequent

to and in light of *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010)). According to

Israeli case law, liability for violations thereof is pursuant to Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act applies to the

claims arising from trades made by Plaintiffs on the TASE.

464.     Additionally, in a Motion to Dismiss the Class Action Complaint filed on December

1, 2017, in the Class Action defendants Teva, Vigodman, Desheh, Altman, Oberman, Olafsson,

Peterburg, and Bhattacharjee:

> agree[d] that Israeli law mirrors U.S. law here. The Israeli dual-listing regime was
> purposefully created in 2000 to make the TASE more attractive to Israeli companies
> (like Teva) who otherwise might list their securities only on exchanges outside of
> Israel. *See generally, e.g.*, Marcus Best & Jean-Luc Soulier, Israel §21.1,
> *International Securities Law Handbook* (4th ed. 2014). Because issuers find it
> unattractive to be subject to multiple and diverging regulatory regimes, Israel simply
> adopts the securities law requirements of the foreign jurisdiction – in this case, the
> United States – instead of enforcing "requirements that apply to Israeli companies
> listed solely on the TASE." *Id.* As Plaintiffs acknowledge, both Israeli case law and
> the Israel Securities Authority's public statements support the view that, as a matter
> of Israeli law, Israel voluntarily applies U.S. liability standards to dual-listed
> companies like Teva. Compl., ¶1084; *see In re VeriFone Holdings, Inc. Sec. Litig.*,
> No. 07-cv-06140 EMC, 2014 WL 12646027, at *1 (N.D. Cal. Feb. 18, 2014)
> (noting, in case involving securities fraud claims under Israeli law and a dual-listed
> company, that "the Israeli district court ruled twice that U.S. law, and not Israeli law,
> applies").

465.     During the Relevant Period, in violation of Section 10(b) of the Exchange Act and

Rule 10b-5, Defendants carried out a plan, scheme, and course of conduct using the

instrumentalities of interstate commerce and the mails, which was intended to and, throughout the

Relevant Period did: (a) artificially inflate and maintain the market price of Teva common stock; (b) deceive the investing public, including Plaintiffs, as alleged herein; (c) cause Plaintiffs to purchase Teva common stock at inflated prices in reliance on Defendants' false and misleading statements made knowingly or with deliberate recklessness by Defendants; and (d) cause them losses when the truth was revealed.

466.    During the Relevant Period, in violation of Section 20(a) of the Exchange Act, the Individual Defendants had control over Teva and made the material false and misleading statements and omissions on behalf of Teva within the meaning of Section 20(a) of the Exchange Act, causing damages to Plaintiffs. By virtue of their controlling shareholder status, executive positions, board membership, and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

467.    Alternatively, if this Court concludes that Israeli, not U.S., law applies to the claims arising from Plaintiffs' purchases of common shares on the TASE, the following provisions and causes of action apply to those claims:

   a.    Regulations 3-5 of the Securities Regulations (Periodic and Immediate Reports of Foreign Corporation), 2000 promulgated under the Securities Law – Teva breached its reporting obligations under the "foreign law" - namely, U.S. law -defined in § 1 of the Securities Law as "the law applying to a foreign corporation because its securities are listed for trade on a foreign stock exchange, including the rules of that foreign stock exchange."

Specifically, Teva failed to submit and publicize reports, notices, and other documents of the adverse information contained herein as required under U.S. law, in a timely fashion as required under U.S. law or earlier, on issues required under U.S. law. Teva thereby caused damage to Plaintiffs.

b.    § 36 of the Securities Law and Regulations 30, 36 of the Securities Regulations (Periodic and Immediate Statements), 1970 thereunder - Teva failed to submit immediate reports in a timely fashion as required under Regulation 30. According to Regulation 36(a): "An [immediate] report shall provide, with respect to any event or matter that deviates from the corporation's ordinary course of business, the details of [such an event's or matter's] nature, scope or potential result which will have or could have a significant effect on the corporation; the same details will be provided with respect to any event or matter that could significantly affect the price of the corporation's securities." Moreover, even if Teva may have delayed timely reporting pursuant to Regulation 36(b), once it became aware of rumors and other public information, it breached its obligation under Regulation 36(d) to submit an immediate report and refer therein to the correctness of the information that has already been made public. Teva thereby caused damage to Plaintiffs.

c.    §§ 31-32A, 34, 38B-38C of the Securities Law - Read together, these sections impose liability, *inter alia*, on a corporation, a director of a corporation, its general manager, and a controlling shareholder thereof with regard to a misleading item that was in a report, notice or document that the corporation filed pursuant to this Law - to anyone who sold or purchased securities in the course of trading on a stock exchange or over the counter, for damage caused to them by the inclusion of a misleading item in those disclosures. A "misleading item" is defined in § 1 of the Securities Law as "including anything that is likely to mislead a reasonable investor, and any matter the omission of which is likely to mislead a reasonable investor." Specifically, § 32A(c) denies the safe harbor protection for "forward looking information" under this Section from "a party that knew that the forward-looking information would not be realized." Section 32A(d) further excludes from the safe harbor's purview "facts, figures or other details in a prospectus, opinion, report, review or certificate, as applicable, which served as a basis for forward-looking information." Defendants are liable to Plaintiffs under these provisions.

d.    § 52K of the Securities Law - This general civil liability provision imposes liability on an issuer, the directors of the issuer, its general manager, and on a controlling shareholder of the issuer for any damage caused to a holder of the issuer's securities by virtue of the issuer's violation of the provisions of this Law or of regulations hereunder. Defendants are liable to Plaintiffs under this provision.

e.    §§ 35-36 of the Torts Ordinance [New Version] - These sections impose general liability in torts for negligence towards any person where a reasonable person in like circumstances should have foreseen that in the ordinary course of things the former person may be harmed by the latter person's conduct or omission. Defendants are liable for damage caused to Plaintiffs by the former's misrepresentations and omissions as detailed in the above paragraphs.

f.    § 63 of the Torts Ordinance [New Version] - This section imposes general liability in torts for breach of statutory duty on any person who failed to comply with a duty imposed on him according to any statute, excepting this Ordinance, where the statute, according to its correct construction, is meant for the protection or benefit of another person, the breach caused damage to that person of the kind or nature of damage meant by the statute, unless that statute was meant to exclude such remedy. Defendants are liable for damage caused to Plaintiffs by the former's failures to comply with their duties under the Securities Law as detailed in the above paragraphs.

## COUNT IV

### For Violation Of Sections 1-402(c) and 1-501(c) of the PSA
### (Against the Defendants)

468.    Plaintiffs incorporate each and every allegation above by reference as if fully set forth herein.

469.    The Defendants directly and/or indirectly, for the purpose of inducing the purchase of Teva securities by others, participated in the circulation and/or dissemination of misrepresentations and omissions of material facts to the effect that the price of the security would or was likely to rise.  During the Relevant Period, the Defendants sold or offered to sell Teva securities, or received consideration, directly or indirectly, from a person who sold or offered to sell Teva securities.

470.    Teva has conceded that "the factual center of this case  is  Pennsylvania[.]"  *See Galmi*, ECF No. 37-1, at 6. The false statements detailed above were prepared in Pennsylvania and Israel. *Id.*; Kim Declaration ¶5. Moreover, Teva's "sales, marketing, and finance executives with responsibility for U.S. generics pricing are based in Pennsylvania." *Id.*, ¶4.  In addition, Teva's

153

investor relations department and individuals responsible for drafting and preparing  Teva's public filings with the SEC are based at Teva USA's Pennsylvanian offices. *Id*.  Lastly, "[d]ocuments relating to the subject matter of this lawsuit—*e.g.*,  materials related to Teva USA, drug pricing, and U.S. competitors—are  located in Pennsylvania, or, if not there, in Israel." *Id.*, ¶7.

471.    The Defendants willfully participated in the acts and transactions that caused the circulation and/or dissemination of misrepresentations and omissions of material facts.

472.    The Defendants are liable for all materially false and misleading statements made during the Relevant Period, as alleged above.

473.    The Defendants acted with the requisite scienter in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness. The misrepresentations and omissions of material facts set forth herein were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

474.    Plaintiffs suffered damages as a result of the Defendants' wrongful conduct in that they purchased or otherwise acquired Teva securities at artificially inflated prices in reliance on the Defendants' untrue or misleading statements or omissions of material fact and/or the integrity of the market.

475.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Teva Securities during the Relevant Period.

## COUNT V

### For Violation of Sections 1-401 and 1-501(a)(ii) of the PSA
### (Against the Defendants)

476.    Plaintiffs incorporate each and every allegation above by reference as if fully set forth herein.

477.    Teva has conceded that "the factual center of this case is Pennsylvania[.]" *See Galmi*, ECF No. 37-1, at 6. The false statements detailed above were prepared in Pennsylvania and Israel. *Id.*; Kim Declaration ¶5. Moreover, Teva's "sales, marketing, and finance executives with responsibility for U.S. generics pricing are based in Pennsylvania." *Id.*, ¶4.  In addition, Teva's investor relations department and individuals responsible for drafting and preparing  Teva's public filings with the SEC are based at Teva USA's Pennsylvanian offices. *Id*.  Lastly, "[d]ocuments relating to the subject matter of this lawsuit—*e.g.*,  materials related to Teva USA, drug pricing, and U.S. competitors—are  located in Pennsylvania, or, if not there, in Israel." *Id.*, ¶7.

478.    The Defendants violated § 1-401 of the PSA in that they:

(a)    Employed devices, schemed, and artifices to defraud;

(b)    Made untrue statements of material fact or omitted to state materials facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Teva Securities during the Relevant Period.

479.    The Defendants acted with the requisite scienter in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness. The misrepresentations and omissions of material facts set forth herein were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

480.    Plaintiffs suffered damages as a result of the Defendants' wrongful conduct in that they purchased or otherwise acquired Teva Securities at artificially inflated prices in reliance on the Defendants' untrue or misleading statements or omissions of material fact and/or the integrity of the market.

481.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Teva Securities during the Relevant Period.

## COUNT VI
## For Fraud
## (Against the Defendants)

482.    Plaintiffs incorporate each and every allegation above by reference as if fully set forth herein.

483.    Plaintiffs bring this count under Pennsylvanian law, as Pennsylvania is the "factual center" of this Action. *See Galmi*, ECF No. 37-1, at 6. The false statements detailed above were prepared in Pennsylvania and Israel. *Id.*; Kim Declaration ¶5. Moreover, Teva's "sales, marketing, and finance executives with responsibility for U.S. generics pricing are based in Pennsylvania." *Id.*, ¶4.  In addition, Teva's investor relations department and individuals responsible for drafting and preparing  Teva's public filings with the SEC are based at Teva USA's Pennsylvanian offices. *Id.*  Lastly, "[d]ocuments relating to the subject matter of this lawsuit—*e.g.*,  materials related to Teva USA, drug pricing, and U.S. competitors—are  located in Pennsylvania, or, if not there, in Israel." *Id.*, ¶7.

484.    During the Relevant Period, the Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

485.    Defendants made these misrepresentations with the intent that Plaintiffs would rely upon them in deciding to purchase Teva Securities.

486.    Plaintiffs reasonably and justifiably relied upon the false and misleading statements specified above when purchasing Teva Securities at artificially inflated prices.

487.    Plaintiffs would not have purchased Teva Securities at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially and falsely inflated by the Defendants' misleading statements.

488.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Teva Securities during the Relevant Period.

## COUNT VII
### For Negligent Misrepresentation
### (Against the Defendants)

489.    Plaintiffs incorporate each and every allegation above by reference as if fully set forth herein.

490.    Plaintiffs bring this count under Pennsylvanian law, as Pennsylvania is the "factual center" of this Action. *See Galmi*, ECF No. 37-1, at 6. The false statements detailed above were prepared in Pennsylvania and Israel. *Id.*; Kim Declaration ¶5. Moreover, Teva's "sales, marketing, and finance executives with responsibility for U.S. generics pricing are based in Pennsylvania." *Id.*, ¶4.  In addition, Teva's investor relations department and individuals responsible for drafting and preparing  Teva's public filings with the SEC are based at Teva USA's Pennsylvanian offices. *Id.* Lastly, "[d]ocuments relating to the subject matter of this lawsuit—*e.g.*,  materials related to Teva USA, drug pricing, and U.S. competitors—are  located in Pennsylvania, or, if not there, in Israel." *Id.*, ¶7.

491.    During the Relevant Period, the Defendants made, disseminated or approved the misleading statements specified above, which they knew or should have known were misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

492.     Defendants made these misrepresentations with the intent that Plaintiffs would rely upon them in deciding to purchase Teva Securities.

493.     Plaintiffs reasonably and justifiably relied upon the false and misleading statements specified above when purchasing Teva Securities at artificially inflated prices.

494.     Plaintiffs would not have purchased Teva Securities at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially and, at minimum, negligently inflated by the Defendants' misleading statements.

495.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Teva Securities during the Relevant Period.

## XII.     INFLATED PROFIT ANALYSIS

496.     Teva did not disclose profits, revenues, or pricing for individual generic drugs, nor was that information otherwise public.  As alleged in the amended complaint filed in the Class Action, an independent investigation was undertaken in order to calculate and isolate the profit that Teva earned from its Price-Hike Strategy. This investigation comprised multiple distinct econometric analyses, including regression analyses, that ultimately took into account thousands of data points.

497.     The analysis screened Teva's entire generic drug portfolio during the relevant period to identify Wholesale Acquisition Cost ("WAC") increases of at least 50%. The data was accessed via private, subscription-only databases costing tens of thousands of dollars annually. Next, any price increases plausibly connected to supply shortages or other economic anomalies were removed from the set.

498.     To isolate Inflated Profit for each drug, the analysis first determined the drug's price per unit had Teva not made the increase. To do so, the drug's specific pricing history was analyzed using a regression analysis that determined the price through the relevant period had prevailing

drug-specific pricing trends continued. The analysis further took into account CPI inflation for prescription drugs and empirical measures of the trend in average pricing for prescription drugs over the past five years.

499.    Calculating Inflated Profit, *i.e.*, the difference between Teva's actual revenues (with the price increase) and the revenues that would have been earned at each drug's price without the increase, involved accounting on a month-by-month basis for (i) Teva's sales quantities; and (ii) the discounts and rebates, unique to each drug, that Teva would provide to customers, which varied over time.

500.    Sales volumes were derived by reference to figures reported in a subscription database. Through another regression analysis, it was confirmed that the price and volume for each drug exhibited no statistically meaningful relationship, meaning that as pricing changed, volume of sales did not change.

501.    Teva's discounts and rebates are unavailable by any means of which Plaintiffs are aware. Thus, the level of discounts and rebates was determined by analyzing, on a month-by-month basis over the relevant period, multiple data points from a number of subscription and other industry datasets that reflected average pricing and sales volume data. This analysis was unique for each drug and captured fluctuations over time.

## XIII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

502.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made.

503.    To the extent any of the untrue or misleading statements alleged herein can be construed as forward-looking, they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements; the generalized risk disclosures Teva or other Defendants made were not sufficient to shield Defendants from liability.

504.    To the extent the statutory safe harbor otherwise would apply, the Defendants are liable under the 34 Act for any untrue or misleading forward-looking statement complained of herein because the person who made each such statement knew that the statement was untrue or misleading when made, or because each such statement was approved by an executive officer who knew that the statement was untrue or misleading when made.

505.    Specifically as to the alleged false and misleading guidance issued on July 13, 2016, and January 6, 2017, that guidance incorporated an assumption grounded on historically-inaccurate data. Namely, the assumption was that pricing was declining at the same rate as it had during 2015 and the first half of 2016 because, as Olafsson puts it on Teva's July 13, 2016 Preliminary Outlook call, Teva was "assuming . . . [the] same pricing assumption as we have had for the first half of the year," because Teva "saw no change in the pricing. We saw a stable environment . . . from first quarter into second quarter." Teva's pricing erosion was not, however, "stable." Teva's Inflated Profits had declined by $10 million from Q1 2016 to Q2 2016, and had declined over $100 on YOY basis from Q1 2015 due to an increasingly adverse pricing environment. Moreover, because Teva had received the DOJ and State AG subpoenas, it would be unable to mitigate these declines, as it had in the past, by taking additional price increases.

## XIV.    JURY DEMAND

506.    Plaintiffs hereby demand a trial by jury.

XV.     **PRAYER FOR RELIEF**

507.    WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)     Awarding Plaintiffs damages, including interest;

(b)     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

(c)     Granting such other and further relief as the Court may deem just and proper.


Dated:   April 30, 2019                   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                          */s/ Erin Green Comite*
                                          Erin Green Comite
                                          Bar No. 420630
                                          Margaret B. Ferron
                                          Bar No. 431445
                                          156 South Main Street
                                          P.O. Box 192
                                          Colchester, CT 06415
                                          Phone:   860-537-5537
                                          Fax:     860-537-4432
                                          Email:   ecomite@scott-scott.com
                                                   mferron@scott-scott.com

                                          **POMERANTZ LLP**
                                          Jeremy A. Lieberman*
                                          Michael J. Wernke*
                                          J. Alexander Hood II*
                                          Jonathan D. Lindenfeld*
                                          600 Third Avenue, 20th Floor
                                          New York, New York 10016
                                          Telephone:  (212) 661-1100
                                          Facsimile:  (212) 661-8665
                                          Email:  jalieberman@pomlaw.com
                                                  mjwernke@pomlaw.com
                                                  ahood@pomlaw.com
                                                  jlindenfeld@pomlaw.com

                                          **POMERANTZ LLP**
                                          Patrick V. Dahlstrom*
                                          10 South La Salle Street, Suite 3505
                                          Chicago, Illinois 60603

Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*pro hac vice* applications forthcoming

*Attorneys for Plaintiffs*

**APPENDIX A**
**Teva WAC Increases**

Parallel Price Increases Indicated In **Orange**

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **April 4, 2014** | |
| Ketoconazole Tablets | 250% |
| Bumetanide Tablets | 249% |
| Cephalexin Oral Suspension | 111% |
| Nystatin Tablets | 110% |
| Ketoconazole Cream | 108% |
| Hydroxyzine Pamoate Capsules | 94% |
| Cyproheptadine HCL Tablets | 93% |
| Dicloxacillin Tablets (1st of 2) | 91% |
| Theophylline Anhydrous SR Tabs | 75% |
| Anagrelide HCL Capsules (1st of 2) | 58% |
| Estazolam Tablets (1st of 2) | 37% |
| **April 15, 2014** | |
| Baclofen Tablets | 381% |
| **July 1, 2014** | |
| Fluocinonide .05% Cream | 435% |
| Fluocinonide .05% Ointment | 415% |
| Fluocinonide .05% Gel | 255% |
| **August 28, 2014** | |
| Carbamazepine Tablets | 1543% |
| Carbamazepine Chewable Tablets | 270% |
| Enalapril Maleate Tablets (2nd of 2) | 230% |
| Clotrimazole Topical Solution (1st of 2) | 164% |
| Flutamide Capsules | 140% |
| Meperidine HCL Tablets | 110% |
| Penicillin V Potass. Tablets | 100% |
| Nefazodone Tablets (1 of 2) | 90% |
| Mexiletine Capsules | 90% |
| Cromolyn Sodium Inhalant (1st of 2) | 90% |
| Desmopressin Acetate Tablets | 75% |
| Fosinopril Tablets | 70% |
| Megestrol Acetate Tablets | 55% |
| Diclofenac Potass. Tablets (2nd of 2) | 50% |
| Cimetidine Tablets (2nd of 3) | 29% |
| Tolmetin Sodium Capsules (2nd of 3) | 25% |
| Loperamide HCL Capsules (1st of 2) | 22% |

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **July 3, 2013** | |
| Oxybutynin Chloride Tablets | 812% |
| Nadolol Tablets | 786% |
| Fluconazole Tablets | 218% |
| Methotrexate Sodium Tablets | 163% |
| Cimetidine Tablets (1st of 3) | 151% |
| Prazosin Capsules | 118% |
| Ranitidine HCL Tablets | 115% |
| **July 19, 2013** | |
| Enalapril Maleate Tablets (1st of 2) | 316% |
| **August 9, 2013** | |
| Doxazosin Mesylate Tablets | 305% |
| Etodolac Tablets | 282% |
| Pravastatin Sodium Tablets | 175% |
| Ketoprofen Capsules (1st of 3) | 168% |
| Etodolac SR Tablets | 96% |
| Tolmetin Sodium Capsules (1st of 3) | 91% |
| Clemastine Fumarate | 90% |
| Diltiazem HCL Tablets | 71% |
| Ketorolac Trometh. Tablets (1st of 2) | 34% |
| Diclofenac Potass. Tablets (1st of 2) | 22% |

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **January 28, 2015** | |
| Fluoxetine HCL Tablets | 608% |
| Propranolol Tablets | 447% |
| Glimepiride Tablets | 312% |
| Ciprofloxacin HCL Tablets | 194% |
| Penicillin v Potass. Oral Sol. (1st of 2) | 91% |
| Nortryptyline HCL Capsules | 91% |
| Estradiol Tablets | 90% |
| Ketoprofen Capsules (2nd of 3) | 90% |
| Danazol Capsules | 90% |
| Ketorolac Trometh. Tablets (2nd of 2) | 90% |
| Methyldopa Tablets | 90% |
| Diltiazem HCL Tablets | 90% |
| Carbidopa/ Levodopa Tablets | 50% |
| Griseofulvin Oral Suspension | 50% |
| **July 29, 2015** | |
| Fluoxetine HCL Oral Solution | 275% |
| Dipyridamole Tablets | 98% |
| Trazodone Tablets | 77% |
| Loperamide HCL Capsules (2nd of 2) | 68% |
| Clotrimazole Topical Solution (2nd of 2) | 65% |
| Cimetidine Tablets (3rd of 3) | 54% |
| Estazolam Tablets (2nd of 2) | 50% |

| Drug Name / Form | Wtd. Avg. Increase |
|---|---|
| **April 6, 2016** | |
| Anagrelide HCL Capsules (2nd of 2) | 27% |
| Penicillin v Potass. Oral Sol. (2nd of 2) | 26% |
| Nefazodone Tablets (2nd of 2) | 25% |
| Tolmetin Sodium Capsules (3rd of 3) | 25% |
| Cromolyn Sodium Inhalant (2nd of 2) | 24% |

## Collusive Drug Price Increases

### 2013 Collusive Drug Price Increases

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[5] |
|---|---|---|---|
| **Enalapril Maleate** (1st Increase) | Mylan<br>*Teva*<br>Wockhardt | July 2<br>*July 19*<br>August 1 | $25.15 (92%)<br>*$25.15 (341%)*<br>$21.38 (275%) |
| **Pravastatin Sodium** Zydus *Teva* Lupin (201%) | Glenmark<br>Apotex | May 16<br>May 31<br>June 14<br>*August 9*<br>August 28 | $75.51<br>$75.51<br>$64.73<br>*$64.73*<br>$64.80 |

### 2014 Collusive Drug Price Increases

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase) |
|---|---|---|---|
| **Cephalexin** | Lupin<br>*Teva* | Nov.  1,  2013<br>*April 4* | $41.00 (128%)<br>*$41.00 (128%)* |
| **Ketoconazole** Cream | *Teva*<br>Taro | *April 4*<br>April 18 | *$63.30 (110%)*<br>$63.30 (110%) |
| **Ketoconazole** Tablets | *Teva*<br>Taro | *April 4*<br>April 18 | *$221.55 (250%)*<br>$221.55 (250%) |
| **Nystatin** | *Teva*<br>Heritage | *April 4*<br>July 1 | *$100.30 (110%)*<br>$100.30 (110%) |
| **Theophylline SR** | *Teva*<br>Heritage | *April 4*<br>July 1 | *$54.53 (80%)*<br>$54.53 (80%) |
| **Baclofen** | Upsher-Smith<br>*Teva* | February 21<br>*April 15* | $29.93 (350%)<br>*$29.93 (350%)* |

[5] Because drugs are often available in multiple strengths and package sizes, "New WAC per Pkg." refers to the pricing for the most-common package size of the most-widely-used strength

**2014 Collusive Drug Price Increases (continued)**

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| **Fluocinonide** 5% Ointment | Taro *Teva* | June 3 *July 1* | $226.40 (483%) *$226.40 (483%)* |
| **Fluocinonide** 5% Cream | Taro *Teva* | June 3 *July 1* | $145.75 (524%) *$145.75 (524%)* |
| **Fluocinonide** 5% Gel | Taro *Teva* | June 3 *July 1* | $190.57 (255%) *$190.57 (255%)* |
| **Enalapril Maleate** (2nd Increase) | Mylan *Teva* Taro Wockhardt | April 17 *August 28* October 15 December 15 | $82.98 (230%) *$83.00 (230%)* $83.00 (230%) $70.53 (230%) |
| **Carbamazepine** Tablets | Taro Apotex *Teva* Torrent | June 3 July 11 *August 28* September 12 | $127.93 (2517%) $127.93 (1030%) *$127.93 (1538%)* $127.93 (2517%) |
| **Carbamazepine** Chewable Tablets | Taro *Teva* Torrent | June 3 *August 28* September 12 | $52.68 (290%) *$52.68 (270%)* $52.68 (778%) |
| **Diclofenac Potassium** | *Teva* Sandoz Mylan | *August 28* October 10 Mar. 4, 2015 | *$104.58 (50%)* $104.58 (82%) $104.58 (50%) |

**2015 Collusive Drug Price Increases**

| Drug / Form | Manufacturers Raising Price | Dates of Increases | New WAC per Pkg. (% increase)[1] |
|---|---|---|---|
| **Propranolol** | *Teva* Actavis Mylan Heritage | *January 28* February 17 July 10 August 17 | *$34.40 (632%)* $34.39 (632%) $35.67 (659%) $34.39 (632%) |
| **Estradiol** Actavis | *Teva* | *January 28* May 21 | *$30.74 (90%)* $30.74 (109%) |

A-3

**Trade Shows and Conferences**

### 2013 Trade Shows and Conferences

| Date | Organization[3] / Event | Teva Attendees |
|---|---|---|
| February 20-22 | GPhA Annual Meeting | Oberman<br>Olafsson (with Actavis) |
| April 20-23 | NACDS Annual Meeting | Oberman<br>Cavanaugh |
| August 10-13 | NACDS Total Store Expo | Cavanaugh<br>Galownia<br>Oberman |
| December 3 | NACDS Annual Dinner | Cavanaugh |

### 2014 Trade Shows and Conferences

| Date | Organization[6] / Event | Teva Attendees |
|---|---|---|
| February 19-21 | GPhA Annual Meeting | Oberman |
| February 26 | GPhA BOD Quarterly Meeting | Oberman |
| April 1 | HDMA Roundtable Fundraiser | Cavanaugh |
| April 26-29 | NACDS Annual Meeting | Cavanaugh<br>Oberman |
| June 1-4 | HDMA Leadership Conference | Patel |
| August 23-26 | NACDS Total Store Expo | Cavanaugh<br>Galownia<br>Patel |
| Sept. 27 - Oct. 1 | HDMA Annual Board Membership Meeting | Cavanaugh<br>Baeder |
| November 19-21 | IGPA Annual Conference | Oberman |
| December 3 | NACDS Annual Dinner | Cavanaugh |

---

[6] GPhA = Generic Pharmaceutical Association;
HDMA = Healthcare Distribution Management Alliance;
IGPA = International Generic Pharmaceutical Alliance;
NACDS = National Association of Chain Drug Stores.

**2015 Trade Shows and Conferences**

| Date | Organization[1] / Event | Teva Attendees |
|------|------------------------|----------------|
| February 9-11 | GPhA Annual Meeting | Olafsson |
| June 7-10 | HDMA Leadership Conference | Patel |